# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.: <u>1:16-cv- 02981</u>

TECH INSTRUMENTATION, INC., a Colorado corporation, individually and on behalf of all others similarly situated,

Plaintiff,

v.

EURTON ELECTRIC COMPANY, INC., a California corporation

Defendant.

## MOTION FOR CLASS CERTIFICATION

## I.      INTRODUCTION

This case presents a textbook class action. Defendant Eurton Electric Company, Inc. ("Defendant" or "Eurton") sent the same unsolicited faxes to Plaintiff Tech Instrumentation, Inc. ("Plaintiff" or "TII") and over 1,000 other businesses—all in violation of the Junk Fax Prevention Act ("JFPA") which is part of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* and its implementing regulations, 47 C.F.R. § 64.1200, *et seq.* ("TCPA"). Common issues abound for which this case will provide common answers, including key questions upon which each Class Member's claims either succeed or fail, including: (1) whether Eurton's faxes were advertisements, (2) whether Eurton's opt-out language complied with the JFPA, and (3) whether Eurton acted willfully and knowingly such that statutory damages should be trebled.

Further, and despite carrying the burden of showing consent, Eurton has no records whatsoever evidencing that any member of the proposed class gave express permission or invitation to receive the faxes prior to Eurton's decision to send them. Moreover, not only has

Eurton failed to keep records of consent, it deleted all records sent to it from WestFax, the vendor Eurton hired to send the blast faxes—including WestFax's fax reports showing which transmissions were successful, failed, busy, etc. Given the absence of any evidence as to consent, Eurton cannot show that any faxes to any class member were solicited under the JFPA.

As such, and as explained below, Eurton has violated the JFPA uniformly with respect to the entire Class. This Court should therefore grant certification and provide TII with a deadline for proposing a reasonable Notice Plan.

## II.    BACKGROUND FACTS

### *Eurton Electric engaged in blast faxing to notify actual and potential customers of its products and promotions*

Eurton Electric is a California-based electric motor supply and repair company. *See* Rule 30(b)(6) Deposition of Eurton Electric ("Eurton Depo. Tr.") 11:4-11, excerpts of which are attached hereto as Ex. A. Its president is John Buchanan. (Eurton Depo. Tr. 10:14-15.)

In an effort to boost Eurton's sales and attract new customers, Eurton sent faxes to thousands of businesses advertising its tools and other equipment. Eurton didn't send the faxes itself; it hired a blast fax company in Colorado known as WestFax to perform the actual faxing. (Eurton Depo. Tr. 24:22-25 - 25:1-5.) That said, Eurton knew about the faxes and controlled their content, including the opt-out language that was used, which stated:

> PLEASE REMOVE: We at Eurton Electric try our best to contact all customers on our list, but understand mistakes occur, or unauthorized permission may have been given. If you have no need for our repair or parts service, and which to be removed from future contacts, please fax, e-mail, or phone (below) and let us know the number you wish removed.

*See* "Sample Faxes," Group Ex. 3 to Eurton Depo, attached hereto as Ex. B.

The faxes were sent to various industry-specific lists. (Eurton Depo. Tr. 126:23-25 - 127:1-25.) No matter the list, however, the faxes contained identical opt out language. (Eurton Depo. Tr. 136:15-25.)[1]

Eurton employed a common, three-step method for obtaining consent in this case. *See* Amd. Resp. to RTP No. 8, attached hereto as Ex. C. Eurton's practice was to first locate businesses online that might use motors in their operations and then, second, cold-call those businesses and ask whether the business would be interested in receiving more information. (Eurton Depo. Tr. 67:1-25 - 69:1-19.) The company policy was to then ask the businesses if they agreed to receive more information, including by fax. (Eurton Depo. Tr. 67:5-10.) This was an admittedly imperfect system, so it was also a matter of company policy that Eurton would remove anyone when "mistakes" occurred. (Eurton Depo. Tr. 56:4-25 - 57:1-5; 77:9-10.) Indeed, the "Please Remove" language expressly concedes that, "mistakes occur."

As explained below, in addition to failing to keep other evidence, Eurton didn't record any conversations where consent was supposedly obtained. (Eurton Depo. Tr. 57:17-20.) Hence, Eurton has no evidence that TII (or anyone else for that matter) actually gave prior express permission or invitation to be faxed. (Eurton Depo. Tr. 65:20-25 - 66:1-10.) And TII never had any sales with Eurton. (*See* Amd. Resp. to RTP No. 1, attached hereto as Ex. C.) As Eurton's corporate designee testified:

> Q. But we have already established that you have no evidence that any fax sent to my client was solicited; correct?
>
> A. No.

---

[1] Despite this, and notwithstanding the fact that each of Eurton's faxes are likely advertisements, out of an abundance of caution the Class is in this case is limited to the same businesses that were on the "Tools List," that TII was on, and therefore were sent the same faxes on the same dates as TII was sent.

Q. You do have evidence?

A. I'm sorry. Evidence, no. No evidence. You're right.

(Eurton Depo. Tr. 65:18-25; 56:4-17.) Indeed, Eurton lacks any other written evidence of

consent for anyone:

Q.  [D]o you now make sure you have a record of someone giving consent before
they go on the fax list or do you still sort of put them on and take them off?

...

THE WITNESS: Yes. I wasn't aware that I had to until this, and now we are
doing it, yeah.

(Eurton Depo. Tr. 139:5-15; *see also* 65:20-25 - 66:1-10.) Indeed, rather than keep any records

of consent, Eurton simply presumes it obtained consent because of its supposed policy to call

ahead and ask for such permission. (Eurton Depo. Tr. 66:12-25 - 67:1-25; 76:6-10.)

