# GROUP EXHIBIT A

10

1    Q.   So you get there in '84 doing sales.  How long
2    were you in sales for?

3    A.   Well, I don't know if I have ever left sales.
4    I mean, that's --

5    Q.   As you stayed with the company did your
6    responsibilities increase?

7    A.   Yes.

8    Q.   Where was the next step going from sales to
9    gaining more responsibility?

10   A.   I don't understand quite -- what do you mean?

11   Q.   Did you become a manager at some point?

12   A.   Officially, I don't know that I ever had an
13   official title.

14   Q.   Do you have an official title today?

15   A.   President.

16   Q.   When did you become president?

17   A.   I don't recall the year.

18   Q.   Has it been more than a decade?

19   A.   Yes.

20   Q.   Was it before the millennium?

21   A.   Yes.

22   Q.   Was it sometime in the 1990s?

23   A.   To be sure I'd have to check.  I don't know
24   the date for sure.

25   Q.   Do you have an electrical background?

1    A.    Yeah.  Growing up in the industry.

2    Q.    Did you ever become a licensed electrician?

3    A.    No, we're not in that type of business.

4    Q.    So what type of business is it?

5    A.    We repair and rebuild electric motors.

6    Q.    What type of electric motors?  What are they

7    used in?

8    A.    They're used in everything.  I mean, to be

9    honest, I do anything from the windshield wiper motor in

10   your car all the way up to advanced higher end.

11   Q.    Like industrial stuff?

12   A.    Yes.  Industrial, yeah, that kind of thing.

13   Q.    How many employees do you have?

14   A.    I can't give an exact number, but around 35.

15   Q.    And do you still work in the building that you

16   used to clean?

17   A.    Yes.

18   Q.    So every day you go to a building that you

19   have been cleaning since you were 16 years old?

20   A.    Yes.

21   Q.    Who cleans the buildings now?

22   A.    One of the employees.

23   Q.    Do you have any grandkids?

24   A.    No.

25   Q.    Do you have kids?

1          Did you do anything to prepare yourself to

2    answer questions about topic 11?

3          A.   No.

4          Q.   Did you review any documents --

5          A.   No.

6          Q.   -- to prepare yourself to testify about topic

7    11?

8          A.   No.

9          Q.   Did you have any conversations with anyone

10   about topic 11?

11         A.   It could have been covered in our conversation

12   yesterday.

13         Q.   The 10 --

14         A.   With my attorney.

15         Q.   The 10 or 11-minute discussion?

16         A.   Yes.

17         Q.   Aside from that 10 or 11-minute discussion and

18   reviewing no documents other than the, I think it's an

19   FCC ruling you referenced, other than doing that, did

20   you do anything else to prepare for today's deposition?

21         A.   No.

22         Q.   You hired WestFax to send faxes; is that

23   correct?

24         A.   By hiring them, you mean did I enter into a

25   contract?  They did the faxes for me and I paid them to

1  do it, but there was no contract with WestFax hiring as

2  a -- other than just a vendor.

3      Q.   Okay.  Were there terms of that vendor/vendee

4  relationship?

5      A.   Other than, you know, they offer a service, I

6  pay for it, no.

7      Q.   Are you familiar with their terms of use?

8      A.   No.

9      Q.   Who is your main point of contact over at

10 WestFax?

11     A.   I don't have a main point of contact.  It was

12 all via e-mail.

13     Q.   Who does the e-mailing, you or someone else?

14     A.   Yes, I would do the e-mailing.

15     Q.   Who would you e-mail over at WestFax?

16     A.   I don't recall.  It's probably just

17 info@WestFax or -- it's an online thing that you would

18 do.  You don't have to really have any contact with

19 them.

20     Q.   Take me through that.  When you say it's an

21 online thing that you do, do you go to a WestFax

22 website?

23     A.   Yes.

24     Q.   Do you remember the URL address for that

25 website?

1  and uploading the specific faxes you want sent?

2      A.   Yes.

3      Q.   And you would have to do that every time you

4  wanted WestFax to send out faxes to your list?

