**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 1:16-cv-02981-MSK-KMT

TECH INSTRUMENTATION, INC., a Colorado corporation,
individually and on behalf of all others similarly situated,

      Plaintiff,

v.

EURTON ELECTRIC COMPANY, INC., a California corporation

      Defendant.

---

**DEFENDANT EURTON ELECTRIC COMPANY, INC.'S OPPOSITION
TO PLAINTIFF TECH INSTRUMENTATION, INC.' MOTION FOR CLASS
CERTIFICATION; DECLARATION OF THEODORE E. BACON**

---

## I.    INTRODUCTION

    Plaintiff Tech Instruments, Inc. ("Plaintiff") brings this Motion requesting class certification as it relates to the alleged violation of the Telephone Consumer Protection Act ("TCPA") by Defendant Eurton Electric Company, Inc. ("Defendant"). Specifically, Plaintiff claims that Defendant engaged in the practice of sending unsolicited facsimiles without the "opt-out" language under the TCPA. Defendant disputes these allegations.

    Nonetheless, the focus of this Motion is not on the merits, but on whether Plaintiff has met its burden under Federal Rules of Civil Procedure Rule 23 ("Rule 23"), which would permit this Court to certify the requested class. On the surface, the boldness of the language of the Motion provides the initial appearance that such requirements are easily satisfied and that the class-action should proceed against Defendant for its alleged wrongdoings. However, the closer the examination of Plaintiff's arguments, the quicker such appearance fades—*especially when it comes to the issue of predominance under Rule 23(b)(3)*. The Court in deciding this Motion should look not only at evidence that Plaintiff presented in the Motion, but also the evidence that

1

Plaintiff chose not to address.

The issue of consent has been determinative of the predominance requirement when it comes to allegations of improper transmission of facsimiles under the TCPA. If the trial on the merits would essentially require mini-trials for each member of the class on the issue of whether or not they consented to receive the facsimiles, then the moving party has fallen short of predominance requirement. Plaintiff attempts to gloss over this issue in the Motion, providing a string of case citations where prior districts courts have find predominance to exist despite the issue of consent. But, a close examination of the case law cited by Plaintiff shows a common thread: the list of fax numbers all came from a single source. Absent from the Motion is any discussion on this issue as Plaintiff is well aware that Defendant did not obtain their list of fax numbers from a single source, but through several different means.

Accordingly, because Plaintiff has not advanced any theory that would allow for class-wide proof on the issue of consent, Plaintiff has failed to satisfy its burden under the predominance requirement. Therefore, the Motion should be denied in its entirety.

## II.    RELEVANT FACTS

Defendant unfortunately found itself in this present lawsuit not by a willful act of defiance, but because Defendant was not aware of the requirements of the TCPA. Indeed, the present president of Defendant, John Buchanan ("Buchanan"), responded as follows regarding the language placed at the bottom of each of Defendant's facsimiles:

> Q.    Did you review any part of the TCPA before you put the "please remove" language in?
>
> A.    No, I was really unaware of the TCPA.
>
> Q.    So you didn't run this by a lawyer first and have them bless the language?
>
> A.    No.
>
> Q.    You were putting this on the faxes sort of as a sign of goodwill?
>
> A.    Yes. It's our policy.

2

*See* Exhibit 1 attached hereto (Reporter's Transcript of Deposition of John Buchanan ("RT"),
63:17-25).  However, despite such lack of awareness, Defendant endeavored to obtain express
permission from each entity prior to sending an advertisement by facsimile.

　　　To put this lawsuit in context, Defendant is not a large corporation.  Defendant is family-
run company that only has approximately 35 employees.  *See* Motion, Exhibit A (RT, 11:13-14).
Defendant was formed by Buchanan's grandfather in 1933.  *See* Exhibit 1 attached hereto (RT,
7:10-15).  Buchanan started working part time for Defendant cleaning bathrooms while in high
school and has now taken over Defendant's operations as the President.  *See* Exhibit 1 attached
hereto (RT, 7:16-10:24).  The business of Defendant is the repair and rebuild of electronic
motors.  *See* Motion, Exhibit A (RT, 11:4-10).  While Defendant understands this background
information is not determinative of the outcome of this Motion, it is beneficial to put a face to the
corporation for which a class action is being sought against along with the monetary ramification
associated with it.

　　　As president, Buchanan implemented a policy within Defendant for the purposes of
distributing advertisements by facsimile.  As correctly noted in the Motion, a description of this
policy and procedure is found in Defendant's responses to the written discovery:

> ...It is Responding Party's practice to utilize search engines on the
> internet for the purpose of locating potential customers.  Once a
> potential customer is located, Responding Party's practiced policy
> an procedure is for a representative of Responding Party to (1)
> contact the potential customer by telephone, discuss with the
> potential customer Responding Party's goods, and request express
> permission to utilize a customer's specific facsimile number for the
> purposes of sending Responding Party's facsimile regarding
> Responding Party's goods, (2) when express permission is
> obtained from the potential customer, the facsimile number
> authorized to be used by the potential customer is added to a
> running list maintained by Responding Party, and (3) Responding
> Party send its facsimile to the potential customer utilizing the
> facsimile number that the potential customer provided express
> permission to use.

