# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| Tech Instrumentation, Inc., a Colorado Corporation, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>Eurton Electric Company, Inc., a California Corporation,<br><br>Defendant. | ) | Case No. CV 16-02981-KMT<br><br>CERTIFIED COPY |

DEPOSITION OF JOHN BUCHANAN

Tuesday, September 12, 2017

9:54 A.M.

633 W. 5th Street, Suite 900

Los Angeles, California 90071

Reported by:
Maria Beesley
CSR 9132, RMR, FCRR
Job No. 139402



```
1          A.    Yes.
2          Q.    In what capacity?
3                MR. BACON:  Initially --
4                THE WITNESS:  Sales.
5                MR. BACON:  -- correct?
6    BY MR. WOODROW:
7          Q.    I wanted to know when you first went there,
8    you started working in sales?
9          A.    Yes.
10         Q.    What year was the company formed?
11         A.    1933.
12         Q.    By who?
13         A.    Carl Victor Eurton.
14         Q.    Do you have any relation to him?
15         A.    Grandfather.
16         Q.    Were you working at the company when you were
17   in school?
18         A.    Yes.
19         Q.    On a part-time basis?
20         A.    Yes.
21         Q.    And what were you doing when you were working
22   on a part-time basis while you were still in school?
23         A.    Janitor.
24         Q.    How many buildings does Eurton Electric have?
25         A.    Just one.
```

8

1      Q.    And you cleaned the whole building?

2      A.    Yeah.   Primarily bathrooms.

3      Q.    How old are you then?

4      A.    The part-time years were between maybe 16 and

5   20.

6      Q.    Was this your grandfather on your mother's

7   side or your father's side?

8      A.    Mother's.

9      Q.    Were there other relatives who worked for the

10  company?

11     A.    Yes.

12     Q.    Did your mom work for the company?

13     A.    She did.

14     Q.    Is she still with us?

15     A.    No.

16     Q.    Sorry.

17           Did your father work for Eurton Electric?

18     A.    Yes.

19     Q.    What capacity?

20     A.    He worked for the company and then ran the

21  company.

22     Q.    After your grandfather stepped down?

23     A.    Yes.

24     Q.    Do you remember what year that was?

25     A.    No.

1       Q.   When you were working on a part-time basis for

2   the company when you were around 16 years old, was your

3   dad already running it?

4       A.   At 16 years old my dad had cancer.  So as

5   memory serves, he was not -- it was sort of in a

6   transition at that time.  He passed away when I was 17.

7       Q.   Okay.  So you leave school in about 1984 and

8   go work for the company in sales.  Is that what you

9   testified?

10       A.   Primarily, yes.

11       Q.   Primarily.

12       Do you have brothers or sisters?

13       A.   Yes.

14       Q.   How many?

15       A.   One brother deceased, and two sisters.

16       Q.   And do the two sisters work for the company?

17       A.   One.

18       Q.   Are your sisters younger than you or older or

19   both?

20       A.   Older.

21       Q.   Are you the baby?

22       A.   I am, yes.

23       Q.   And one of your older sisters works for the

24   company still?

25       A.   Yes.

10

1     Q.    So you get there in '84 doing sales.  How long

2     were you in sales for?

3           A.    Well, I don't know if I have ever left sales.

4     I mean, that's --

5           Q.    As you stayed with the company did your

6     responsibilities increase?

7           A.    Yes.

8           Q.    Where was the next step going from sales to

9     gaining more responsibility?

10          A.    I don't understand quite -- what do you mean?

11          Q.    Did you become a manager at some point?

12          A.    Officially, I don't know that I ever had an

13    official title.

14          Q.    Do you have an official title today?

15          A.    President.

16          Q.    When did you become president?

17          A.    I don't recall the year.

18          Q.    Has it been more than a decade?

19          A.    Yes.

20          Q.    Was it before the millennium?

21          A.    Yes.

22          Q.    Was it sometime in the 1990s?

23          A.    To be sure I'd have to check.  I don't know

24    the date for sure.

25          Q.    Do you have an electrical background?

35

1    would like to be removed from faxes.

2         A.    Right.

3         Q.    You actually produced evidence in discovery in

4    this case of a couple opt-out requests.

5               Do you remember that?

6         A.    I do because those are the only ones I had,

7    yeah.

8         Q.    Is it your testimony that there were more and

9    you just don't have the e-mails anymore?

