IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-02981-MSK-KMT

TECH INSTRUMENTATION, INC., a Colorado corporation, individually and on behalf of all others similarly situated,

        Plaintiff

v.

EURTON ELECTRIC COMPANY, INC., a California corporation

        Defendant

**DECLARATION OF JOHN BUCHANAN IN
SUPPORT OF MOTION FOR DECERTIFICATION**

1. I am over the age of eighteen years and am competent to make this declaration.

2. I have personal knowledge of the matters set forth in this declaration, except as to those matters stated upon information and belief, and I believe those matters to be true.

3. I am President of Defendant Eurton Electric Company, Inc. ("Eurton").

4. Eurton supplies and repairs electric motors. Eurton is a small business with 30 employees.

5. Eurton has been in business for over 35 years.

6. Based on the foregoing, if called upon as a witness, I could and would competently testify as to all of the matters stated herein.

7. Exhibits 3, 4, 5, 6, 7, 8, and 13 were maintained in the regular course of Eurton's business. These records are updated as applicable, at or near the time of the acts, conditions, or events to which said books and records relate.

8. As part of its business, Eurton would obtain fax information for potential

customers. Eurton engaged a company called WestFax to mount an advertising campaign via fax to a list of recipients that Eurton supplied.

9. This list included Plaintiff Tech Instrumentation Inc. ("Tech") and over 1,000 other individuals/businesses.

10. Plaintiff filed its Complaint on December 6, 2016. Within the four years prior to filing of Plaintiff's complaint, Westfax was the only provider Eurton used to send faxes.

11. Eurton does not have a record of the faxes sent by Westfax to class members.

**How Eurton obtains permission to fax**

12. Eurton's primary practice to obtain fax numbers has been described as a three-step process.

13. First, Eurton would locate businesses online that might use motors in their operations.

14. Second, Eurton would then cold-call those businesses, explain our rebuilding and rewinding services, and ask whether the business would be interested in receiving more information.

15. Third, the company policy was to then ask the businesses if they agreed to receive more information, including by fax.

16. In addition to the 3 Step Process (above), there other ways Eurton would obtain consent, as described further below.

17. It was also a matter of company policy that Eurton would remove anyone when "mistakes" occurred. However, these removals were few and far in between. I do not have a record of the plaintiff, Tech Instrumentation, asking to be removed. To my knowledge, plaintiff, Tech Instrumentation never requested to be removed from the list.

18. Prior to deposition I did a cursory search for "opt outs." I only located two opt outs. However, an opt-out does not necessarily mean there was not initial permission

to fax, only that the recipient no longer desired faxes.

**Class list**

19. Plaintiff's class was certified on May 29, 2018.

20. I am informed that the Court required notice be sent to the following the following persons or entities:

(i) those listed on Eurton's 2017 fax logs. "Fax logs" were referred to by Defendant in its Opposition to Plaintiff's Motion for Approval of Plaintiff's Proposed Class For Disseminating Notice to the Class (ECF 66) and were set forth at Exhibit 3 (ECF 66-1 at pgs 7-69).

(ii) those listed on any existing iteration of Eurton's "fax list"; and

(iii) those who do not meet either of the first two criteria, but who are noted as having a fax number in either Eurton's accounting database or on its potential customer/actual customer spreadsheet.

21. With respect to Eurton's fax list (item ii), Eurton previously produced a fax list in discovery as EE001-33. See Exhibit 1. That list represents 1,498 fax numbers. However, 252 of those numbers are numbers that were not able to be faxed, because many of the list recipients are no longer in business, and/or the numbers were no longer in existence. That these companies/numbers were no longer in business or these fax numbers did not work was determined by Eurton after the lawsuit was filed.

22. With respect to persons in Eurton's database that do not overlap with the fax list (item iii), Eurton has identified 2,738 phone numbers. This was produced as EE2363. See Ex. 2.

