# EXHIBIT B

{Exhibt a.1}

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLORADO

 3

 4   Tech Instrumentation, Inc., a    )
     Colorado Corporation, individually )
 5   and on behalf of all others      )
     similarly situated,              )
 6                                    )
                   Plaintiff,         )
 7                                    )
            vs.                       ) Case No.
 8                                    ) CV 16-02981-KMT
                                      )
 9   Eurton Electric Company, Inc., a )
     California Corporation,          )    CERTIFIED COPY
10                                    )
                   Defendant.         )
11   _____)

12

13

14

15              DEPOSITION OF JOHN BUCHANAN

16

17              Tuesday, September 12, 2017

18                     9:54 A.M.

19              633 W. 5th Street, Suite 900

20              Los Angeles, California 90071

21

22

23   Reported by:
     Maria Beesley
24   CSR 9132, RMR, FCRR
     Job No. 139402
25
```

```
 1   APPEARANCES OF COUNSEL:

 2

 3   For Plaintiff:

 4        WOODROW & PELUSO
          BY:   STEVEN L. WOODROW, ESQ.
 5        3900 E. Mexico Avenue, Suite 300
          Denver, Colorado 80210
 6        720.213.0676

 7

 8
     For Defendant:
 9
          ALVARADO SMITH
10        BY:   THEODORE BACON, ESQ.
          633 W. 5th Street, Suite 900
11        Los Angeles, California 90071
          213.229.2400
12
```

3

1                              I N D E X

2     WITNESS:   JOHN BUCHANAN

3     EXAMINATION BY                                        PAGE

4     By Mr. Woodrow...........................................4

5                              EXHIBITS

6

7     EXHIBIT    DESCRIPTION                                 PAGE

8

9        1     Notice of Deposition..........................12

10       2     Westfax Response to Subpoena..................41

11       3     Sample faxes..................................61

12       4     Fax Opt-out...................................79

13       5     Preliminary Statement.........................84

14       6     Invoice dated 5/14/16........................124

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                  LOS ANGELES, CALIFORNIA
 2           TUESDAY, SEPTEMBER 12, 2017, 9:54 A.M.
 3
 4                       JOHN BUCHANAN,
 5        having been first duly sworn, was examined and
 6                    testified as follows:
 7                         EXAMINATION
 8   BY MR. WOODROW:
 9        Q.   Good morning.
10             My name is Steven Woodrow.  I'm an attorney in
11   the lawsuit.
12             Can you say and spell your full name for the
13   record?
14        A.   John Buchanan, J-o-h-n, B-u-c-h-a-n-a-n.
15        Q.   What is your date of birth?
16        A.   7/13/62.
17        Q.   Have you ever been deposed before?
18        A.   No.
19        Q.   Okay.  So just a few ground rules that I'm
20   sure your attorney went over, but I'm going to do it
21   again, so bear with me.
22             One thing is I'm going to be asking you
23   questions and it's very important for the sake of the
24   court reporter's fingers that you wait until I'm done
25   talking until you answer.
```

1   e-mails in your possession that evidence someone
2   agreeing or consenting to receive a fax from you?
3        A.   Well, that's confusing.  I may have some.
4        Q.   Where might they be?
5        A.   I would imagine they would be in my e-mails.
6        Q.   You are unsure because you haven't searched
7   yet?
8        A.   Well, I haven't searched for e-mails.  You are
9   asking a different question.
10        Q.   Okay.  So you haven't searched for e-mails.
11   And sitting here today you think you might have some;
12   correct?
13        A.   Might have some --
14        Q.   E-mails.
15        A.   -- e-mails.  Concerning?
16        Q.   People indicating that they would like to
17   receive faxes from you.
18        A.   I have no -- I have done no search for that
19   type of thing.
20        Q.   Right.
21             And sitting here today you don't actually know
22   whether you have any such e-mails in your possession;
23   correct?
24        A.   I don't know.
25        Q.   What don't you know?

1   today, that any of the faxes you sent were solicited;
2   correct?
3       A.   I need to clarify what we said earlier.  Yes.
4   To answer the earlier question prior to this lawsuit, I
5   had no evidence or e-mails.
6       MR. BACON:  Today, as of this lawsuit, do you
7   have any evidence that prior to this lawsuit you had any
8   permission; is that correct?
9       THE WITNESS:  I had no tangible or physical
10  evidence.
11  BY MR. WOODROW:
12      Q.   When you say "no tangible or physical
13  evidence," are you saying that you just have memories of
14  conversations?
15      A.   Well, our policy is to contact everybody and
16  that's what I gave instructions for them to follow
17  what's on this flier.
18      Q.   Okay.  Who did you give instructions to?
19      A.   People -- employees.
20      Q.   Of Eurton Electric?
21      A.   Yes.
22      Q.   How many employees were part of this process?
23      A.   Well, over the years we have had telemarketers
24  in and out to call and contact, and usually I would have
25  no more than two.