Plaintiff TII is just one of the thousands of businesses that received several faxes from

Eurton. TII appeared on what Eurton internally called the "Tools List." (Eurton depo. Tr. 134:13-

19.) According to records received from WestFax in response to a subpoena, in 2016 alone TII

sent faxes to the Tools List on the following dates (and to the following number of recipients)

within the last four years:

| Date (Invoice Date) | Quantity |
|---|---|
| 12/16/13 (12/21/13) | 520 |
| 1/3/14 (1/4/14) | 526 |
| 1/23/14 (1/25/14) | 1,055 (possible 2 page fax) |
| 4/11/14 (4/12/14) | 518 |
| 4/16/14 (4/19/14) | 494 |
| 5/15/14 (5/17/14) | 1,331 |
| 6/25/14 (6/28/14) | 767 |
| 5/1/15 (5/2/15) | 770 |
| 5/12/16 (5/14/16) | 1,621 |
| 5/23/16 (5/28/16) | 1,592 |
| 6/6/16 (6/11/16) | 3,079 (possible 2 page fax) |
| 6/16/16 (6/18/16) | 1,524 |

| 7/15/16 (7/16/16) | 1,499 |
|---|---|
| 8/25/16 (8/27/16) | 1,474 |

At no time did TII ever provide express permission to Eurton to send it faxes.

***Eurton failed to keep accurate records and has destroyed key evidence that could be used to easily identify Class Members.***

Eurton, specifically its company President, John Buchanan, deleted relevant evidence (presumptively before the case began). That is, Eurton received regular "fax reports" from WestFax that included information regarding the faxes that were sent, the date sent, and the successful transmissions. (Eurton Depo. Tr. 28:23-25 - 29:1-8; 32:23-25 - 33:1-24.) Mr. Buchanan deleted these reports as part of his "procedure." (Eurton Depo. Tr. 29:5-24; 38:1-3.) He also deleted his e-mails routinely. (Eurton Depo. Tr. 57:21-24.) WestFax does not have copies of these reports. (*See* "WestFax Subpoena Response," Ex. 2 to Eurton Depo, attached hereto as Ex. D.) Further, Mr. Buchanan obtained a new computer after the lawsuit was filed though he believes his files were transferred. (Eurton Depo. Tr. 106:23-25 - 108:1-17.)

In addition to this, Buchanan never saved prior versions of the company's Fax List (explained below) whenever he would edit it by adding new fax numbers and/or through the deletion of older numbers. (Eurton Depo. Tr. 35:1-23); *see also* Amd. Resp. to RTP No. 3, attached hereto as Ex. C.

Third, Eurton failed to maintain *any* records of prior express permission or invitation from its fax recipients. (Eurton Depo. Tr. 139:5-15; *see also* 65:20-25 - 66:1-10.)

***Nevertheless, sufficient data remains from which Class Members can be objectively identified***

While it only produced the latest iteration of its "Fax list" in discovery, Eurton has actually has <u>three</u> different data sets that can be used to locate Class members. First, Eurton has an "accounting database system," that includes a master list of persons with whom it has

transacted business. (Eurton Depo. Tr. 102:12-13.) This list contains not only fax numbers, but also names, addresses, and sales. (Eurton Depo. Tr. 102:5-11.) The accounting database system is incomplete, however, because there are several entities with whom Eurton has transacted business with once or twice that don't make it into the accounting database system.

Rather, customers and potential customers that haven't been entered yet into the accounting database system (and many who have been) are tracked on a second list, referred to as the potential customer/actual customer spreadsheet. (Eurton Depo. Tr. 102:14-18.) This spreadsheet captures both potential customers as well as actual customers (both those who've only had minimal sales and haven't been transferred yet into the accounting database system as well as those who've transacted substantial business with Eurton).

The third data set is Eurton's "Fax list"—the spreadsheet produced in discovery of the persons Eurton has faxed. This list consists only of fax numbers but represents a significant portion of the Class in this case. Indeed, everyone on the list received the same faxes after supposedly providing permission or invitation to be called in the same way.

Eurton, however, may claim that one cannot tell from the Fax List which numbers belong to Class Members. First, Eurton may claim that the list is too broad because it includes persons who may have given permission to be called or other persons who have established business relationships ("EBRs") with Eurton. Second, Eurton could assert that the list is under-inclusive because it doesn't cover individuals who were at one point on the fax list but were subsequently deleted from the list upon asking to no longer receive faxes.

Taking this final point first, determining which entities were on the fax list but then were subsequently deleted poses no problem. This is because when Eurton would remove a fax number from the fax list that would not "delete the entry in the database for that company...."

Rather, "They're just no longer on the fax list." (Eurton Depo. Tr. 95:4-8; 113:10-17.) As such, a comparison can be done between the fax list and both the accounting database system and the potential customer/actual customer spreadsheet and determine which entities have been removed from the fax list, albeit without perfect accuracy. (Eurton Depo. Tr. 95:13-18.)

Nor is the list overbroad. Eurton claims that the term "solicited" refers to any person with whom it has or may potentially conduct business. Its designee testified as follows:

> Q. What is the definition of "solicited"?
>
> A. You have to look it up, but I have read it. And if we don't have it here in front of us, I don't think I should—we should review it in answer because solicited is with people that have given permission, do business with, and potentially can do business with, amongst other things. And by that definition, all these are solicited faxes.

(Eurton Depo. Tr. 55:12-22.) Under the TCPA:

> The term *established business relationship* for purposes of paragraph (a)(4) of this section on the sending of facsimile advertisements means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a business or residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the business or residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party.

47 C.F.R. 64.1200(f)(6). Meanwhile:

> The term *unsolicited advertisement* means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise.