5      A.   Correct.

6      Q.   Were there times when you wanted it segmented,

7  when you wanted a fax not sent to the whole list but to

8  a portion of it?

9      A.   No.

10      Q.   And would you upload the list every time that

11  you wanted faxes sent?

12      A.   Yes.

13      Q.   And then WestFax, what, sends you a bill at

14  the end of the month?

15      A.   Yes.

16      Q.   Did anyone else at Burton Electric handle this

17  process or was this your responsibility?

18      A.   No, no one else did.  It was me.

19      Q.   Okay.  How did you hear about WestFax?

20      A.   I don't know.  Either they contacted me

21  somehow or I searched them out, one of the two.  I can't

22  recall.

23      Q.   Did you ever get reports sent to you from

24  WestFax?

25      A.   Yes.

1   Q.   And those would be e-mailed to you?

2   A.   Yes.

3   Q.   What is your e-mail address?

4   A.   John@EurtonElectric.com.

5   Q.   And when those reports would be e-mailed to

6   you, what would you do with them?

7   A.   The report gave the faxes that went through,

8   the faxes that didn't.  I would remove from the list all

9   the bad numbers and update the list.

10   Q.   What would you do with the report, though?

11   A.   Delete it.

12   Q.   And that was in your e-mail system?

13   A.   Mm-hmm.

14   Q.   Remember, you have to say "yes."

15   A.   Yes.

16   Q.   And would you delete it then or would you save

17   the report and delete it later?

18   A.   Generally, then at that point after it was

19   updated, it was deleted.

20   Q.   Okay.  And do you remember the last report

21   that you received from WestFax?

22   A.   I do not.

23   Q.   Do you know if you deleted that report?

24   A.   Yes.

25   Q.   Could that have been in December of 2016?

A.   Exactly.

Q.   Describe the reports to me.  You talked briefly about them saying it would show you which faxes were marked received and which ones failed to send; is that correct?

A.   Correct.

Q.   Do you remember anything else about the reports?

A.   Have you seen the list, the fax list?

MR. BACON:  You don't get to ask questions, sorry.  But just to the extent you know.

THE WITNESS:  Okay.  I'll tell you about -- the fax list is just a list of numbers.

BY MR. WOODROW:

Q.   I'm talking about the reports.

A.   Well, no --

Q.   I want to --

A.   -- the list of numbers would be on the report.

Q.   How so?  In what?  You saw the reports, I didn't.  So I want to know what's on.

A.   I would submit the fax numbers.

MR. BACON:  All he wants to know is what the report looks like; what information is on the report itself.

THE WITNESS:  It has the fax numbers listed.

It has the date it went through and whether or not they were good, busy, bad numbers. And you know, no contact of any kind, and remove these, and these are the good numbers, these are the bad ones.

BY MR. WOODROW:

Q. So the reports would indicate the numbers that faxes were sent to; correct?

A. Yes.

Q. It would also indicate which of those numbers received faxes; correct?

A. Yeah.

Q. It would also indicate which of those numbers returned a busy signal; isn't that correct?

A. Correct.

Q. It would also let you know which ones had some sort of data transmission error; isn't that correct?

A. Yeah. For whatever reason would not be deliverable.

Q. The ones that you would remove, did you only use the reports to remove the numbers that were unworking or undeliverable or did you remove even the ones with the busy signal?

A. Generally, I would just keep the ones that were good numbers and the busy numbers.

Q. Because the busy numbers could still be a good

35

would like to be removed from faxes.

    A.   Right.

    Q.   You actually produced evidence in discovery in this case of a couple opt-out requests.

    Do you remember that?