*See* Motion, Exhibit C (Amended Response to Request to Produce No. 8).

　　　In collecting information on potential customers, Defendant did not utilize any kind of

3

data collection agencies.  Instead, Defendant undertook various methods of obtaining said

information itself.  As Buchanan explained at his deposition:

> Q.      So you would locate numbers of potential customer of Eurton?
>
> A.      Yes.
>
> Q.      How would you do that? You would go online?
>
> A.      Any number of ways.  I mean, people – online is certainly one of them.  People would contact us.  They're current customers or potential customers.  And online would probably be the primary source of collection data.
>
> Q.      We're not taking about current customers.  We're just going to talk about the potential ones.  You would go onto, what, Google and look up companies and get their phone numbers?
>
> A.      That's one way, yes.
>
> Q.      Were there other ways?
>
> A.      Sure.  Say we do business with Dewalt service center.  They have hundreds of Dewalt service centers so I would solicit Dewalt to give me all their service centers that way.  It would be other than just a Google search, something like that.  A rental yard has 400 stores.  They would say, here's all our stores.  That's type of thing.  So it wouldn't necessarily involve Google, but that's only one avenue.  So there are other avenues.
>
> Q.      But you would get a list of numbers and provide it with the – provide that list to the marketers for them to call and solicit permission?
>
> A.      Yes.

See Motion, Exhibit A (RT, 68:8-69:11).

Buchanan would then provide training to certain employees on the manner in which to

contact potential clients by telephone and obtain permissions to send an advertisement by

facsimile.  Over the years, Defendant has had hired telemarketers to contact these potential

customers, but would usually have no more than two employed at a time.  See Motion, Exhibit A

(RT, 66:22-67:4).  Buchanan summarized his instructions as follows:

> Well, they call, introduce the company.  Explain what we do and ask permission to contact them via fax, e-mail, or mail.  Get their attention, their e-mail address.  And then mail, e-mail or fax some

4

information on us.

*See* Motion, Exhibit A (RT, 67:5-10).  In order to ensure compliance with Defendant's policy in contacting and communicating with potential clients, Buchanan would engage in role playing demonstrations with Defendant's employees:

> Q.     Okay.  Are you saying that first you would give the instructions and watch them make a call or two?
>
> A.     Yes.  Actually, and then we had role playing, you know, like this what you ask, this what you say, this is what you do.
>
> Q.     When did you use the role playing?
>
> A.     When they were hired.
>
> Q.     How many times have you engaged in role-playing sessions with marketers teaching them how to make calls?
>
> A.     Well, I guess I always – to some degree I still do it because they come to me and they tell me what the potential customer or something said, and then I coach them on what to say after that. So it's a continual process, but specifically I couldn't tell you exactly.

*See* Exhibit 1 attached hereto (RT, 78:21-79:11).

As explained in the Motion, Defendant would then submit a list of fax number to WestFax in order for the facsimile advertisements to be sent to Defendant's potential customers. The following language was found at the bottom of the each of the facsimile advertisements:

> **PLEASE REMOVE:**  We at Eurton Electronic try our best to contact all customers on our list, but understand mistakes occur, or unauthorized permission may have been given.  If you have no need for our repair or parts service, and wish to be removed from future contacts, please fax, e-mail, or phone (below) and let us know the number you wish removed.

*See* Motion, Exhibit B [emphasis included].

In the event that a recipient did not wish to receive any further facsimile advertisements from Defendant, Defendant would immediately remove that entity from the fax list.  If the request to be removed from the fax list came by e-mail, Defendant would remove the entity from the list and then delete the email.  As Buchanan explained during his deposition:

> Q.     Is it your testimony that there were more and you just don't

4586068.1 -- B2144.4

have the e-mail anymore?

A.      Correct.  Yeah.

Q.      About how many more?

A.      If we would get asked, I would take the number, remove them from the list, update the list, and it would be gone.

Q.      And then you would probably delete the e-mail?

A.      I'd delete the e-mail or usually, the funny thing is, more people would fax it back to me.

Q.      And what would you do with those faxes?

A.      I would tell them please don't fax me.

Q.      Would you remove them from the list?

A.      Yes, of course.

Q.      Would you save the fax or throw it out?

A.      I would throw it out after I removed them.

Q.      Okay.  So there is no pile of faxes sitting somewhere from people asking you not to fax them anymore?

A.      Correct.

*See* Exhibit 1 attached hereto (RT, 35:8-36:2); *see also* Exhibit 1 attached hereto (RT, 111:24-113:17).