10        A.    Correct.  Yeah.

11        Q.    About how many more?

12        A.    If we would get asked, I would take the

13   number, remove them from the list, update the list, and

14   it would be gone.

15        Q.    And then you would probably delete the e-mail?

16        A.    I'd delete the e-mail or usually, the funny

17   thing is, more people would fax it back to me.

18        Q.    And what would you do with those faxes?

19        A.    I would tell them please don't fax me.

20        Q.    Would you remove them from the list?

21        A.    Yes, of course.

22        Q.    Would you save the fax or throw it out?

23        A.    I would throw it out after I removed them.

24        Q.    Okay.  So there is no pile of faxes sitting

25   somewhere from people asking you not to fax them

36

1    anymore?

2         A.    Correct.

3         Q.    And aside from the two e-mails that you have

4    produced, there are no other e-mails of people

5    requesting that you remove them from the list?

6         A.    To the best of my knowledge, yes.

7         Q.    What did you do to search your e-mails?

8         A.    Well, they would come to me.  Our e-mail is

9    listed on the flier.

10        Q.    I mean in terms of producing information in

11   this case, I assume that the e-mails that were produced

12   were found in your e-mail system; correct?

13        A.    Yes.

14        Q.    Do you use Outlook?

15        A.    No.

16        Q.    Do you use gmail?

17        A.    Yes.

18        Q.    So did you have to search your gmail for those

19   requests?

20        A.    No.  Generally, they would come in my in box.

21        Q.    I mean the two that you produced in the case.

22        A.    Yes.  I searched for those.

23        Q.    Do you remember what search terms you used?

24        A.    No.

25        Q.    Do you remember how long you searched for?

78

1    A.    Yes, with the same instructions that prior

2    ones have gotten.

3    Q.    But you can't name a single occasion prior to

4    the lawsuit when you instructed -- strike that.

5    You can't name a single occasion prior to the

6    lawsuit being filed when you listened in on a marketer's

7    conversation with a potential fax recipient wherein the

8    marketer requested consent of the recipient to send

9    faxes?

10    A.    Yes, no specific date.

11    Q.    Do you remember any specific instance?  Not

12    even the date?

13    A.    Just being in their general presence after

14    instructions and listening to them talk, other than

15    that.  But no date or specific time.

16    Q.    How often would you sit there and be in their

17    presence while they were making the calls?

18    A.    Well, after they have gotten their

19    instructions and they were good, I would not monitor

20    them that much.

21    Q.    Okay.  Are you saying that first you would

22    give the instructions and watch them make a call or two?

23    A.    Yes.  Actually, and then we had role playing,

24    you know, like this is what you ask, this is what you

25    say, this is what you do.

79

1     Q.     When did you use the role playing?

2     A.     When they were hired.

3     Q.     How many times have you engaged in role-

4  playing sessions with marketers teaching them how to

5  make calls?

6     A.     Well, I guess I always -- to some degree I

7  still do it because they come to me and they tell me

8  what the potential customer or something said, and then

9  I coach them on what to say after that.

10          So it's a continual process, but specifically

11  I couldn't tell you exactly.

12     Q.     But you don't record their conversations;

13  correct?

14     A.     I do not, no.  Or we do not.

15     Q.     You don't sit next to them when they're making

16  the phone calls and write notes, do you?

17     A.     Correct.  That's why we say understand

18  mistakes occur.

19     Q.     Okay.  Because your process isn't airtight;

20  right?

21     A.     Correct.

22     Q.     I'm going to show you what we're going to mark

23  as Exhibit 4.

24                    (Exhibit 4 was marked

25                         for identification)

80

1    BY MR. WOODROW:

2         Q.    Please take a minute and review.

3         A.    (Witness reads document.)

4         Q.    You have had a chance to review?

5         A.    I have.

6         Q.    Are these two opt-out requests that you

7    received?

8         A.    Yes, these were the two that I had.

9         Q.    When you say two that you had, you mean

10   e-mails?

11        A.    When I did the search, this is all that came

12   up.

13        Q.    Do you remember what you searched for?

14        A.    The key words, no, I honestly don't.

15        Q.    Do you remember how much time you spent?

16        A.    I think we covered that; right?

17        Q.    I don't believe so.

18        A.    Maybe 10 minutes perhaps.

19        Q.    And these were the only two you could locate?

20        A.    Correct.

21        Q.    And it's your testimony that after you got

22   these numbers, you removed them from your list?