23. Eurton did not have any 2017 fax logs other than post-lawsuit fax attempts to verify company information associated with the fax numbers on the list because the list in question was just numbers with no other information. Those faxes were made to verify prior express permission or invitation to fax the persons under (ii) and (iii), so those persons are subsumed in EE001-33 ("Initial List") and EE2363

("Supplemental List"). Those logs were produced as EE0039-1285.

24. The potential customer/actual customer spreadsheet referenced at the deposition of Eurton was "Tools List for Mailer 5-2009", but those numbers are already included in EE001-33. This list does contain 841(56%) of the list recipients from the list in question with previously contacted names and fax numbers from 2009.

25. A true and correct copy of this Tool List is set forth as Exhibit 3.

26. The Tool List was Eurton's mailing list for potential and current customers at that time (2009). This collection was independent and not part of our customer database. The list was assembled for mailing, but as Eurton added contact names, fax numbers, and permissions, the fax numbers were put on the fax list in question and represent the majority of the list recipients.

27. The fax numbers on the Tool List would have been added if the fax number was provided via the three-step process described above, or if the fax number was provided as customers contacted Eurton, via credit application, customer update information form, or data quote form.

28. The fax numbers and other contact information in the Tool List would have been added in the regular course of Eurton's business by Eurton employees near or at the time the contact information was provided.

29. The 841 of the 1,523 entities on the Tools List are associated with fax numbers. The remaining 682 had not been updated with fax numbers and were not faxed. Those 841 (56%) contacts were in the Initial List, and therefore the confirmation of consent to fax those individuals via the Tools List predates this lawsuit.

30. The Tools List is a large but not exclusive source of the fax list numbers produced as EE001-33 used to create the Initial List.

31. With respect to persons in Eurton's database that do not overlap with the Initial List, Eurton identified 2,378 individuals.

32. Eurton produced a Supplemental class list ("Supplemental List") relating to

the names, addresses, and fax numbers for these individuals as EE2363. A true and correct copy of EE2363 is attached hereto as Exhibit 2.

**Documents reflecting consent prior to certification**

33. Eurton possesses documents reflecting three different ways consent was provided prior to this lawsuit being filed. At my deposition, when I was asked, "In fact, you don't have evidence, sitting here today, that any of the faxes you sent were solicited; correct?", I was confused and believed Plaintiff's counsel was only referring to the plaintiff Tech, not the entire class. This is apparent, given the number of credit applications and Customer Update Forms in Eurton's possession.

34. Once the Court's Order certifying class and identifying the means to give notice was finalized, Eurton applied its resources to developing evidence of consent for these class members.

**Credit application forms**

34. As part of its customer process, Eurton would have customers fill out a credit application.

35. Credit applications, along with Customer Update Forms relating to Initial List were produced as EE1411-1501. And, credit applications along with Customer Update Forms relating to the Supplemental List were produced as EE1502-2022.

36. True and correct samples of credit applications with respect to the Initial List are set forth as Exhibit 4 and with respect to the Supplemental List are set forth as Exhibit 5.

37. Eurton has only produced credit applications relating to letters A, B, and C with respect to the Supplemental List. Assembling the credit applications during January and February 2020 relating to letters A, B and C required 240 hours. This required manual review of thousands of hard copy applications to match with the individual/businesses in EE1502-2202.

38. During this unprecedented and unforeseen time Eurton has had to lay off

personnel as a result of COVID-19. Eurton does not have sufficient personnel or funds to assemble evidence relating to letters D-Z. Such review would require an estimated 1,840 hours.

39. It was Eurton's policy and procedure such that every company who was listed in the customer database with a credit account would have completed a credit application. Not every credit application would have specifically had the language referencing faxes for "sales and specials," for several reasons.

40. First, many of Eurton's customer's applications date back before faxing. Second, many customers would submit their own pre-filled out credit forms with their contact information which includes their fax numbers among other contacts. Moreover, Eurton changed credit application forms over the years.

41. Although the specific verbiage was not always included, the forms provided for normal business communications which included faxing for promotions.

42. Regardless, it was Eurton's practice to orally inform customers who completed credit applications the various reasons faxes would be sent.