1    A.   Oh, yeah.  I definitely think it's semantics
2    here.  I provided what the TCPA requires, I believe.
3    And you believe I don't.  So we're at a standstill.  You
4    believe they're unsolicited, I believe they're
5    solicited.
6    Q.   Putting aside what I believe, I go by evidence
7    and I have yet to see any evidence that you sent
8    solicited faxes, other than your testimony that you have
9    this process which people are supposed to follow.
10   A.   Right.
11   Q.   Did you ever check that the marketers were
12   following your procedure and process for getting
13   permission?
14   A.   Of course.
15   Q.   How did you do that?
16   A.   Just by seeing the data they would collect.
17   Especially in the personal e-mails, if I gave them a
18   list and said contact this person, maybe their phone and
19   their fax would be there, but their e-mail would not be.
20        So in the column where their personal e-mails
21   are there, I know we have contacted that person and they
22   have their -- that person is being contacted, we've
23   gotten their personal e-mail and their contact name at
24   that location.
25        So it was very easy to see that that was going

1    marketers now?
2         A.   Yes.
3         Q.   Do you remember who was before Madeleine and
4    Annette?
5         A.   No.  That's what I cannot recall.
6         Q.   Can't recall the names of anyone?
7         A.   No.  I mean, I'm sure when I see their names
8    it will hit me, but right now in the deposition I can't.
9    I'm drawing a blank.
10        Q.   Do you have any records of any transactions or
11   sales between Eurton Electric and Tech Instrumentation?
12        A.   No.
13        Q.   For the numbers on the fax list that you have,
14   does do those numbers correspond to different
15   businesses?
16        A.   Yes.  I mean, the faxes are all businesses.
17        Q.   If someone wanted to, could they look up --
18   maybe put the fax number into Google and find out which
19   business it's associated with?
20        A.   Yes, I would imagine.
21        Q.   Do you have a system where you know which
22   numbers are associated with which customers or potential
23   customers?
24        A.   Those were -- the numbers were taken off the
25   list, like the list with the name and address and e-mail

94

1   and contact and phone number all that.  So then just the
2   column of fax numbers were compiled to just make the
3   list.
4           So I could reverse it that way and Google that
5   way as well.
6       Q.  So when you look at the list of phone numbers,
7   it's not just a list of phone numbers.  Your system
8   has --
9       A.  The fax list is just the list of phone
10  numbers.
11      Q.  Correct.  But in your system those numbers are
12  tied to names and bills?
13      A.  That correspond to, yes.
14      Q.  There is a difference there; right?
15      A.  Of course.
16      Q.  Me typing up a list of fax numbers is
17  different than me producing a list of numbers from a
18  spreadsheet?
19      A.  Correct.
20      Q.  Using some sort of database program; right?
21      A.  Yes.
22      Q.  To run a query?
23      A.  Right.
24      Q.  So those are the numbers on the list, but you
25  still have the business names and addresses and other

1    contact information?
2        A.   Yes.  They're on -- I mean, yes, in theory I
3    have all that to go to that specific list.
4        Q.   When you remove a number from the fax list,
5    does that delete the entry in the database for that
6    company or can you still call and mail things to that
7    company, they're just no longer on the fax list?
8        A.   They're just no longer on the fax list.
9        Q.   Could we do a comparison of the businesses on
10   the master list, we'll call it, to the fax list and come
11   up with a list of who's been removed from the fax list
12   but was on it at some point?
13       A.   Would it be 100 percent accurate?  Probably
14   not, but...
15       Q.   I'm not asking that.  I'm a lawyer.  Who cares
16   about accuracy.
17            It could be done?
18       A.   Anything could be done.
19       Q.   Not everything.  I asked someone at a
20   deposition once when they said everything can be done,
21   and I said, "Can I fly?"
22            And guess what they responded with.  "I could
23   throw you out the window right now and you would do
24   pretty good for the first nine floors."
25            So striking the hypothetical, anything is

1  possible in a world of quantum physics.  Let's go with
2  what we know.
3      A.  It would be possible to get a lot of them.
4      Q.  Numbers that used to be on the fax list but
5  aren't anymore; correct?
6      A.  Yes.
7      Q.  And with respect to the master list, do you
8  track sales or transactions with every customer to know
9  what they're buying?
10     A.  It would be our customer database would have
11 all that information.
12     Q.  Okay.  You could match up the customer name
13 from the master list to the customer database that keeps
14 track of sales and whatnot and figure out which folks on
15 the master list you have sold stuff to; correct?
16     A.  No.  I mean, yes and no.
17     Q.  Tell me the yes part first.
18     A.  Yes, if they're an established customer.  We
19 have many customers that only use us one or twice or
20 before we entered them in as a fixed customer.  They
21 will have used us three or four times.
22     Q.  So it takes a few times to get them into the
23 system?
24     A.  Yeah.  They would have to want to be on the
25 system.  Then we give them a customer number, that kind