47 C.F.R. 64.1200(f)(15).

Hence, "Solicited" within the context of the JFPA refers to a fax recipient's prior express permission or invitation to receive faxes. It doesn't automatically include persons with whom the sender of a fax has an EBR. Rather, a sender can have an EBR with a recipient and yet the fax

itself can still violate the JFPA if the fax number wasn't obtained through appropriate channels and if the faxes fail to include the statutorily-required opt-out language (which the faxes here plainly lack). Further, Eurton testified that, at least with respect to its more regular customers (those whose information has been entered on the accounting database system), it would be able to review its data to determine the entities with which it has transacted business. (Eurton Depo. Tr. 103:11-25 - 104:1-9.) Eurton claims this would be a "tedious" process, however, that could take "probably a minute a person" for an initial screen. (Eurton Depo. Tr. 104:9; 119:1-16.) Ultimately, there may be a small group that Eurton is unsure whether it has done business with but could verify based on its records. (*Id.*) As such, the fact is that the inclusion of businesses with which Eurton has had sales doesn't render the data insufficient.

With respect to whether Eurton actually obtained any recipient's prior express permission or invitation, as explained above the record shows that Eurton employed a common practice or policy that involved researching numbers online, cold-calling such businesses, and asking them orally if they wanted more information sent or faxed to them. Eurton hasn't produced any evidence that any person provided prior express permission or invitation. Given the absence of any proof that anyone actually provided such express permission or invitation to receive Eurton's faxes, Eurton cannot credibly claim that the data is insufficient based on speculation.

In the end, Eurton blasted out faxes to thousands of recipients without any proof that anyone ever gave prior express invitation or permission. As such, and as set forth more fully below, the record firmly supports certification.

## III.    ARGUMENT

Class certification is appropriate where the class is ascertainable and where the record shows that all of the enumerated requirements of Rule 23(a) and at least one section of Rule

23(b)(3) can be satisfied. As explained below, that is precisely the case here, and certification should be granted.

> ### A.   The Class is ascertainable—Class members can be identified through reference to objective criteria, including a combination of Eurton's records and Class member declarations and phone records.

First, the existence of an ascertainable class is an implied prerequisite to class certification under Rule 23. *Edwards v. Zenimax Media Inc.*, No. 12-CV-00411-WYD-KLM, 2012 WL 4378219, at *4 (D. Colo. Sept. 25, 2012). A class is ascertainable if it is "administratively feasible for the court to determine whether a particular individual is a class member." *Id.* (citation omitted.) As such, "it is not fatal for class definition purposes if a court must inquire into individual records, so long as 'the inquiry is not so daunting as to make the class definition insufficient.'" *Agne v. Papa John's Int'l*, 286 F.R.D. 559, 566 (W.D. Wash. 2012) (quoting *Herkert v. MRC Receivables Corp.*, 254 F.R.D. 344, 348 (N.D. Ill. 2008)); *see also Rhodes v. Cracker Barrel Old Country Store, Inc.*, 213 F.R.D. 619, 674 (N.D. Ga. 2003) ("The class simply must meet a minimum standard of definiteness which will allow the trial court to determine membership in the proposed class.") (quotations omitted.)

Indeed, "a court need not ascertain 'absent class members' actual identities ... before a class can be certified... rather, it is enough that the class be ascertain*able*'... with class members to be identified during a claims administration process if the class prevails.'" *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 245 (N.D. Ill. 2014) (quoting *Boundas v. Abercrombie & Fitch Stores, Inc.,* 280 F.R.D. 408, 417 (N.D. Ill. 2012)). Rather, if the court "can ascertain the members of the class by reference to objective criteria, then the class is adequately defined." *Edwards*, 2012 WL 4378219, at *4; *see* 5 James Wm. Moore et al., Moore's Federal Practice*, ¶ 23.21[1] (3d ed. 2001) ("The identity of class members must be

ascertainable by reference to objective criteria."); *see also G.M. Sign, Inc. v. Finish Thompson, Inc.*, No. 07 C 5953, 2009 WL 2581324, at *4 (N.D. Ill. Aug. 20, 2009) (finding TCPA class sufficiently identifiable because "[plaintiff] may use the log and fax numbers to 'work backwards' to locate and identify the exact entities to whom the fax was sent"); *CE Design Ltd. v. Cy's Crabhouse N., Inc.*, 259 F.R.D. 135, 141 (N.D. Ill. 2009) (finding class sufficiently identifiable in a TCPA fax case through fax numbers on transmission logs).

Conversely, a class definition that requires the assessment of subjective criteria, like the class members' states of mind, will not be certified. *Lau v. Arrow Fin. Servs., LLC*, 245 F.R.D. 620, 624 (N.D. Ill. 2007); *cf DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (refusing to certify class of all "residents of this State active in the 'peace movement'").

With these principles in mind, the proposed Class is ascertainable. That is, TII seeks to certify a Class that consists of the following people:

> All persons in the United States who, from December 16, 2013 through the date notice is sent to the Class, received one or more faxes sent to Eurton's Tools List, where prior express permission or invitation to send the faxes was supposedly obtained by Eurton through its three-step procedure.

Class membership is based on objective criteria. Whether someone is in the United States and received a fax during the relevant time period are all wholly objective inquiries—none has a subjective component. Likewise, whether a phone number appeared on Eurton's Tool List is neither subjective nor difficult to determine. As explained above, Eurton's designee admitted during his deposition that the Tool List could be compared to Eurton's accounting database to determine which numbers have been removed from the Tool List. (Eurton Depo. Tr. 95:13-18.)

Finally, Eurton claims that it applied its supposed three-part procedure for obtaining prior express invitation or permission with respect to everyone in the Class. (Amd. Resp. RTP No. 8, Ex. C.) Indeed, Eurton eschewed keeping actual records of prior express permission in favor of

simply presuming that if a number appeared on the fax list, it would've only been placed there had express permission or invitation been provided. Because Eurton applied this process uniformly, determining which consumers supposedly provided permission in this manner is straightforward—all of them.