    A.   I do because those are the only ones I had, yeah.

    Q.   Is it your testimony that there were more and you just don't have the e-mails anymore?

    A.   Correct.  Yeah.

    Q.   About how many more?

    A.   If we would get asked, I would take the number, remove them from the list, update the list, and it would be gone.

    Q.   And then you would probably delete the e-mail?

    A.   I'd delete the e-mail or usually, the funny thing is, more people would fax it back to me.

    Q.   And what would you do with those faxes?

    A.   I would tell them please don't fax me.

    Q.   Would you remove them from the list?

    A.   Yes, of course.

    Q.   Would you save the fax or throw it out?

    A.   I would throw it out after I removed them.

    Q.   Okay.  So there is no pile of faxes sitting somewhere from people asking you not to fax them

38

A.   That's my procedure.

Q.   Is it your policy and process to delete all e-mails that come to you?

A.   No.

Q.   So some e-mails you deem worth saving; correct?

A.   Correct.

Q.   But the WestFax reports to you weren't worth saving?

A.   No, as I knew I would be getting more.

Q.   Okay.  But the faxes are different each month; correct?

A.   They are.

Q.   So when you delete one, you are getting rid of that report and that information; correct?

A.   Let me clarify something.  I don't regularly fax.  So every month I would not get a report from WestFax.  Could be one every three months, every four months.  I've gone years without faxing.  I don't fax regularly like you kind of hope I do.

Q.   Okay.  So let's go back to 2012.

Do you remember how many months in 2012 you engaged WestFax to send faxes?

A.   No.

Q.   Do you remember how many months in 2013?

47

these terms and conditions on August 29, 2012?

    A.   Yes, I'm sure.

    Q.   Do you think that it's important that Eurton

Electric lives up to its contractual obligations?

    A.   And I do.

    Q.   If you can see down, it says No. 3, "The TCPA

and the FCC's rules include, but are not limited to,

these requirements:  A, sending facsimile advertisements

only to those recipients the sender has express consent

or permission to send to, or to recipients the sender

has an established business relation with."

    Do you see that?

    A.   I do.

    Q.   "B.  Including an opt-out notice conspicuously

on the first page of the facsimile advertisement.  The

opt-out notice language must state, 'The recipient is

entitled to request that the sender not send any future

or unsolicited advertisements to his telephone facsimile

machine.  Failure to comply within 30 days from date the

request is properly made is unlawful.  800 blank is the

telephone number and blank is the fax number for the

recipient to transfer such opt-out requests."

    Do you see that?

    A.   I do.

    Q.   Do you believe that your opt-out notices on

48

1    your faxes complied with that language?

2        A.   I do.  Other than the 30 days, our opt-out

3    says immediately.  So we're actually better than their

4    notice.

5        Q.   So the notice that has to be put in says,

6    "failure to comply within 30 days from the date the

7    request is properly made is unlawful."

8        Do you see that?

9        A.   Are we on number three again?

10       Q.   Yes.  About four lines down.  You see that

11   line?

12       A.   I'm searching for it.

13       Q.   It's under 3B.

14       A.   3B, "Including opt-out notice conspicuously on

15   the first page."  We do that.

16       "Opt-out notice must state the recipient is

17   entitled to request sender not do" -- we do that.

18       "Failure to comply within 30 days."  We say

19   immediately, not 30 days.  So I do see that now, yes.

20       Q.   Do you see that it says "failure to comply

21   within 30 days from the date the request is properly

22   made is unlawful"?

23       Do you see that?

24       A.   Yes.

25       Q.   Do you believe that that language is in your

"solicited faxes."

Q.    That's interesting, because when I was reading this saying that your opt-out language was faulty, you said, oh, but it says unsolicited.

So now you are telling me I have to define "unsolicited." It's a word you just used.

MR. BACON: Do you know what he means by "solicited"?

THE WITNESS: No.

MR. BACON: Please explain.

BY MR. WOODROW:

Q.    With permission.

A.    That's not the definition.

Q.    What is the definition of "solicited"?

A.    You have to look it up, but I have read it. And if we don't have it here in front of us, I don't think I should -- we should review it in answer because solicited is people that have given permission, do business with, and potentially can do business with, amongst other things.

And by that definition, all these are solicited faxes.

Q.    So by your definition you think you sent a solicited fax to my client?

A.    By the definition I believe I sent solicited

56

faxes to everyone on that list.

    Q.   Including my client?

    A.   Yes.  Because of our policy as well.

    Q.   Do you have any evidence that my client agreed to receive faxes from you?

    A.   I have no evidence from your client.

    Q.   So sitting here today you are guessing you sent solicited faxes to my client?

    A.   As our policy states on the flier, that we do try our best to contact everyone on that list, get permission, and then do it.