However, after this lawsuit was filed, Defendant did receive an email from a third-party requesting to be removed from Defendant's fax list.  *See* Exhibit 1 attached hereto (RT, 79:22-80:8 & Exhibit 4 to RT).  After Defendant inquired which facsimile was being referenced in the email due to Defendant having not sent any facsimiles for months, the employee of the third-party responded "We didn't receive one but my supervisor would like me to unsubscribe from any previously companies fax lists."  *See* Exhibit 1 attached hereto (p. 2 of 2 of Exhibit 4 to RT).  When examined on this email at his deposition, Buchanan testified:

Q.      And it's your testimony that after you got these numbers, you removed them from your list?

A.      I did, yes.  Actually, you can see from the one I didn't even know what list he was talking about or where he was because he

> didn't actually received one.
>
> Q.      Right.  He was just asking you to unsubscribe; correct?
>
> A.      Exactly.

*See* Exhibit 1 attached hereto (RT, 80:21-81:3).  While Defendant quickly removed anyone from their fax list that would request as such, Defendant had a low percentage of third-parties contacting them to be removed from their fax list.  *See* Exhibit 1 attached hereto (RT, 123:21-124:9).

## III.   PLAINTIFF HAS FAILED TO SATISFY ITS BURDEN IN UNDER RULE 23(b)(3)

The parties "seeking class certification bear the burden of demonstrating that they have met each of the four requirement of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)."  *See Ellis v. Costco Wholesale Corp.* 657 F.3d 970, 979-980 (9th Cir. 2011).  With regard to the latter, Plaintiff is seeking to certify this class action pursuant to Rule 23(b)(3).

Rule 23(b)(3) states that a class action may be maintained if "the court finds that the question of law or fact common to class members predominates over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The moving party must satisfy both the issue of predominance and superiority.  *See Gene and Gene LLC v. BioPay LLC* 541 F.3d 318, 325 (5th Cir. 2008).

The issue of predominance under Rule 23(b)(3) focuses on "whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *See Amchem Products, Inc. v. Windsor* 521 U.S. 591, 623 (1997).  In determining whether Rule 23(b)(3) has been satisfied, courts "must consider how a trial on the merits would be conducted if a class were certified." *See Sandwich Chef of Texas, Inc. v. Reliance Nat. Indem. Ins. Co.* 319 F.3d 205, 218 (5th Cir. 2003).  Such an undertaking by the district court "entails identifying the substance issues that will control the outcome, assessing which issues will predominate, and then determining whether

7

the issues are common to the class." *See O'Sullivan v. Countrywide Home Loans, Inc.* 319 F.3d 732, 738 (5th Cir. 2003).

Indeed, "[g]oing beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *See Castano v. American Tobacco Co.* 84 F.3d 734, 744 (5th Cir. 1996). If the court determines that the "main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." *See Blair v. CBE Group, Inc.* 309 F.R.D. 621, 628 (S.D. Cal. 2015) (*quoting Zinser v. Accufix Research Institute, Inc.* 253 F.3d 1180, 1189 (9th Cir. 2001)).

In the Motion, it is apparent that Plaintiff understood the issue that of whether Defendant obtained consent prior to the transmission of any facsimiles would have to be overcome in order to the obtain its desired class certification. *See* Motion, p. 21. Plaintiff tries to sidestep this issue by including a string of case citations to give the appearance that that Defendant's natural argument in opposition to this Motion is somehow meritless. However, even Plaintiff's own case law undercuts its position.

A.     **The Issue of Consent is Determinative of the Issue of Whether the "Opt-Out" Language is Required Under the TCPA is Applicable**

Plaintiff proposes the following class definition:

> All persons in the United States who, from December 16, 2013 through the date notice is sent to the Class, received one or more faxes sent to Eurton's Tools List, where prior express permission or invitation to send the faxes was supposedly obtained by Eurton through its three-step process.

*See* Motion, p. 10. In seeking certification upon this proclaimed class, Plaintiff asserts that the following common questions predominate over any possible individualized issue to the class member:

> Whether the faces were advertisements, the identity of the entity that sent the faxes, whether the opt out language complied with the TCPA, and whether Eurton acted willfully and knowingly are all common issues that cut to the heart of the case that aren't trumped by any individual concerns.

8

*See* Motion, p. 23.  However, these alleged common issues—*especially the applicability of the "opt out" language which appears to be the crux of this entire lawsuit*—are predicated on whether Defendant obtained express permission prior to transmitting the facsimiles.

Under the TCPA, it is unlawful for any person in the United States "to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine an unsolicited advertisement[.]"  *See* 47 U.S.C. § 227(b)(1)(C).  The TCPA defines the term "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person *without that person's prior express invitation or permission, in writing or otherwise.*"  *See* 447 U.S.C. § 227(a)(5) [emphasis added].  As such, if the sender obtained permission, either orally or in writing, the transmission of the facsimile would not be a violation of the TCPA.