23        A.    I did, yes.  Actually, you can see from the

24   one I didn't even know what list he was talking about or

25   where he was because he didn't actually receive one.

81

1    Q.   Right.  He was just asking you to unsubscribe;

2  correct?

3    A.   Exactly.

4    Q.   Okay.  And it's your testimony you couldn't

5  find any other opt-outs when you searched your e-mails?

6    A.   Yes.  When you requested that, this is all I

7  could find.

8    Q.   And so is it your testimony that over the last

9  four years you have received other e-mails similar to

10 these e-mails, but just don't have copies anymore?

11   A.   Yes.

12   Q.   And so as you sit here today, these are the

13 only two e-mails that you have -- strike that.

14        As you sit here today, these two e-mails are

15 the only two written opt-outs that you have proof of;

16 correct?

17   A.   On my e-mail server, yes.

18   Q.   Do you have proof somewhere else?

19   A.   I don't know.

20   Q.   Where else could proof be?

21   A.   Trash.  We have stacks of paper, perhaps there

22 could be some in there, but I'm unaware of any.

23   Q.   Where is your stacks of paper?

24   A.   The only fax -- by the fax machine actually.

25   Q.   Have you searched that stack of paper?

1    Q.   Why would someone be in the system database,

2  but not on the spreadsheet of potential and actual

3  customers?

4    A.   The one on the potential and actual would be

5  -- oh.  This particular list of this fax sheet, it's

6  just to specific potential customers in a specific area,

7  like the service industry.  I may have another list for

8  the medical industry.

9    Q.   Okay.  So this potential/actual customer

10 spreadsheet, the Excel file that we're talking about is

11 just for what type of customer?

12   A.   Electric motor repair, power tool repair,

13 service, and other repair, service industry people.

14   Q.   Okay.  So then there would be folks in the

15 system database who might be there as a customer for

16 health care or some other sector?

17   A.   Right, that wouldn't be on this list because

18 medical is a different -- would be a different list.

19   Q.   When an entry is made into the system

20 database, that's bucket number one, does the database or

21 the system make any notation as to when that record was

22 created?

23   A.   I don't know.

24   Q.   So, you've indicated in your responses to

25 discovery that when someone would respond to the

112

1     language, the opt-out language on your faxes -- and we

2     have two examples of people inquiring, asking to be

3     removed -- you indicate in your discovery responses that

4     you would remove them immediately; is that right?

5         A.   I would, yes.

6         Q.   Take me through that process.  How would you

7     remove them immediately?  Would you delete them from

8     just the fax list?  Would you delete them from the

9     patient -- potential customer spreadsheet?  Would you

10    delete their entry into the system database?  Tell me

11    how it's done.

12        A.   It would be I would get a notification, like

13    for example, if I got this one.

14        Q.   For the record, you are pointing to the one of

15    the two e-mails that we went over before?

16        A.   Yes.

17        Q.   Okay.  So you would get the first request?

18        A.   I would go to the fax list where his number

19    was and remove it from there.

20        Q.   But that --

21        A.   And then delete this e-mail.

22        Q.   Okay.  But that potential customer or actual

23    customer, their record would still appear on the

24    potential customer spreadsheet from which the fax list

25    was made originally; correct?

113

1     A.   Correct.  But that fax sheet is not used for

2  faxing.

3     Q.   I'm sorry, what?

4     A.   On that spreadsheet, those numbers would never

5  be faxed.  Only the fax list would be faxed.

6     Q.   Right.  And you get the fax list from the fax

7  numbers on the second group which we call the potential

8  customer, actual customer spreadsheet.

9     A.   Correct.

10     Q.   But my point is, you wouldn't then go to the

11  spreadsheet and delete them entirely.  You would just

12  delete their fax number off the fax list?

13     A.   Oh, correct.  Correct.  I have customers that

14  have said -- current customers that didn't want to be

15  faxed anymore.  They prefer e-mails.  And so I would

16  take them -- so they're still there for reference and

17  contacting, just not through faxing.

18     Q.   Do you have a computer background?

19     A.   Only using it for a long time, but no, no

20  technical repair.

21     Q.   You don't have a degree in computer science?

22     A.   No.

23     Q.   Would you know whether or not your new office

24  computer would have your logins to the WestFax website

25  for when you visited the website?