**Customer Contact Information Update Form**

43. For the past 36 years, since I started full-time at Eurton, Eurton has always sent out periodic customer update forms every 3-4 years via e-mail, fax, or and mail.

44. Examples of these updates are included in EE1411-1501, EE2023-2361, EE3061-3946.

45. As evidence that this practice predated the lawsuit, attached hereto as Exhibit 6 are customer update forms EE3061-3070 faxed stamped from customers that predate the lawsuit.

46. The majority of the update forms do not have fax stamps because they were generally completed and returned to Eurton via e-mail or mail, not faxed backed by customers.

47. True and correct copies of sample customer updates are attached hereto as

Exhibit 7.

48. Although there are not date stamps on most of these update forms, Eurton can determine certain forms predate the lawsuit by the address and the graphics used on the forms.

49. Also, although Eurton's location remains unchanged, it resides on the border of two cities, Santa Fe Springs, and Whittier. After years of struggles with Google, UPS, the FedEx, and the Post Office, Eurton started showing Eurton's address as located in Whittier (rather than Santa Fe Springs) in early 2017.

50. Therefore, a Santa Fe Springs address on a form indicates the form was created prior to 2017. See, for example, the Customer Contact Information Update Forms EE3071-74 (Ex. 7), reflecting a Santa Fee Springs address. However not all forms have Eurton's address.

51. Customers may have received several of these forms periodically over the years. Those customers can return the form and update Eurton whenever they wished to update. This process is continuously in effect as our customers can supply Eurton with this information whenever there is a cause for an update.

52. Because the update forms are generally e-mailed or mailed back to Eurton, or dictated orally, Eurton does not have readily available means of determining the date a customer returned and completed a particular update form.

53. Only the most recent update forms would usually be kept in the files. Therefore, the presence of an update form post-lawsuit would not mean Eurton had not received a similar update form pre-lawsuit.

54. A true and correct copy of an update form for Kalamazoo Electric Motor Co. is attached hereto as Exhibit 7 at (EE1287). Notice the change of address and other information from their original credit application Exhibit (EE1289) (See Exhibit 4 ) over 20+ year prior, and the new recent contact "Kara" on their latest form.

55. Many of Eurton's customers have been customers over five to thirty plus

years. In this regard, much of the documentation relating to prior permission, credit applications, and updated credit applications has been lost over time.

56. Although Eurton provided these Customer Contact Information Update Forms to customers periodically in the regular course of business, it did not send these forms as a mass one-time communication to the entire class in June 2018 or any other time. It was a regular business practice to use these forms. They were not used as a response to Plaintiff's lawsuit.

**Review of forms**

57. With respect to the Initial List, the spreadsheet set forth at EE02362 summarizes Eurton's review of documents relating to the Initial list such as hardcopy credit applications, updates and records relating to business transactions. A true and correct copy of EE2362 is attached hereto as Exhibit 10.

58. This spreadsheet contains columns relating to "Estab. Bus Relations Contact", and " Update Verified Info. / Perm. To Fax Doc."

59. If there is an "X" in the Estab. Bus Relations Contact column, that means there is a corresponding document in Ex. 14, 10,000+ Business Transactions with EBR List Recipients .pdf" (See EE394-EE4969).

60. If there is an "X" in "Update Verified Info. / Perm. To Fax Doc.", this means there is a corresponding document in "1,000 + fax flyers" (EE039-1285)

61. Where there is listed "NO LISTING" in the "Business" column, means that at the time of Eurton's research, Eurton could not find any association of the fax number with a business or individual.

62. With respect to the Supplemental List, the spreadsheet set forth at EE02364 (Eurton Database A's B's C's Cust with Credit Apps and Updates 5-2020.xls) summarizes Eurton's review of the hardcopy credit applications and updates relating to A, B and C (EE1502-2202), against the Supplemental List.

63. A true and correct copy of EE2364 is attached hereto as Exhibit 11.

64. If there was a credit application or update, the column was marked with a "C" or "U" (76%). If they were no longer in business, that was also indicated on the spreadsheet (12%).