102

1   A.   Mm-hmm.
2   Q.   We call that the network?
3   A.   Yeah.  Our accounting database system,
4   whatever that's in.
5   Q.   That's better because I don't work for you.
6   So whatever you want to call it.  The accounting
7   database system.
8        So that's what I have called the master list
9   that has names, addresses, fax numbers, and sales;
10  correct?
11  A.   Of people that have done business with us.
12  Q.   Correct.  And it's not complete, is it?
13  A.   Correct.
14  Q.   Because you have a middle spreadsheet of,
15  we'll call it the potential customer spreadsheet that
16  actually has potential customers and some actual
17  customers on it; correct?
18  A.   Yes.  Our customers that have given us faxing
19  because you want to keep your current customers up to
20  speed on what you do, and potential customers, showing
21  them what you do, that's what's on the list.
22  Q.   Okay.  And then a third list is the fax list
23  which is the numbers that you have pulled from that
24  second spreadsheet; correct?
25  A.   Correct.

115

```
 1        Q.   Okay.
 2        A.   It's a Google Sheet.
 3        Q.   This is number two, the potential/actual
 4   customer spreadsheet?
 5        A.   The potential/actual customer.
 6        Q.   Is a Google Sheet?
 7        A.   Yes.
 8        Q.   Was it at one point an Excel file and now it's
 9   a Google Sheet?
10        A.   Yes.
11        Q.   Do you still have the original Excel file?
12        A.   I believe I do.
13        Q.   Don't delete it.
14             Do you recall when you transferred the
15   information from the Excel file to the Google Sheet?
16        A.   Yes.  May or June.
17        Q.   Of this year?
18        A.   Yes.
19        Q.   After the lawsuit was filed?
20        A.   Yes.
21        Q.   Does the Google Sheet still provide you with
22   the same functionality?  You are still able to pull
23   numbers from a particular column and make the separate
24   fax list?
25        A.   I haven't made a separate fax list out of it,
```

136

1      A.   Yes.
2      Q.   So if I had the invoices from 2015, '14 and
3 '13, could I apply essentially the same logic and figure
4 out which entries on those invoices featured our list
5 versus a difference list?
6      A.   If you got this from WestFax you mean for
7 those years?  Yeah, it would show similar, I would
8 imagine.
9      Q.   So if there were entries for tools and being
10 sent to around 1500 people, I know from all the other
11 entries on the invoice that's the list in our case?
12     A.   That would be the one, yes.
13     Q.   So at any given time the people who got the
14 faxes that my clients got was only about 1500 people?
15     A.   Yeah.
16     Q.   Was the opt-out language the same on all your
17 faxes, though?
18     A.   Yes.
19     Q.   So it didn't matter what list you are on?
20     A.   Yeah.  If I'm autopsy saws, cast saws, RV, the
21 opt-out language is the same.
22     Q.   And do you generate those fax lists, those
23 separate ones in the same way as you did the tools fax
24 list?
25     A.   Yes.

### DEPOSITION ERRATA SHEET

| # | Entry |
|---|---|
| 2, 3 | Page No. 59   Line No. 5<br>Change: Add "other documents reflecting consent such as credit applications, customer contact update permission forms and faxed flyers from recipients to Eurton Electric." |
| 4, 5 | Page No. 66   Line No. 5<br>Change: "had no evidence or e-mails" to "I could not locate any evidence or e-mails with respect to your client only." |
| 6, 7 | Page No. 66   Line No. 9<br>Change: "I had no" to "I could not locate any". |
| 8, 9 | Page No. 66   Line No. 10<br>Change: Add "with respect to your client only. I have evidence for other faxes sent." |
| 10, 11 | Page No. 76   Line No. 10<br>Change: Add "I have not produced all of our evidence of permission to fax." |
| 12, 13 | Page No. 93   Line No. 12<br>Change: "No" to "I could not locate any." |
| 14, 15 | Page No. 94   Line No. 13<br>Change: "Those that correspond to" to "those in the system that correspond to." |
| 16, 17 | Page No. 95   Line No. 3<br>Change: "all" to "many" |
| 18, 19 | Page No. 96   Line No. 11<br>Change: "all" to "much of" |
| 20, 21 | Page No. 102   Line No. 13<br>Change: "Correct." to "Correct, our accounting database." |
| 22, 23 | Page No. 115   Line No. 20<br>Change: "Yes" to "Yes, it's the new master list I mentioned earlier." |
| 24, 25 | Page No. 136   Line No. 12<br>Change: "would" to "could" |
| 26, 27 | Page No. _____   Line No. Change:<br>_[signature]_   7-28-20<br>John Buchanan                Dated |

Coalition Court Reporters | 213.471.2966 | www.ccrola.com