As explained above, Eurton has a fax list (the "Tools List") that corresponds to business names and addresses. As such, most of the Class is identifiable. Likewise, Eurton can review its other two lists, the accounting database and the prospective/actual customer list to determine whether any companies used to be on the Tools List but have since been removed. Following a search for updated addresses, notice of these proceedings could be mailed to most of the Class.

To the extent there remains any doubt, Class Members can provide records, including affidavits and documents including phone bills and copies of the faxes themselves, to establish class membership. Indeed, "'It is enough that the class be ascertain*able*' with class members to be identified during a claims administration process if the class prevails." *Birchmeier*, 302 F.R.D. at 245 (*citing Boundas v. Abercrombie & Fitch Stores, Inc.,* 280 F.R.D. 408, 417 (N.D. Ill. 2012) ("a court need not ascertain "absent class members' actual identities ... before a class can be certified.") Documentary evidence, together with sworn declarations from class members, can be used to show class membership. *Birchmeier*, 302 F.R.D. 240, 249–50 (N.D. Ill. 2014).[2]

---

[2] Importantly, "a class is not rendered unascertainable merely because an analysis of data is necessary to determine class membership. *See Dunnigan v. Metro. Life Ins. Co.,* 214 F.R.D. 125, 136 (S.D.N.Y. 2003) ("[T]he class can be identified through an examination of the individual files of each of the participants. The fact that this manual process may be slow and burdensome cannot defeat the ascertainability requirement."); *In re TFT–LCD (Flat Panel) Antitrust Litig.,* 267 F.R.D. 583, 592 (N.D. Cal. 2010).

As a final point, Eurton should not be permitted to rely in any way on its own failure to maintain adequate records as a basis for denying certification, particularly on ascertainability grounds. As *Birchmeier* explains:

> In other words, defendants are essentially arguing that the contours of the class should be defined by defendants' own recordkeeping. This would result in an artificial class definition that would leave out individuals who actually received the calls in question—an unquestionably objective criterion—and who possess a record that is at least circumstantial evidence of class membership, a picture they can complete with their own sworn statements. Doing this—or declining to certify a class altogether, as defendants propose—would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct. The Court does not agree that the classes should be limited in the way defendants propose.

*Birchmeier*, 302 F.R.D. at 250. Indeed:

> Refusing to certify on this basis effectively immunizes defendants from liability because they chose not to maintain records of the relevant transactions. See *Daniels v. Hollister Co.,* 440 N.J.Super. 359, 113 A.3d 796, 801 (N.J.App.2015) ("Ascertainability ... is particularly misguided when applied to a case where any difficulties encountered in identifying class members are a consequence of a defendant's own acts or omissions.... Allowing a defendant to escape responsibility for its alleged wrongdoing by dint of its particular recordkeeping policies ... is not in harmony with the principles governing class actions.")

*Mullins v. Direct Digital, LLC*, 795 F.3d 654, 668 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 1161, 194 L. Ed. 2d 175 (2016); *see also Dr. Robert L. Meinders D.C., Ltd v. Emery Wilson Corp.*, No. 14-CV-596-SMY-SCW, 2016 WL 3402621, at *6 (S.D. Ill. June 21, 2016) ("Sterling also contends that there is no way to determine consent due to lack of record keeping. However, Sterling may not rely on its own failure to obtain and retain records of who consented to receiving fax advertisements in order to defeat class certification in this matter.")

In short, class membership is objectively ascertainable.

**B.    The Class meets each of the requirements of Rule 23(a).**

Additionally, the Class is numerous, and its members share common issues. Further, TII has typical claims, and it, along with its counsel, will adequately represent the Class.

### 1.      The Class consists of thousands of businesses.

The proposed Class is sufficiently numerous as well so as to satisfy Federal Rule

23(a)(1). Numerosity is satisfied where "the class is so numerous that joinder of all members is

impracticable." Fed. R. Civ. P. 23(a)(1); *Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 549

(N.D. Cal. 2007) (explaining that, in general, numerosity is satisfied when the class comprises

forty or more members); *Schwartz v. Celestial Seasonings, Inc.,* 178 F.R.D. 545, 550 (D. Colo.

1998). A proponent of certification need not identify the exact number of class members to

satisfy numerosity; rather, the moving party must "produce some evidence or otherwise establish

by reasonable estimate the number of class members who may be involved." *Rex v. Owens*, 585

F.2d 432, 436 (10th Cir. 1978)*; see* Newberg on Class Actions § 3:5, 243-46 ("Class actions

under the amended Rule 23 have frequently involved classes numbering in the hundreds, or

thousands . . . In such cases, the impracticability of bringing all class members before the court

has been obvious, and the Rule 23(a)(1) requirement has been easily met.")

Generally, forty (40) or more members suffices, *Celano v. Marriott Int'l Inc.*, 242 F.R.D.

544, 549 (N.D. Cal. 2007), and classes that number in the thousands "clearly" satisfy the

numerosity requirement. *See, e.g., Heastie v. Cmty. Bank of Greater Peoria*, 125 F.R.D. 669, 674

(N.D. Ill. 1989); *Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 646-47 (W.D. Wash. 2007)

(finding numerosity requirement satisfied in TCPA junk fax case involving the transmission of

3,000 unsolicited faxes). Precision isn't required, nor is hard data. *See, e.g.*, *Neiberger v.*

*Hawkins*, 208 F.R.D. 301, 313 (D. Colo. 2002) (court may use common sense when determining

whether joinder is impractical.)

Applied here, the Class consists of well over 1,000 fax recipients. Eurton sent faxes

repeatedly to its "Tools List" and, as explained below, doesn't have any record of consent with

13

respect to anyone. Eurton is able to determine which businesses it had sales with yet to date

hasn't shown that any of the companies on its fax list had EBRs and agreed to receive faxes.