        If we make a mistake, and mistakes can be made, just let us know and we'll remove you.

        So yes, I'm assuming by our policy Tech Instrumentation was contacted.

    Q.   Before you sent the fax?

    A.   Yes.

    Q.   But you don't have any proof.  You are just saying it based on your --

    A.   It would be --

    Q.   Stop.  Let me finish the question before you interrupt, sir.

        So you are just guessing based on your company policy that the fax to my client must have been solicited because it's your company policy to send only

57

solicited faxes; correct?

A.   It's an educated assumption, yes.

Q.   You don't actually have proof do you?

A.   I have no written proof from Tech Instrumentation.

Q.   Do you have any oral proof?

A.   From Tech Instrumentation?

Q.   Yes.

A.   What would be oral proof?

Q.   Do you have a recording of a conversation?

A.   No.

Q.   Do you have any e-mails?

A.   I did have a conversation with Tech Instrumentation.

Q.   After the lawsuit was filed; correct?

A.   It was.  I did.

Q.   I'm talking about before you sent faxes to Tech Instrumentation, do you have any recordings of conversations?

A.   Sorry, we don't do that.

Q.   Do you have any e-mails from Tech Instrumentation?

A.   If I had, they would have been deleted and I don't think so.

Q.   Do you have any recorded conversations with

64

MR. BACON:  You have answered the question.

BY MR. WOODROW:

Q.   And now that you know that the TCPA requires really specific language, you can admit that this language "please remove" -- let the record reflect that the witness' cell phone has rung.

A.   Go ahead.

Q.   And you testified before the break that you believe that this language is compliant; correct?

A.   Yes.

Q.   Even though it doesn't say anything about Eurton's responsibility to honor or request within 30 days; correct?

A.   I did say it, yes.

Q.   You believe that it's implied in this language that Eurton will remove someone immediately?

A.   Yes.

Q.   Does it say anywhere in this language that someone will be removed immediately?

A.   It does not.  I see that.

Q.   And it doesn't say anything about them being removed within 30 days either; right?

A.   Correct.

Q.   But it was your policy that if someone did fax or e-mail or call you and say that they wanted their

65

number removed, you would remove them; correct?

    A.   Yes.

    Q.   And are you aware of the TCPA, sitting here today?

    A.   Yes.  I haven't read the whole -- everything they have, but major parts.

    Q.   You have some familiarity with it today?

    A.   Now, yes.

    Q.   And some familiarity with this section of the TCPA that's referred to as the Junk Fax Prevention Act?

    A.   I would have to read that again just to say I'm familiar with it.

    Q.   I'll represent to you that it's the part of the TCPA that deals with faxes and it's why we're here.

    A.   But that's to unsolicited faxes.

    MR. BACON:  Just answer the question.

BY MR. WOODROW:

    Q.   But we have already established that you have no evidence that any fax sent to my client was solicited; correct?

    A.   No.

    Q.   You do have evidence?

    A.   I'm sorry.  Evidence, no.  No evidence. You're right.

    Q.   In fact, you don't have evidence, sitting here

66

today, that any of the faxes you sent were solicited;
correct?

A.   I need to clarify what we said earlier.  Yes.
To answer the earlier question prior to this lawsuit, I
had no evidence or e-mails.

MR. BACON:  Today, as of this lawsuit, do you
have any evidence that prior to this lawsuit you had any
permission; is that correct?

THE WITNESS:  I had no tangible or physical
evidence.

BY MR. WOODROW:

Q.   When you say "no tangible or physical
evidence," are you saying that you just have memories of
conversations?

A.   Well, our policy is to contact everybody and
that's what I gave instructions for them to follow
what's on this flier.

Q.   Okay.  Who did you give instructions to?

A.   People -- employees.

Q.   Of Eurton Electric?

A.   Yes.

Q.   How many employees were part of this process?

A.   Well, over the years we have had telemarketers
in and out to call and contact, and usually I would have
no more than two.

Q.   So two people at any give time?

A.   At any given time.  And we went years without
having any.  So that would be -- but the most at any
given time was two.