Moreover, if the sender obtained such permission prior to the transmission of the facsimile, the lack of any "opt out" language cannot be considered a violation of the TCPA.  The "opt out" language cited to in the Motion by Plaintiff refers to a safe harbor provision in the TCPA.  The section stated above states that a facsimile of an unsolicited advertisement would not be violation if "the unsolicited advertisement contains a notice meeting requirement under paragraph (2)(D)."  *See* 447 U.S.C. § 227(b)(1)(C)(ii).  The referenced paragraph provides the language to be included in the "opt out."  But, as expressly stated in the TCPA, the "opt out" language is only necessary when the sender does not obtain prior express permission.

Recently, the Federal Communications Commission ("FCC") attempt to create a rule increasing the scope of the requirements of the "opt out" language.  As explained by the U.S. Court of Appeals, District of Columba Circuit ("D.C. Circuit"), in *Bais Yaakov of Spring Valley v. Federal Communications Commission* 852 F.3d 1078 (D.C. Cir. 2017), in "2006, the FCC issued a rule that requires businesses to include opt-out notices not just on unsolicited fax advertisements, but also on solicited fax advertisements."  *Id.* at 1079.  However, the D.C. Circuit found that such a rule promulgated by the FCC was "unlawful to the extent that it requires opt-out notices on solicited faxes."  *Id.*  In particular, the D.C. Circuit held that "what

9

the FCC may not do under the statute is require opt-out notices on solicited faxes—that is, opt-out notices on those faxes that are sent with prior express invitation or permission of the recipient." *Id.* at 1082.

Accordingly, the predominate issue in this lawsuit is whether Defendant obtained the express permission of the each member of the purported class prior to any transmissions of a facsimile. Under the facts of this case, this issues is sufficiently individualized to require the denial of Plaintiff's request for certification of the class.

### B.   The Issue of Express Permission Requires Individual Inquiries

Despite Plaintiff's claims in the Motion, the issue of express permission predominates over all other issues in this lawsuit and requires separate adjudication for each alleged class members. The case precedence supports Defendant's position.

In *Kenro, Inc. v. Fax Daily, Inc.* 962 F.Supp.2d 1162 (S.D. Ind. 1997), the U.S. District Court for the Southern District of Indiana addressed a similar issue. The plaintiff attempted to certify a class action against the defendant for sending unsolicited advertisements by facsimile. *Id.* at 1163. The proposed class was defined as follows:

> All persons or entities who have received and/or currently receiving a publication from Fax Daily, Inc., via telephone facsimile machine containing any material advertising the commercial availability or quality of any property, goods, or services without the prior express invitation or permission of such person or entity.

*Id.* at 1169. However, the District Court denied the plaintiff's request for class certification for failing to satisfy its burden under both Rule 23(a) and 23(b)(3). *Id.* at 1169-1170. Specifically, the District Court ruled that it "would require this Court to conduct individual inquiries into the merits of each potential plaintiffs' case in order to determine their qualifications as class members." *Id.* at 1170.

Thus, under *Kenro*, it would be impermissible for a court to certify a class expressly seeks to include only individuals and entities that did not provide prior express permission to the sender before the transmission of the facsimile. It is safe to assume that Plaintiff and its counsel

is aware of this pitfall.  Indeed, instead of expressly stating that the class includes only those members where prior permission was not obtained, Plaintiff define the proposed class as to those members "where prior express permission or invitation to send the faxes was supposedly obtained by Eurton through its three-step procedure."  *See* Motion, p. 10.  However, this attempted fix by Plaintiff does not mean that Plaintiff has met the burden of predominance under Rule 23(b)(3).

In *Gene and Gene LLC v. BioPay LLC* 541 F.3d 318 (5th Cir. 2008) (hereafter "*Gene*"), the U.S. Court of Appeals for the Fifth Circuit ("Fifth Circuit") found that the predominance standard under Rule 23(b)(3) was not satisfied in the context of alleged TCPA violation.  In *Gene*, the lower court certified a class action against the defendant, BioPay, based upon the alleged transmission of unsolicited faxes in violation of TCPA.  *Id.* at 322.  In collecting the facsimile numbers at issue in that lawsuit, BioPay did not collect said numbers from a single source.  While BioPay admitted that it purchased databases that included the facsimile numbers, BioPay also "produced evidence that it periodically culled fax numbers from other sources— from information submitted by merchants through BioPay's website, from information submitted at trade shows BioPay attended, and also from lists of companies with BioPay or its affiliates had an established business relationship."  *Id.* at 323.

When addressing the issue of predominance, the Fifth Circuit correctly found the issue of express permission to be most significant:

> But one substantive issue undoubtedly will determine how a trial on the merits will be conducted if the proposed class is certified. This issue, as all ultimately acknowledge, is whether BioPay's fax advertisements were transmitted without the prior express invitation or permission of each recipient.  Thus, the predominate issue of fact is undoubtedly one of the individual consent.