123

1    like a coach saying, you know, next time ask this or

2    throw this in, and those type of things.

3          Never on, you didn't get the particular number

4    or you didn't ask correctly.

5          I would have if they did.  If that was a

6    coaching thing, I would say it if it ever came up, but

7    it never came up.  I've never given that instruction.

8          Q.   Was it enough for the marketer to just request

9    the fax number from the person or did they also have to

10   specifically request don't send faxes?

11         A.   Well, a lot of the time it was -- sometimes

12   they did bundle it:  Can I fax you?  Can I e-mail you?

13   Can I send you stuff in the mail to this address?

14         And we verified the whole thing.  So it was

15   Bob at whatever, or Steve here at Gezon, can I do all

16   these things.  And if you said yes, then we would have

17   that -- we would consider that permission.

18         And then later on if Steve, as he did here,

19   changes his mind, he just lets us know and we e-mail and

20   mail him from there.

21         Q.   Sitting here today, do you know how many

22   people have requested to opt out that you then processed

23   their opt-outs apart from the two that we have shown?

24         A.   We had a very low percentage of opt-out

25   people.  I'm very surprised that -- sometimes none.

124

1      Q.   I'm surprised you found two.

2           So what I want to know is how many more do you

3    think you possibly had.  Maybe a handful?

4      A.   Now, I may do another -- yeah, it's a handful.

5    Most people --

6      Q.   Most people didn't tell you that they wanted

7    to opt-out?

8      A.   Correct.  Over 95 percent said -- well, I

9    never heard from them.

10     Q.   I'm going to show you what is going to be

11   marked as Exhibit 6.

12                    (Exhibit 6 was marked

13                        for identification)

14   BY MR. WOODROW:

15     Q.   Take a minute to look through these.

16     A.   (Witness reads document.)

17          They all have "Attention:  Julie" on it.

18     Q.   What is Julie's last name?

19     A.   Macias.

20     Q.   Would Julie ever order the faxes or would it

21   always be you?

22     A.   It would always be me.

23     Q.   Let me know when you have gotten to it.

24     A.   (Witness reads document.)

25          Okay.  I mean, they're all --

149

1          I, Maria Beesley, CSR 9132, Certified

2     Shorthand Reporter, do hereby certify:

3          That prior to being examined, the witness

4     named in the foregoing deposition was by me duly sworn;

5          That said deposition was taken down by me in

6     shorthand at the time and place therein named and

7     thereafter transcribed under my supervision;

8          I further certify that I am neither counsel

9     for, nor related to, any party to said proceedings, not

10    in any way interested in the outcome thereof.

11         I declare under penalty of perjury under the

12    laws of the State of California that the foregoing is

13    true and correct.

14

15    Dated: September 22, 2017

16

17

18    _____

19    Maria Beesley, CSR No. 9132, RMR, FCRR

20

21

22

23

24

25

## Fax Opt-out

Inbox x

June 14

Steve Good  steve@gezon.com

to INFO

To Whom this my concern,

Please remove us from any fax list you have us on.
616-451-2728

Thank You

**Steve Good**
GEZON
322 Rumsey SW    Grand Rapids, MI 49503
Phone: 616-451-2725
Fax: 616-451-2728



EE 000037

Raul Jimenez-Gomez <RJGomez@gatewaytelnet.com>

Mar 28

to info

Please remove our fax number from your list 8183747011   March 28

John Buchanan <john@eurtonelectric.com>

Mar 28

to Raul

Hi Raul,

Not a problem, but we haven't sent a fax in months.  What did you get from us?

**John Buchanan**
Eurton Electric Co., Inc.
9920 Painter Ave
Whittier  CA  90605
ISO 9001:2008 and AS9110B

800-423-4789 (main)
562-946-0014 (fax)
john@eurtonelectric.com

Raul Jimenez-Gomez <RJGomez@gatewaytelnet.com>

Mar 28

to me

We didn't receive one but my supervisor would like me to unsubscribe from any previous companies fax lists.

Thanks have a nice day

From: John Buchanan [mailto:john@eurtonelectric.com]
Sent: Tuesday, March 28, 2017 2:59 PM
To: Raul Jimenez-Gomez <RJGomez@gatewaytelnet.com>
Subject: Re: Fax

EE 000038

**5**