65. If there was a blank row in EE2364, that means it was non-contactable by company name, phone number, fax, email or web presence. Roughly 12% of the Eurton Customers on the A, B & C Supplemental List conducted business with Eurton several years prior. During those years, they never notified Eurton of going out of business nor filled out a Customer Update information form. Therefore, these 84 contacts, are represented by the blank cells in the column. Their company names, addresses, phone and fax numbers no longer exist and far as we know.

**Data Quote forms documents consent prior to certification**

66. Every day, potential customers and long-established customers request and fax to Eurton quotation data sheet flyers and other information via "Armature Data Sheet Quotation" and other winding related forms which contain the pertinent information required to get them the rewinding quotations they need. These documents were produced as EE2365-3060 ("Fax Flyers From List Customers and Potential Customers To Eurton Electric pdf")

67. These forms include a line for the customer to provide their fax number.

68. A true and correct copy of examples of these documents produced as EE2365-3060 are attached hereto as Exhibit 8.

**Post lawsuit**

69. In addition to the credit applications, updates and Armature Data Sheet Quotation forms obtained prior to certification, Defendant also obtained evidence of consent after the lawsuit was filed.

**Verification faxes documents consent post-lawsuit**

70. In 2017, without prompting or involvement of defense counsel, Eurton directly contacted its customers to verify their company information and consent to fax.

71. In this regard, Eurton contacted these customers to orally confirm/verify the fax numbers because the numbers on the Initial List in question were only numbers, they needed to be reverse engineered from having just a fax number to get the further needed information (company name, address, phone, etc).

72. During this verification process, Eurton would then send these persons who had given their previous permission to fax them a flyer to confirm their prior consent and numbers to receive faxes.  Note:  841 (56%) of these original contact names can also be found in the Tool List 2009 (Ex. 3), which predates the lawsuit.

73. All 1,100 + fax flyers, (EE039-1285), have the contacts, verified numbers and have "Permission to Fax was given by contact at the top of the flyer" and an extensive opt out message.

74. Samples of these faxes are attached hereto as Exhibit 9.  As an example, the fax confirmation sheet on EE0096 confirms confirming fax for businesses EE0103 (Minneapolis Lock & Key, 612-822-7716), EE146 (Broadview Instrumentation Services, Inc., 216-575-0051) and EE148 (Butler Cranberry Lock, Safe & Door Inc. (724-282-2227), among others.  Similarly, EE000295 is a fax confirmation sheet which includes a fax for EE0270 (Tool Place Corp. 305-591-5653), among others.

**Business relationships**

75. Eurton has produced documents reflecting over 10,000 business transactions between EBR List Recipients and Eurton Electric. Sales Orders, Invoices and Statements (EE3947-EE4969).  True and correct copies of samples from this production is attached hereto as Exhibit 13.  As just one example, EE4840 reflects invoices as early as 1999 for Kalamazoo Electric.  This relationship began with a credit application whereby Kalamazoo provided its fax number.  See Ex 12 at EE1289.

   **Fax Logs**

76. Eurton does not possess any records of faxes actually sent ("fax logs"). Such fax logs would likely be in the possession of Westfax.  Any fax logs received from

Westfax would have been deleted in the regular course of Eurton's business prior to notice of Plaintiff's lawsuit in late 2016.

77. When Eurton refers to a "fax list", it refers to a list of fax phone numbers that it maintained that were presumably sent to WestFax. I periodically updated this list with Excel.

78. Therefore, there were various iterations of the "fax list."

79. With respect to Eurton's fax list, Eurton previously produced a fax list in discovery as EE001-33. That list represents 1,498 fax numbers. However, 252 of those numbers are numbers that were not able to be faxed, because many of the list recipients are no longer in business, and/or the numbers were no longer in existence. That these numbers are no longer working numbers was determined post-lawsuit.

80. A true and correct copy of a postcard Eurton received is set forth as Exhibit 12.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23th day of September 2020, at Whittier, CA.

_____
John Buchanan