Rather, Eurton employed its "we make mistakes" approach across the entire Class.[3] As such,

common sense dictates that even subtracting for any specific instances of prior express

permission or invitation Eurton may manage to show such that some faxes were solicited, or any

instances where the EBR exception may somehow apply, there are still over 40 class members so

as to render joinder impracticable in satisfaction of Rule 23(a)(1).

        **2.**      **Class members share common issues that drive the resolution of the claims.**

Next, common issues abound in satisfaction of Rule 23(a)(2). These include whether the

faxes were advertisements, who sent the faxes, whether the opt-out notice complied with the

TCPA and whether Eurton acted willfully. All are common issues capable of class wide

resolution. Commonality, requires that "there are questions of law or fact common to the class."

Fed. R. Civ. P. 23(a)(2). That is, the claims must "depend upon a common contention . . .

capable of class-wide resolution—which means that determination of its truth or falsity will

resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*

*Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). Under commonality's "permissive" standard,

"'factual differences in the claims of the class members should not result in a denial of class

certification where common questions of law exist.'" *Joseph v. Gen. Motors Corp.*, 109 F.R.D.

635, 640 (D. Colo. 1986) (*quoting Milonas v. Williams,* 691 F.2d 931, 938 (10th Cir. 1982), *cert.*

*denied,* 460 U.S. 1069 (1983)); *Parra v. Bashas', Inc.*, 536 F.3d 975, 978 (9th Cir. 2008)

---

[3] Indeed, the opt-out language on the faxes admits this approach. It relevant part, the deficient opt-out language states "We at Eurton Electric try our best to contact all customers on our list, but understand mistakes occur . . ."

("[w]here the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists.")

As the Supreme Court explained in *Dukes*, "[w]hat matters to class certification. . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. *Dukes*, 131 S. Ct. at 2551 (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131-132 (2009)). Commonality requires that only a single issue be common to the class. *Colorado Cross-Disability Coal. v. Abercrombie & Fitch Co.*, No. 09-CV-02757-WYD-KMT, 2012 WL 1378531, at *3 (D. Colo. Apr. 20, 2012); *Dukes*, 131 S.Ct. at 2545, 2556 ("[E]ven a single common question will do."); *In re First Alliance Mortg. Co.*, 471 F.3d 977, 990-91 (9th Cir. 2006) ("Rule 23(a)(2) commonality may be met by a single issue of law or fact."). Identical issues aren't required--rather, the common issues must be susceptible to generalized, as opposed to specific, proofs. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

As explained below, several common issues are present for which the litigation will produce common *answers* across the entire class in satisfaction of the commonality here, including whether the faxes were advertisements, who sent them, whether the opt out language was sufficient and whether Eurton acted willfully.

> **a.  Whether the faxes were advertisements is common among all Class members.**

The first common factual issue asks whether the faxes are advertisements. Under the TCPA, "the term 'unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47

U.S.C.A. § 227(a)(5); *see APB Assocs., Inc. v. Bronco's Saloon, Inc.*, 315 F.R.D. 200, 214 (E.D. Mich. 2016) ("The class members in each case are alleged to have received the very same fax advertisement. As such, with respect to each of these three cases, there are multiple common legal questions, such as: 1) whether the one-page fax in each case constitutes an "advertisement" under the TCPA....")).

In this case, every member of the Class received the same faxes. Numbers that may have appeared on Eurton's other fax lists, apart from the "Tool List" are excluded. Consequently, there are no differences between the faxes with respect to their content, which a hearing on the merits will show plainly advertised the commercial availability or quality of Eurton's products and services. Because the answer is the same for everyone and will depend on common proof, individual trials on this issue would be inappropriate, inefficient, and would pose a risk of inconsistent outcomes. This issue alone satisfies the requirement of commonality.

> **b.      Whether WestFax sent each of the faxes is the same for every Class member.**

A second common issue asks whether WestFax, as opposed to some other entity, sent the faxes. It is undisputed that Eurton retained WestFax, and no other vendors, to send faxes on its behalf. In its response to Request for Admission No. 4, Eurton had indicated that it could not determine whether WestFax had sent the faxes—leaving unclear whether this meant that Eurton had hired other entities to send faxes, and thus couldn't determine which entity sent the faxes to TII, or whether Eurton was instead answering that it only hired WestFax, and thus one could presume that WestFax sent the faxes to TII, but that Eurton couldn't rule out the possibility of WestFax having subcontracted out the faxing to some other fax blaster. (*See* Responses to Request for Admission, attached hereto as Ex. E.) As set forth in Section II, above, counsel for Eurton explained at the Rule 30(b)(6) deposition that:

> We told WestFax send to these particular clients. Did WestFax—were they the one that actually did it? I don't know. But we do know it did get to your client and we admit it got to your client. We did cause them to do it. But that part where it says "you caused WestFax," yes. But did WestFax send the fax? I don't know if they did or a third party....WestFax is the one that's going to have to say yea, that's our number and we're the one that did it. That's all.

(Eurton Depo. Tr. 88:7-20.) As such, which entity sent the faxes to the numbers on the Tools List—WestFax or some other third party—also presents a common issue of fact that should be resolved in a single proceeding. Hundreds of individual lawsuits would again be a waste of judicial resources and could result in consistent rulings. As the issue of which entity actually sent the faxes will be resolved based on common evidence, the issue satisfies Rule 23(a)(2)'s commonality requirement as well.

### c.     Whether Eurton's opt-out notice complied with the JFPA is a common issue for every class member.

A third issue asks whether Eurton included the statutorily required opt-out notice in its faxes. Under the TCPA, all unsolicited faxes must contain "a notice that informs the recipient of the ability and means to avoid future unsolicited advertisements." To comply, a notice must:

> [S]tate[] that the recipient may make a request to the sender of the advertisement not to send any future advertisements to a telephone facsimile machine or machines and that failure to comply, within 30 days, with such a request meeting the requirements under paragraph (a)(4)(v) of this section is unlawful...