Q.   What would you instruct these individuals?

A.   Well, they call, introduce the company.
Explain what we do and ask permission to contact them
via fax, e-mail, or mail.  Get their attention, their
e-mail address.  And then mail, e-mail, or fax some
information on us.

Q.   And that's been your policy from the get-go?

A.   Mm-hmm.  It says -- that's why it's on there.

Q.   But I want know, this "please remove" language
is slightly different from what you're instructing the
marketers; right?  You give them more than just three
sentences; correct?

A.   Well, that's part of the introduction of
Eurton Electric.  We introduce ourselves, explain what
we do and how we can be of value to them.  And if they
agree, then they allow us to send them something or
e-mail or fax.

Q.   Are the marketers put in a room to do this?

A.   I have a room currently to do this specific
thing.  Otherwise, some of them were in various
locations in the company.

68

Q.   Where would they get the phone numbers to call people and ask them if they wanted to receive faxes?

A.   The computer.

Q.   Like they would go on the computer and get the number?

A.   Well, the number I would give them is via computer.

Q.   So you would locate numbers of potential customers of Eurton?

A.   Yes.

Q.   How would you do that?  You would go online?

A.   Any number of ways.  I mean, people -- online is certainly one of them.  People would contact us. They're current customers or potential customers.  And online would be probably the primary source of collecting data.

Q.   We're not talking about your current customers.  We're just going to talk about the potential ones.

You would go onto, what, Google and look up companies and get their phone numbers?

A.   That's one way, yes.

Q.   Were there other ways?

A.   Sure.  Say we do business with a Dewalt service center.  They have a hundred Dewalt service

69

centers so I would solicit Dewalt to give me all their

service centers that way. It would be other than just a

Google search, something like that. A rental yard has

400 stores. They would say, here's all our stores.

That's type of thing.

So it wouldn't necessarily involve Google, but

that's only one avenue. So there are other avenues.

Q. But you would get a list of numbers and

provide it with the -- provide that list to the

marketers for them to call and solicit permission?

A. Yes.

Q. How many numbers would you provide them at a

time?

A. I don't know. Whatever is on the list,

however many I compile. If I had 10 on a list at one

point, I would give them 10. If somebody gave me a

hundred, like if Dewalt said here's all our service

centers, here's 150, that kind of stuff.

So it could vary all the time.

Q. Do they make these calls just with their cell

phones or do they work computer phones?

A. I think originally they were landline phones.

At some point some used cell phones, and now we're using

a -- like a Google phone, whatever. It plugs in a wifi

phone.

76

A.   Oh, yeah.   I definitely think it's semantics here.   I provided what the TCPA requires, I believe. And you believe I don't.   So we're at a standstill.   You believe they're unsolicited, I believe they're solicited.

Q.   Putting aside what I believe, I go by evidence and I have yet to see any evidence that you sent solicited faxes, other than your testimony that you have this process which people are supposed to follow.

A.   Right.

Q.   Did you ever check that the marketers were following your procedure and process for getting permission?

A.   Of course.

Q.   How did you do that?

A.   Just by seeing the data they would collect. Especially in the personal e-mails, if I gave them a list and said contact this person, maybe their phone and their fax would be there, but their e-mail would not be.

So in the column where their personal e-mails are there, I know we have contacted that person and they have their -- that person is being contacted, we've gotten their personal e-mail and their contact name at that location.

So it was very easy to see that that was going

77

on.

Q.   But you don't know whether or not the substance of the conversation sought permission to send faxes, do you?

A.   I gave them instructions.

Q.   And how do you know that they followed through on your instructions with respect to the substance of the conversation?

A.   That's why it says understand mistakes occur or unauthorized permission may have been given.

Q.   I want to know, though, what you did to monitor the marketers.  Did you ever --

A.   I just told you.

Q.   Did you ever listen in to their conversations?

A.   Yes.  I mean --

Q.   Name a time you recall listening to a marketer have a conversation with a vendor wherein the marketer requested permission to send the vendor faxes.