*Id.* at 327.  The Fifth Circuit further explained that "[w]hether established by BioPay as an affirmative defense or by Gene as an element of the cause of action, the issue of consent will entirely determine how the proposed class-action trial will be conducted on the merits."  *Id.*  As such, the Fifth Circuit explains that in seeking class certification, it incumbent on the plaintiff to

"advance a viable theory with respect to the class involved, and it mean that the district court must only certify class action filed under the TCPA when such a theory is being advanced." *Id.* at 328.

In analyzing the issue of predominance, the Fifth Circuit in *Gene* looked to prior cases where class certification was granted. One of particular importance to the Fifth Circuit's analysis was *Kavu, Inc. Omnipack Corp.* 246 F.R.D. 642 (W.D. Wash. 2007), a case that is relied upon by Plaintiff in its Motion. *See* Motion, p. 23.

The District Court for the Western District of Washington in *Kavu* granted class certification based upon an alleged TCPA violation for sending unsolicited advertisements by facsimile. In *Kavu*, a significant factual issue was the manner in which the defendant obtained the facsimile numbers:

> Omnipak alleges that it obtained all of the recipients' facsimile numbers from the Manufacturers' News database. Therefore, whether the recipients' inclusion in the Manufacturers' News database constitutes express permission to receive advertisements via facsimile is a common issue. In fact, plaintiff has provided some authority, albeit incomplete, from the Federal Communications Commission ("FCC") stating that if a sender "obtains the number from sources of information compiled by third parties—e.g., ... commercial databases ...—the sender must take reasonable steps to verify that the recipient consented to have the number listed...." Williamson Decl., Ex. C. If the FCC's opinion, or similar authority, is credited and defendant took no steps to verify consent, then there would be no need for individual evidence on the permission issue. In contrast, in the cases relied on by defendant, the issue of whether each potential class member gave permission to receive the facsimiles was key. *See*, e.g., Kenro, Inc., 962 F.Supp. at 1169; Forman, 164 F.R.D. 400. Those defendants did not, as defendant does here, assert that they received the facsimile numbers and consent to receive facsimiles from the recipients' inclusion in a database.

*See Kavu, supra,* 246 F.R.D. at 647.

In deciding the typicality issue under Rule 23(a), the District Court found that the issue of consent would be common among all members:

> Although the presence of unique defense can undermine the typicality elements, Omnipak's defense to plaintiff's claims are not unique. Instead, it will no doubt assert the same defense for most if not all of the class members' claims: the recipients consented to

12

> receive advertisements via facsimile by providing their consent
> information to Manufactures' News.

*Id.* at 648. For this same reason, the District Court found that the predominance requirement had

been satisfied as well. *Id.* at 650.

In deciding the class certification to be improper on the facts and circumstances of the

case before it, the Fifth Circuit in *Gene* found *Kavu* to be significantly distinct. The Fifth Circuit

found that District Court in *Kavu* was not presented with an individualized issue of consent

because the defendant in *Kavu* "had obtained all of the fax recipients' fax numbers from a single

purveyor of such information and because given this fact, Kavu was able to propose a novel,

class-wide means of establishing the lack of consent based arguably applicable federal

regulations." *See Gene, supra,* 541 F.3d at 327-328. Thus, the Fifth Circuit held that "[u]nlike

the single-source contact list in *Kavu,* here BioPay culled fax numbers from a variety of sources

over a period of time, such that class-wide proof of consent is not possible under the theory

advanced in *Kavu.*" *Id.* at 329.

In *Gene,* the predominance issues was not satisfied because the plaintiff had not advanced

a viable theory of proof on the issue of consent. The plaintiff tried to rely on the procedure of

the actual transmission of the faxes by the defendant. However, the Fifth Circuit found the fact

that the defendant "sent its fax advertisements in accordance with the same procedure is not

necessarily determinative of whether class-wide proof is available to establish consent." *Id.* As

such, the Fifth Circuit held:

> ...that Gene has failed to advance any viable theory employing
> generalized proof concerning the lack of consent with respect to
> the class involved in this case; that this leads to the conclusion that
> myriad mini-trials cannot be avoided; and that, given these
> conclusions and those we have reached above, the district court
> abused its discretion in certifying the class.

*Id.*

Like *Gene,* Plaintiff has not advanced a viable theory of class-wide proof on the issue of

consent. Under the present facts and the testimony of the President of Defendant, Defendant did

not obtain the facsimile numbers from a single source. As detailed above, Defendant used

13

several methods of obtaining potential customers information: (1) undertaking searches on the internet, (2) potential customers contacting them, and (3) contacting present customers to obtain contact information for their affiliates.  Buchanan testified that he trained Defendant's employees to contact each potential customer individually to get their express permission.  Because each express permission would be obtained based upon an individualized communication with that prospective customer, any trial on the merits would require mini-trials on the issue of consent with each alleged class member.