47 C.F.R. § 64.1200(a)(4)(iii)(B). Notwithstanding Eurton's failure to include an opt out notice that makes any mention of the fact that a failure to comply within 30 days is unlawful, Eurton's designee insisted that the company complied with the TCPA because, supposedly, "[O]ur opt-out says immediately, so we're actually better than their notice." (Eurton Depo. Tr. 47:14-25 - 48:1-8.) Eurton's designee, however, couldn't identify anywhere on the faxes where consumers were told that their opt-out requests would be honored, let alone immediately. (Eurton Depo. Tr. 64:15-23.) ("Q. Does it say anywhere in this language that someone will be removed

immediately? A. It does not. I see that.") This is because notwithstanding Eurton's designee's incorrect reading of the opt-out language, it was wholly silent with respect to any "immediate" honoring of an opt out request. As such, while Eurton may do its best to deny it, a hearing on the merits will demonstrate that Eurton's opt-out language wasn't sufficient with respect to anyone, presenting yet another common issue that meets Rule 23(a)(2).

> **d.    Whether Eurton acted willfully is also the same for each member of the class.**

The TCPA sets statutory damages in the amount of $500 per violation with an allowance for trebling for willful violations. *See* 47 U.S.C. § 227(b)(3)(A-C); *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1318 (S.D. Fla. 2012) ("The TCPA is essentially a strict liability statute" that "does not require any intent for liability except when awarding treble damages.") (*quoting Alea London Ltd. v. Am. Home Servs., Inc.,* 638 F.3d 768, 776 (11th Cir. 2011)).

Given that Eurton engaged in a common course of conduct and sent the same fax to everyone, whether its violations of the JFPA were committed knowingly or willfully will be the same for every Class member. *See, e.g.*, *Compressor Eng'g Corp. v. Manufacturers Fin. Corp.*, No. 09-14444, 2016 WL 1394649, at *13 (E.D. Mich. Apr. 7, 2016) (explaining that commonality was met where question as to "whether Defendants' actions were "willful" or "knowing" under the TCPA, thereby authorizing treble damages...will have common answers.") There is no evidence of record to suggest that Eurton single anyone out for special treatment. Rather, Eurton appears to have simply ignored the JFPA's requirements as to everyone. As such, a factfinder will either conclude that Eurton's actions were willful and knowing with respect to all of the class members or as to none of them, thereby presenting another common issue.

In sum, several common issues of law and fact are present in this case from which the litigation will generate common answers as to everyone. Rule 23(a)(2) is therefore met as well.

**3.** **Typicality is met as well—like every other member of the Class, TII received Eurton's faxes, never did business with Eurton, and Eurton has no record of any recipient providing prior express permission or invitation to receive faxes.**

TII also satisfies Rule 23(a)(3)'s requirement of typicality. "Typicality insures that the class representative's claims resemble the class's claims to an extent that adequate representation can be expected." *Colo. Cross-Disability Coal.*, 2012 WL 1378531, at *11-12. Typicality "does not mean that the claims of the class representative[s] must be identical or substantially identical to those of the absent class members." 5 NEWBERG ON CLASS ACTIONS, § 24.25 (3d ed. 1992); *Milonas v. Williams*, 691 F.2d 931, 938 (10th Cir. 1982) (citing *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 340 (10th Cir. 1975) ("courts have consistently ruled that even though it appears that the named plaintiffs have not suffered discrimination, this fact does not prevent them from representing the class") (citations omitted)).

Under the Rule's permissive standards, "Plaintiffs need only show, as they have done here, that their interests are compatible and not antagonistic to the interests of the other class members." *Rodriguez v. Bar-S Food Co.*, 567 F. Supp. 1241, 1248 (D. Colo. 1983); *see also Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001). That is, "[s]o long as there is a nexus between the class representatives' claims or defenses and the common questions of fact or law which unite the class, the typicality requirement is satisfied." *Kohn v. Am. Hous. Found., Inc.*, 178 F.R.D. 536, 541 (D. Colo. 1998); *see also* 1 Newberg on Class Actions § 3:29 (5th ed.) ("[T]ypicality will be satisfied so long as "the named representatives' claims share the same essential characteristics as the claims of the class at large."); *Joseph*, 109 F.R.D. at 639-40 ("It is to be recognized that there may be varying fact situations among individual members of the class and this is all right as long as the claims of the plaintiffs and other class members are based on

the same legal or remedial theory." ) (quoting *Penn v. San Juan Hospital, Inc.,* 528 F.2d 1181, 1189 (10th Cir. 1975)).

Hence, "[e]ven though some factual variations may not defeat typicality, the requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Oshana v. Coca–Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006). The test is whether other class members have the same or similar injury and whether the action is based on conduct that is not unique to the named plaintiffs. *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir. 1992). "A finding of commonality will ordinarily support a finding of typicality." *Barefield v. Chevron U.S.A., Inc.*, No. 86-CV-2427, 1987 WL 65054, at *5 (N.D. Cal. Sept. 9, 1987).

Here, TII's claims are typical of those of the other class members. It received the same unwanted faxes from the defendants at its fax machine number that everyone else received. The claim is that the defendants acted the same way as to all putative class members. *See Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996) ("Typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members."). Further, TII is a member of the Class. *See Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 449 (N.D. Cal. 1994) ("[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members."); *Mortimore v. Fed. Deposit Ins. Corp.*, 197 F.R.D. 432, 437 (W.D. Wash. 2000) (finding typicality for class on claims of breach of contract, stating that "[o]n a very basic and elementary level, [plaintiff] seeks to have the defendants charge him what he believes to be the correct interest rate, and to make sure that they do in the future for both himself and others like him. . . should he be successful, and that is the crux of [the typicality] requirement.").