A.   Prior to this lawsuit, I can't think of a time, specific time when I did so.

Q.   Is it your testimony that you have instructed the marketers after the filing of this lawsuit?

A.   Yes.

Q.   Is it your testimony that you monitor the marketers after this lawsuit?

95

contact information?

A.    Yes.   They're on -- I mean, yes, in theory I have all that to go to that specific list.

Q.    When you remove a number from the fax list, does that delete the entry in the database for that company or can you still call and mail things to that company, they're just no longer on the fax list?

A.    They're just no longer on the fax list.

Q.    Could we do a comparison of the businesses on the master list, we'll call it, to the fax list and come up with a list of who's been removed from the fax list but was on it at some point?

A.    Would it be 100 percent accurate?   Probably not, but...

Q.    I'm not asking that.   I'm a lawyer.   Who cares about accuracy.

It could be done?

A.    Anything could be done.

Q.    Not everything.   I asked someone at a deposition once when they said everything can be done, and I said, "Can I fly?"

And guess what they responded with.   "I could throw you out the window right now and you would do pretty good for the first nine floors."

So striking the hypothetical, anything is

A.    Mm-hmm.

Q.    We call that the network?

A.    Yeah.  Our accounting database system, whatever that's in.

Q.    That's better because I don't work for you. So whatever you want to call it.  The accounting database system.

So that's what I have called the master list that has names, addresses, fax numbers, and sales; correct?

A.    Of people that have done business with us.

Q.    Correct.  And it's not complete, is it?

A.    Correct.

Q.    Because you have a middle spreadsheet of, we'll call it the potential customer spreadsheet that actually has potential customers and some actual customers on it; correct?

A.    Yes.  Our customers that have given us faxing because you want to keep your current customers up to speed on what you do, and potential customers, showing them what you do, that's what's on the list.

Q.    Okay.  And then a third list is the fax list which is the numbers that you have pulled from that second spreadsheet; correct?

A.    Correct.

103

Q.   Have you done a search of these three data sets to figure out if there has been any sales to Tech Instrumentation?

A.   I did check on Tech Instrumentation, yes.

Q.   And you didn't find --

A.   I didn't find anything.

Q.   Did you find any indication of a date when permission was obtained to send the faxes?

A.   No.  Of course, that was -- we never did that. We didn't track that.

Q.   But if I wanted to find out if another person who got faxes had sales with you, I could take a look at the fax number from the fax list, you can run it through your system, and if it's on the master list because their company was entered into the system at some point, we would be able to look at their sales; correct?

A.   Yes, if they're a regular customer with us.

Q.   You said that the process would be tedious. Why is that?

A.   We would have to take each number and take it back, research it, find out, and then do the next number.  That's why.

Q.   How long do you think it takes to do per number?

A.   Probably one to -- it depends on what you find

104

out once you get in there.  If they're not in there at all, it would be a minute.  If they're in there to research it, it could -- you'd find out what they did, then you would have to find out how much did they do. You can tier it down.  So it could be a lot.

Q.   If you just wanted to find out yes or no on any sales, you wouldn't need to go digging too deep, would you?

A.   No.  Probably minute a person.

Q.   Okay.  Have you taken any efforts to preserve evidence in this lawsuit?

A.   What does that mean exactly?

Q.   Well, evidence can literally be almost anything.

A.   Well, then yes, if it can be anything.

Q.   But to preserve evidence means to, you know, not throw out documents or delete files, maybe even put them in a special place.

Did you do anything to preserve evidence in this case?

A.   Yes.

Q.   What have you done?

A.   Well, we've reviewed all the procedures.

Q.   What procedures?

A.   I mean, there are -- our formal, like, with

106

lawsuit.

        I need to be -- I wanted to be clear, prior to
this lawsuit no one e-mailed me on anything.