Further, the case law relied upon by Plaintiff in its Motion actually supported Defendant's position.  In *Kavu*, the consent issue could be generalized among the class because the defendant obtained the fax numbers from a single source.  As explained by the District Court, the defendant would "assert the same defense for most if not all of the class members' claims: that recipient consented to receive advertisements via facsimile by providing their contact information to Manufactures' News."  *See Kavu, supra,* 246 F.R.D. at 648.

In *Hinman v. M and M Rental Center, Inc.* 545 F.Supp.2d 802 (N.D. Ill. 2008), the defendant also had purchased the fax numbers it utilized "several years earlier from a company called Corporate Marketing, Inc." *Id.* at 804.  As such, in finding that the plaintiff had satisfied its burden on the issue of predominance, the District Court noted that the "fax broadcasted at issue were sent en masse to recipients identified on a singular "leads" list obtained from a singular source." *Id.* at 807.

In *Paldo Sign and Display Co. v. Topsail Sportswear Inc.* No. 08-cv-5959, 2010 WL 4931001 (N.D. Ill. Nov. 29, 2010), the defendant's "personnel created advertisements, which the company then sent via fax broadcasting to fax numbers that came from the list it had purchased form InfoUSA." *Id.* at *1.  The District Court find that the plaintiff had established both typicality and predominance on the fact that the defendant had obtained the fax numbers from a single source:

> Topsail's argument is that there is no way of telling which class members may have consented to receipt of a faxed advertisement. But it is speculative at best that consent will even be an issue in the

> case. The manner in which Topsail obtained and used the fax numbers likely rules out the possibility of individualized consent defenses. When, as in this case, a sender of a fax obtains the recipient's number from a source outside the recipient's public information (such as a website or a telephone directory), "the sender must take reasonable steps to verify that the recipient agreed to make the number available for public distribution." 47 C.F.R. § 64.1200(a) (3)(ii)(B). Topsail appears to have purchased its fax numbers from a commercial source, and based on the depositions of its personnel, it took no steps to obtain or verify consent but rather just broadcast advertisements to the recipients.

*Id.* at *2-*3.

In *Physician Healthsource, Inc. v. A-S Medication Solutions, LLC* 318 F.R.D. 712 (N.D. Ill. 2016), the defendant purchased the assets of another company, Allscript, which included a list of fax number that had been compiled by Allscript. *Id.* at 716-718. Thus, the defendant's position on consent was simple: "the alleged permission given to Allscript to send faxes extended to A-S." *Id.* at 718. However, the single source of the fax number created a singular issue for the purposes of the issue of predominance. Indeed, the District Court found:

> Here, it is undisputed that A-S never received explicit consent to send faxes to the putative class members. Rather, A-S argues that it had consent by way of its acquisition of Allscripts. However, as stated, evidence has not been proffered that Allscripts obtained permission or, if it did obtain permission, the manner in which it obtained permission.
>
> Even if Allscripts obtained permission from class members to send fax advertisements, common issues of law and fact still predominate. Before the court can address the issue of individual consent, if the issue exists, PHI argues that consent cannot be transferred from Allscripts to A-S. Therefore, the question of whether consent can be transferred is a common question to all class members that can be answered on a class-wide basis.

*Id.* at 725.[1]

---

[1] The District Court in *Physicians Healthsources, Inc.* also found that the issue of violating the "opt-out" language under the TCPA was not determined by whether or not there was consent. *Id.* at 725. However, this District Court decision was issued before the D.C. Circuits opinion in *Bais Yaakov of Spring Valley, supra,* 852 F.3d 1078, which found that the "opt-out" language is not required when the sender obtained prior express permission.

Unlike *Kavu, Hinman, Paldo Sign & Display Co., and Physician Healthsource, Inc.*, Defendant did not obtain the fax numbers at issue in this lawsuit from a single source. Plaintiff provides no evidence to contradict this fact. Indeed, it may be reasonably inferred from Plaintiff's lack of any discussion in the Motion on the issue of how Defendant culled the fax numbers that Plaintiff was aware of this defect in their argument and simply tried to avoid it.

Accordingly, because there is no viable theory of class-wide proof on the issue of consent, Plaintiff has failed to satisfy the predominance requirement under Rule 23(b)(3). Therefore, the Motion should be denied in its entirety.

**C.    Defendant's Evidence is Sufficient to Defeat this Motion**

Plaintiff attempts to deflect from the fact it has not satisfied its burden in establishing a class wide theory on the issue of consent by the claiming that Defendant's proof of consent is insufficient. However, Plaintiff's arguments is once again undercut by the case law it relies upon.