As such, the Court should find Rule 23(a)(3) satisfied here as well.

### 4. Both TII and its counsel are adequate to serve as Class representatives.

The final requirement of Rule 23(a) ensures the plaintiff "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry in the Tenth Circuit focuses on two questions: (i) whether the named plaintiffs and their counsel have any conflicts with other class members; and (ii) will the named plaintiffs and their counsel vigorously prosecute the action on behalf of the class." *Belote v. Rivet Software, Inc.*, No. 12-CV-02792-WYD-MJW, 2013 WL 2317243, at *3 (D. Colo. May 28, 2013). Both requirements are met here.

TII has stepped forward, put its name out, and done everything asked of it as a named plaintiff. This includes denying several overtures from the Defendant to settle on an individual basis to the exclusion of the Class. Likewise, proposed Class Counsel have no conflicts either and unquestionably has experience in prosecuting these types of cases. (*See* "Firm Resume of Woodrow & Peluso, LLC," a true and accurate copy of which is attached hereto as Ex. F.)

In the end, "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." *Joseph*, 109 F.R.D. at 640 (quoting 7 C. Wright & A. Miller, *Federal Practice and Procedure* § 1768 at 638–39). "[T]he adequacy requirement mandates that no conflicts of interest exist between the named plaintiffs and the absent class members," *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486, 2006 WL 1530166, at *6 (N.D. Cal. June 5, 2006), and adequacy is only defeated by actual conflicts. *Soc. Servs. Union, Local 535 v. Cnty. of Santa Clara*, 609 F.2d 944, 948 (9th Cir. 1979). Here there are no actual conflicts and Rule 23(a)(4) is satisfied.

### C. The Class also meets the requirements of Rule 23(b)(3) as well.

In addition to meeting each of the requirements of Rule 23(a), the record also establishes that certification is appropriate under Rule 23(b)(3). As explained below, the common issues in the case predominate over any individualized issues. Most critically, Eurton is not allowed to use its own destruction of records (and failure to keep records more generally) to avoid certification. Additionally, a class action is superior, and the Class doesn't present any manageability concerns.

> **1.   The common questions identified in Section III.B.2 above cut to the heart of the litigation and predominate over any supposed individualized issues.**

The record also shows predominance of the common issues. Predominance is similar to commonality but requires a "far more demanding" inquiry than "Rule 23(a)'s commonality requirement." *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 318 F.R.D. 712, 724 (N.D. Ill. 2016) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997)). The predominance requirement is satisfied when "common questions represent a significant aspect of [a] case and ... can be resolved for all members of [a] class in a single adjudication." *Messner*, 669 F.3d at 814. (*quoting* 7AA Wright & Miller, Federal Practice & Procedure § 1778 (3d ed. 2011)). Individual questions need not be absent, however. (*Id*.) (explaining that the rule requires only that individual questions not predominate over the common questions.) Rather, common questions predominate if a "common nucleus of operative facts and issues" underlies the claims brought by the proposed class. *In re Nassau County Strip Search Cases*, 461 F.3d 219, 228 (2nd Cir.2006), *quoting Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 299 (1st Cir.2000). *Messner*, 669 F.3d at 814. Ultimately, predominance "trains on the legal or factual questions that qualify each class member's case as a genuine controversy" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 624.

The common questions identified in Section III.B.2 above predominate over any supposed individualized issues. Whether the faxes were advertisements, the identity of the entity that sent the faxes, whether the opt out language complied with the TCPA, and whether Eurton acted willfully and knowingly are all common issues that cut to the heart of the case that aren't trumped by any individual concerns.

Eurton may seek to assert that issues of consent (*i.e.*, whether the faxes were solicited or unsolicited) and whether it enjoyed an EBR with any particular recipient (and satisfied each element of the EBR exception) present individualized questions. Such arguments fail for several reasons. First, consent is <u>not</u> an individualized question. Rather, in TCPA cases such as this, when thousands of faxes are made as part of an "organized program," and when the defendant stands accused of having engaged in a "standardized course of conduct," commonality is satisfied. *See Hinman v. M and M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 806-07 (N.D. Ill. 2008) (collecting authorities and agreeing that when thousands of calls are made " 'en masse' . . . the question of consent may rightly be understood as a common question"); *Paldo Sign & Display Co. v. Topsail Sportswear, Inc.*, No. 08-cv-5959, 2010 WL 4931001, at *2 (N.D. Ill. Nov 29, 2010) (finding consent to be common when the sender purchased the recipients' fax numbers from a single source and never sought to verify consent); *Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 647 (W.D. Wash. 2007) ("whether the recipient's inclusion in [a particular] database constitutes express permission to receive advertisements via facsimile is a common issue").

Second, Eutron confuses solicited faxes with faxes sent to businesses with whom it has an EBR. As explained in Section II, Eurton applies its own definition of "solicited" which includes faxes sent to persons who've given prior express permission or invitation as well as faxes sent to persons with whom it has an EBR. Of course, the statute distinguishes between the

two—an unsolicited fax can still be sent to an entity with which one has an EBR—and this Court should reject Eurton's attempt to expand the definition.