        Q.    What computer would you use to visit the
WestFax website?

        A.    My computer in my office.

        Q.    What kind of a computer is that?

        A.    I don't know.  Just a regular PC.  It's not a
Mac.

        Q.    Is it a desktop?

        A.    Yes.

        Q.    You don't take it home with you, it stays
there?

        A.    It stays there.

        Q.    Do you know if it runs on a network IP or it
has its own IP address?

        A.    We're on a network so I can access.  I have a
personal one and it goes in and out of the network.

        Q.    Did anyone else visit the WestFax website or
was it just you from that computer in your office?

        A.    From my computer, just me.

        Q.    Did you access WestFax from any other computer
or is that the computer you would use when you ordered
the faxes?

        A.    That's the only computer.  Now, I may have a

new computer since, but that location computer would be
the only one.

Q.   When did you get a new computer?

A.   I think I got one this year.

Q.   What month?

A.   I don't know.

Q.   Could it have been in February or March?

A.   More than six months.

Q.   It's been more than six months since you have
had it?

A.   Yeah, the new computer.

Q.   We're in the ninth month of the year.  So is
it January, February or March?

A.   It could be any one of those.

Q.   Who bought you the computer?

A.   Burton Electric.

Q.   Did someone order it for you?

A.   Either I ordered it or perhaps my sister
ordered it.

Q.   Would there be a receipt?

A.   Yeah.

Q.   Do you think the company credit card was used?

A.   No.  Since it was -- we bought it from our
computer IT guy.  He's on account and so we'd probably
mail him a check.

108

Q.   What is the name of your computer IT guy, do you know?

A.   His name is Norm, that's all I know.

Q.   Do you know what happened to your old computer?

A.   I do not.  I don't know where it is.

Q.   Did you give anyone directions to preserve that computer?

A.   No.

Q.   Does that computer have a hard drive?

A.   It does.

Q.   Is there information on the hard drive?

A.   Yeah, but it was transferred into my new computer.

Q.   Do you believe that all the information on the older computer was transferred to the new computer?

A.   Those were the instructions.

Q.   So back when I asked you about stuff that you did to preserve information in the lawsuit, one of the things you apparently did was instruct Norm or someone else to make sure your old computer file made it on to the new computer?

        MR. BACON:  Objection.  Vague and ambiguous as to time in terms of when the new computer was compared to the lawsuit.

113

A.    Correct.  But that fax sheet is not used for faxing.

Q.    I'm sorry, what?

A.    On that spreadsheet, those numbers would never be faxed.  Only the fax list would be faxed.

Q.    Right.  And you get the fax list from the fax numbers on the second group which we call the potential customer, actual customer spreadsheet.

A.    Correct.

Q.    But my point is, you wouldn't then go to the spreadsheet and delete them entirely.  You would just delete their fax number off the fax list?

A.    Oh, correct.  Correct.  I have customers that have said -- current customers that didn't want to be faxed anymore.  They prefer e-mails.  And so I would take them -- so they're still there for reference and contacting, just not through faxing.

Q.    Do you have a computer background?

A.    Only using it for a long time, but no, no technical repair.

Q.    You don't have a degree in computer science?

A.    No.

Q.    Would you know whether or not your new office computer would have your logins to the WestFax website for when you visited the website?

119

A.   No.   I mean, we have too many, too many
one-time-use customers to know whether or not we have or
not.   I would know plenty of them.   Yes, I could
recognize a lot of our customers on the list for sure.
But the ones I don't recognize, half of them could have
and I wouldn't know it.

Q.   How would you go about verifying whether or
not they had?

A.   Like we said, you would have to go in and do a
search on every potential one.

Q.   So that could still be done after your initial
screen where you quickly identify the ones you know, you
could then take the ones you don't know and go back and
do that process we talked about before lunch where we
would take a minute or two per person?

A.   Yeah.

Q.   When you would train folks, the marketers, to
get consent from people, what was your instructions to
the marketers?   What were they supposed to say to folks
to get their consent?

A.   Well, they were to introduce themselves,
explain who they're with, and then explain what we do.
And then get their permission.

Like I said, if they see the value in needing
somebody to help them out with what we can provide, and

MR. BACON:  Use this one instead.

THE WITNESS:  Okay.