As detailed above, the defendant in *Physician Healthsource, Inc.* tried to overcome the issue of consent by relying on the single source in which the fax numbers. Specifically, "Defendants argue that the alleged permission given to Allscripts to send faxes extended to A-S." *See Physician Healthsource, Inc., supra,* 318 F.R.D. at 718. Moreover, the defendant proffered no evidence that "Allscripts obtained permission or, if it did obtain permission, the manner in which it obtained permission." *Id.* at 725.

In *Savanna Grp. Inc. v. Trynex, Inc.*, No. 10-cv-7995, 2013 WL 66181 (N.D. Ill. Jan. 4, 2013), the defendant argument pertaining to consent is not based upon the actual act of obtaining permission, but based upon an assumption of the who the intended recipients were:

> Here, Defendant s have provided no specific allegations or supporting evidence that individual putative class plaintiffs consented to the recipient of the Tyrex fax. Rather, Defendants rely on the proposition that because the Defendants intended the fax for existing customers, B2B must have only sent fax to existing customers, and thus the Court must resolve consent issue on an individualized basis.

16

*Id.* at \*9.  The District Court found that the mere reliance on an intent to send the facsimiles to existing customers was not sufficient to defeat the issue of predominance.  *Id.* at \*15.

Thus, unlike *Physician Healthsource, Inc.* and *Savanna Group, Inc.*, Defendant is not relying on the alleged permission received by another party or their intent of transmitting the facsimiles to only existing clients.  Instead, Buchanan, the President of Defendant, provided testimony on the procedure utilized in order to obtain consent from the recipients.  Such evidence is significantly distinct from the evidence proffered in the cases relied upon by Plaintiff.

Moreover, the testimony of Buchanan is similar to evidence that was submitted by the defendant in *G.M. Sign, Inc. v. Brink's Mfg. Co.*, No. 09 C 5528, 2011 WL 248511 (N.D. Ill. Jan. 25, 2011) (hereinafter, "*Brinks*").  In *Brinks,* the defendant submitted affidavits to establish its policy and procedure for transmitting facsimiles:

> More specifically, Brink's submits multiple affidavits to the effect that the company created an electronic database, known as "ACT," which included contact information for the company's actual and prospective customers. (Id.) This evidence provides that Brink's gathered information regarding the company's existing customers during the course of the relevant business relationships. (Id.) Furthermore, Defendant obtained information on prospective customers through phone disks and public sources like the Yellow Pages, although neither source generally contained fax numbers. (Id.) The evidence further supports that Brink's instead obtained those fax numbers by calling prospective customers, asking them whether they would be interested in receiving information about Defendant's products, and, if so, asking them for their fax numbers. (Id.) If any prospective customer declined Defendant's offer to send them information, Brink's avers that it would "immediately remove that company from the ACT database." (Id.) Similarly, "[i]f the customer did not agree to receive information from Brink's by fax, in the unlikely event that [Brink's] had their fax number[,][it] would remove it from the ACT database." (Id.)

*Id.* at \*2.  The District Court, in following *Gene*, found that it was "unavoidable that the Court would have to conduct a series of mini-trials to determine the facts of prior business relationships and consent.  It would have to do so both to establish the population of the class, and to determine liability." *Id.* at \*9.

Like *Brinks*, Defendant has provided the testimony of its President, Buchanan, who has (1) stated that the fax numbers are obtained from more than one source, (2) Defendant contacted

perspective customers for permission and (3) immediately deleted the fax numbers of any entity that did not wish to receive faxes.

Accordingly, based upon Plaintiff's own case law, Defendant has provided sufficient evidence to defeat this Motion.

### D. In fact, Plaintiff Has Not Sufficiently Provided Evidence that It Did Not Provide Permission to Defendant Prior to the Transmission of any Facsimile

Lacking from the Motion is any declaration or affidavit from Plaintiff affirmatively stating that Plaintiff was never contacted by Defendant and Plaintiff never provided express permission to Defendant to receive an advertisement by facsimile. Instead, Plaintiff merely relies upon the testimony of Buchanan. However, such reliance is defective.

When bringing a motion to certify a class action, the burden is on the moving party to produce sufficient evidence to show satisfaction with the necessary requirements of Rule 23. As stated in *Brinks*, "[i]t is important to note that the information provided by the affidavits amounts to factual evidence. Contested allegations in a complaint, by contrast, do not." *See Brinks, supra*, 2011 WL 248511 at *2 FN 1.

In order to prove an alleged lack of consent by Plaintiff, Plaintiff relies solely on Buchanan's testimony where he states that he is not in possession of such evidence as it relates to Plaintiff. *See* Motion, pp. 3-4. However, this part of Buchanan's testimony only refers to documentary evidence. In fact, the Buchanan's testimony immediately following the portion cited in the Motion clarifies Defendant's position:

> Q.    But we have already established that you have no evidence that any fax sent to my client was solicited; correct?
>
> A.    No.
>
> Q.    You do have evidence?
>
> A.    I'm sorry. Evidence, no. No evidence. You're right.
>
> Q.    In fact, you don't have evidence, sitting here today, that any of the faxes you sent were solicited; correct?