Third, Eurton hasn't shown that even a single fax was solicited (sent with express permission or invitation) or to anyone with whom it has an EBR. *See Savanna Grp., Inc. v. Trynex, Inc.*, No. 10-CV-7995, 2013 WL 66181 (N.D. Ill. Jan. 4, 2013) (rejecting defendant's argument that affirmative defense of consent created individual issues where defendant "failed to offer specific evidence of consent"); *cf. G.M. Sign, Inc. v. Brink's Mfg. Co.*, No. 09 C 5528, 2011 WL 248511 (N.D. Ill. Jan. 25, 2011) (finding issue of consent required individual inquiry, but only because defendant "offered specific evidence" about "the nature of prior business relationships and consent" with regard to specific fax recipients). Eurton shouldn't be permitted to base its supposed consent defense on oral conversations for which it has produced no proof. Rather, the TCPA and the FCC require a sender to obtain "prior express invitation or permission" from recipients before sending a fax. 21 F.C.C.R. 3787, 3808 (In the Matter of Rules and Regulations Implementing the [TCPA] ) (Apr. 6, 2006). "It is a defendants burden to adduce supporting evidence." *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 318 F.R.D. 712, 722 (N.D. Ill. 2016) (citing 21 F.C.C.R. at 3794 (noting that the entity sending the fax is in the "best position" to have records showing the relationships, "such as purchase agreements, sales slips, applications and inquiry records"). Indeed, senders "must be prepared to provide clear and convincing evidence of the existence of such permission." 21 F.C.C.R. at 3807 (*see also Grant v. Capital Mgmt. Servs., LP.*, 449 Fed.Appx. 598, 600 n. 1 (9th Cir.2011) (unpublished).

The reality is that Eurton acted in accordance with a common course of conduct, applicable to the Class as a whole. As another court faced with similar circumstances explained:

Allscripts had a policy and practice of obtaining consent prior to sending any promotional or informational faxes to clients or prospects." [Def. Resp. at 20, ECF No. 171.]; [Def. Supp. at 4, ECF No. 188. ("Allscripts' policy was to obtain prior express permission to send fax advertisements about its products and services").] Although PHI contests whether such practice existed, [Pls. Reply at 9, ECF No. 175], *Defendants' arguments strongly suggest that class-wide proof is available to prove consent*. Defendants do not contend that each customer gave permission under differing circumstances. Defendants argue that Allscripts received permission from the class members to send them faxes. As evidence of this permission, Defendants state that if the database "included a fax number for a particular entity, it was only because that entity voluntarily provided its fax number to Allscripts, along with permission to fax something.

*Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 318 F.R.D. 712, 722–23 (N.D. Ill. 2016) (Emphasis added.) The same holds true here. Eurton claims that it had a class-wide policy of obtaining oral consent and insists that, mistakes aside, no person gave permission under different circumstances. As such, consent doesn't pose an individualized inquiry that predominates over the common issues. And again, the Court should not reward Eurton for its poor record keeping.

With respect to the potential that some Class Members may have had an EBR, that is irrelevant. Faxes sent to businesses with whom the sender enjoys an EBR still must contain appropriate opt-out language. Because Eurton's faxes failed to include such disclosures, it cannot claim that recipients with an EBR should be treated any differently.

Ultimately, even if there were some individual issues, that does not preclude certification so long as the class-wide issues "are more substantial than the issues subject to only individualized proof." *Belote v. Rivet Software, Inc.*, No. 12-CV-02792-WYD-MJW, 2013 WL 2317243, at *8-9 (D. Colo. May 28, 2013). That is the case here. As such, the Court should find Rule 23(b)(3) predominance met as well.

       2.    **A Class action here is plainly manageable and superior to any other supposed methods of adjudicating the controversy.**

As a final consideration, the Court should also find that a class action would be both manageable and superior. Rule 23(b)(3) further requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Matters pertinent to this inquiry include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and; (D) the likely difficulties in managing a class action."

*Id*. Applied to the instant facts, no class members have any interest in individually controlling the prosecution of separate actions. The costs simply outweigh the benefits of individual litigation. Indeed, the "class action device is frequently superior where proceeding individually would be difficult for class members with small claims." *Belote*, 2013 WL 2317243 (citing *Seijas v. Republic of Argentina,* 606 F.3d 53, 58 (2d Cir. 2010).

The stage of the litigation favors certification. The Parties have engaged in written discovery and Eurton's designee sat for a full-day deposition. There are no other cases pending against Eurton. Further, it is desirable to have all of the claims heard in a single proceeding. In this case, "the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23." *Gen. Tel Co. of the Southwest v. Falcon*, 457 U.S. 147, 155 (1982) (quotation omitted); *Agne*, 286 F.R.D. at 571-72 (addressing Rule 23(b)(3) factors in a similar TCPA case and finding class treatment superior to individual actions); *Macarz v. Transworld Sys., Inc.*, 193 F.R.D. 46, 54-55 (D. Conn. 2000) (rejecting argument that individual actions would better serve class members in a TCPA claim). Finally, a class wouldn't be unmanageable. There are at most 1,500 or so potential class members, and their claims don't hinge on

voluminous individual proofs. Rather, phone bills confirming receipt of the faxes should be sufficient, particularly given the Defendant's lack of proof in support its consent defense.

## IV. CONCLUSION

The proposed Class is worthy of certification here. The Class is defined with reference to solely objective criteria, and it is numerous and its members share common legal and factual issues. TII is typical and both it and its counsel will adequately protect the Class Members' interests. Finally, the common issues predominate and a class action is superior and manageable. As such, this Court should grant class certification and award such additional relief as the Court deems necessary, reasonable, and just.

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

Dated: November 6, 2017　　　　　　Respectfully submitted,

**TECH INSTRUMENTATION INC.**, individually and on behalf of all others similarly situated,

By: /s/ Steven L. Woodrow
One of Plaintiff's Attorneys

Steven L. Woodrow
swoodrow@woodrowpeluso.com
Patrick H. Peluso
ppeluso@woodrowpeluso.com
Woodrow & Peluso, LLC
3900 East Mexico Ave., Suite 300
Denver, Colorado 80210
Telephone: (720) 213-0675
Facsimile: (303) 927-0809

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was served upon its filing via this Court's CM/ECF system on this 6th day of November, 2017 to all counsel of record.

/s/ Steven L. Woodrow