BY MR. WOODROW:

Q.   You see the last page, the invoice date is 12/3/16?

A.   I do.

Q.   And do you see that it has item dates of 11/29?

A.   Yes.

Q.   So you were sending faxes up until the end of November of 2016; is that right?

A.   Correct.  Yes.

Q.   The reason I ask is you had testified earlier that you didn't think you sent any faxes in the second half of 2016.

A.   Right.  I know.

Q.   Does this refresh your recollection?  You can even turn back a page and see if there were orders in October and September and August.

You see those?

A.   I'm going to go back to eight, August.  August was the last time.  Other ones are a different list.

Q.   I'm sorry.

A.   None of these are the list that was for -- it's in question.

127

Q.   How do you know?  What on here tells you which list is at issue?

A.   Well, for one, the size.  And what I'm sending.  You can see like -- what page are you on?  I can go off that one.

Q.   I went to the August 9, 2016 job for 1,577.  That was the quantity.  It says invoice for $65.43.

A.   $65.43, yeah, that would be one of the last times that I would have done it.

Q.   What on this --

A.   No, wait a minute.  That's a different --

Q.   How do you know that this is a different list?

A.   You see it says Easa and Motor Shops CSV, that is not on the list.

Q.   So that's a different list?

A.   So that's a different list.  If you go to the next page it says welding.

Q.   CSV?

A.   And the next page it says Motion Industries, Restaurant Equipment, ABS Motors, APU Repair.

Q.   Cords and tools?

A.   Yeah.  The one that is on there is 8/27 which is tools, CSV.

Q.   I don't see 8/27.  Where is that?

A.   I don't know what page.  10372.

134

A.   Is no.

Q.   So the only one on this is the cords and protectors; correct?

A.   Correct.

Q.   Turn the page.  Floor sander repair, different list?

A.   No.  It's not this list.

Q.   Restaurant equipment is different?

A.   Different, yes.  It is not the list.

Q.   And you already testified about Motion Industries being a different list?

A.   Right.

Q.   Then again we're at the bottom on 616, looks like tool triggers, tools CSV.  That's our list?

A.   That is the list, yes.

Q.   Is it fair to say any time we see "tools" and a quantity of about 15- to 1600 we're going to get the list?

A.   That would be a fair assumption.

Q.   So we can skip the two on the 6/25/2016 because that's BMW and start switches.  Can we assume that all three are on the 7/9 invoice?

A.   I'm not there -- correct.

Q.   Just for the record, we're assuming that none of those three featured the list in question in this

A.   Yes.

Q.   So if I had the invoices from 2015, '14 and '13, could I apply essentially the same logic and figure out which entries on those invoices featured our list versus a difference list?

A.   If you got this from WestFax you mean for those years?  Yeah, it would show similar, I would imagine.

Q.   So if there were entries for tools and being sent to around 1500 people, I know from all the other entries on the invoice that's the list in our case?

A.   That would be the one, yes.

Q.   So at any given time the people who got the faxes that my clients got was only about 1500 people?

A.   Yeah.

Q.   Was the opt-out language the same on all your faxes, though?

A.   Yes.

Q.   So it didn't matter what list you are on?

A.   Yeah.  If I'm autopsy saws, cast saws, RV, the opt-out language is the same.

Q.   And do you generate those fax lists, those separate ones in the same way as you did the tools fax list?

A.   Yes.

anything is like, wow, we're really good.

Q.   Did you search your e-mails for anyone e-mailing Eurton saying send us faxes, you have our permission?

A.   No.   There are no e-mails that say we have permission to fax from a customer like that, you mean. Prior to this lawsuit, I never got an e-mail to that effect.

Q.   Okay.   And now after the lawsuit, do you now make sure you have a record of someone giving consent before they go on the fax list or do you still sort of put them on and take them off?

MR. BACON:   You can answer.   Objection as to -- you can go ahead an answer.

THE WITNESS:   Yes.   I wasn't aware that I had to until this, and now we are doing it, yeah.

BY MR. WOODROW:

Q.   Did you ever meet -- before sending faxes, did you ever meet with a lawyer to see what the rules were?

A.   No.   I didn't know that I had to.

Q.   I know.   It gets back to us talking about the law.

A.   Right.   Exactly.

Q.   Do you think the TCPA should be amended?

A.   Yes, to allow something like, you know, to