A.      I need to clarify what we said earlier.  Yes. To answer the earlier question prior to this lawsuit.  I had no evidence or emails.

MR. BACON:        Today, as of this lawsuit, do you have any evidence that prior to this lawsuit you had permission; is that correct?

THE WITNESS:      I had no tangible or physical evidence.

BY MR. WOODROW:

Q.      When you say "no tangible or physical evidence," are you saying that you just have memories of conversations?

A.      Well, our policy is to contact everybody and that's what I gave instructions for them to this flier.

See Motion, Exhibit A (RT, 65:18-66:17).

Thus, Defendant's President was not conceding that there was no evidence, just no documentary evidence showing that consent had been obtained from Plaintiff.  Indeed, it is Defendant's reasonable belief that Plaintiff was contacted because of its policy.  Buchanan testified as follows:

Q.      Do you have any evidence that my client agreed to receive faxes from you?

A.      I have no evidence from your client.

Q.      So sitting here today you are guessing you sent solicited faxes to my client?

A.      As our policy states on the flier, that we try our best to contact everyone on that list, get permission and that do it.  If we make a mistake, and mistakes can be made, just let us know and we'll remove you.  So yes, I'm assuming by our policy Tech Instruments was contacted.

Q.      Before you sent the fax?

A.      Yes.

Q.      But you don't have any proof.  You are just saying it based on your --

A.      It would be --

Q.      Stop.  Let me finish the question before you interrupt, sir.  So you are just guessing based on your company policy that the fax to my client must have been solicited because it's your company policy to send only solicited faxes; correct?

A.    It's an educated assumption, yes.

Q.    You don't actually have proof do you?

A.    I have no written proof from Tech Instruments.

*See* Motion, Exhibit A (RT, 56:4-57:4).

Therefore, Defendant has an "educated assumption" or reasonable belief that Plaintiff was contacted due to their pattern and practice.  However, despite the fact that Plaintiff included this testimony as an exhibit to its Motion, Plaintiff does not have a single declaration or affidavit from any of its employees or representative affirmatively stating that it never provided prior express permission to Defendant to transmit the facsimiles.  Plaintiff brought this attempted class action, so it appears that it would be simple to obtain such a declaration or affidavit to include with this Motion.  Yet, Plaintiff chose rather to rely on the purported lack of evidence of Defendant instead of its own affirmative evidence on the determinative issue of consent.  As detailed above, Plaintiff has the burden on this Motion.

## IV.    CONCLUSION

Based upon the foregoing, Plaintiff has not satisfied is burden under Federal Rules of Civil Procedure Rule 23 and, therefore, Defendant respectfully requests that the Motion be denied in its entirety.

DATED:  November 27, 2017                    Respectfully submitted,

ALVARADOSMITH
A Professional Corporation

By:    /s/ Theodore E. Bacon
Theodore E. Bacon
Jacob Clark
ALVARADOSMITH, APC
633 W. Fifth Street, Suite 900
Los Angeles, California 90071
Tel: (213) 229-2400

4586068.1 -- B2144.4

## DECLARATION OF THEODORE E. BACON

I, THEODORE E. BACON, declare as follows:

1.      I am an attorney licensed to practice law in the U.S. District Court for the District of Colorado, and am an member of the law firm of AlvaradoSmith, a Professional Corporation, attorneys of record for Defendant Eurton Electronic Company, Inc. ("Defendant").  I am responsible for Defending this matter on behalf of Defendant.  As such, I have personal knowledge of all the facts except as to those matters stated on information and belief, and, as to those matters, I believe them to be true.  If called as a witness to testify as such, I could and would testify competently under oath.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of pages 1, 7-10, 35-36, 78-81, 111-113, 123-124, 149 and Exhibit 4 of the Reporter's Transcript for the Deposition of John Buchanan that occurred on September 12, 2017.

I declare under penalty perjury under the laws of the United States that the forging is true and correct.

Executed on November 27, 2017 at Los Angeles, California

 /s/ Theodore E. Bacon

THEODORE E. BACON

4586068.1 -- B2144.4

## CERTIFICATION OF SERVICE

I hereby certify that on this 27th day of November 2017, I electronically filed the foregoing **DEFENDANT EURTON ELECTRIC COMPANY, INC.'S OPPOSITION TO PLAINTIFF TECH INSTRUMENTATION, INC.' MOTION FOR CLASS CERTIFICATION; DECLARATION OF THEODORE E. BACON** with the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of the filing to all Counsel of record.

*/s/ Theodore E. Bacon*
Theodore E. Bacon

4586068.1 -- B2144.4