IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: <u>1:16-cv- 02981</u>

TECH INSTRUMENTATION, INC., a Colorado corporation, individually and on behalf of all others similarly situated,

        Plaintiff,

v.

EURTON ELECTRIC COMPANY, INC., a California corporation

        Defendant.

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DECERTIFY CLASS**

**I.    INTRODUCTION**

Continuing its recent quest to relitigate this four-year-old case, Defendant Eurton Electric Company, Inc. ("Defendant" or "Eurton") now asks the Court (after two rounds of class notice have been disseminated) to reconsider its May 2018 Order certifying the Class in this case. It is too little, too late, and Eurton's Motion should be denied.

Eurton's Motion reiterates already rejected arguments regarding the supposed need for individualized inquires and sets forth new arguments that could have been raised when the Parties briefed class certification years ago. Eurton's Motion should be denied for this reason alone. But assuming the Court entertains Eurton's new arguments, they fail on the merits. Not only are Eurton's newly-argued methods of supposed consent insufficient, they present even

more common questions for the Class that can be resolved with a single stroke, thus strengthening the case for certification.

As such, and as explained below, Eurton has violated the JFPA uniformly with respect to the entire Class. As the Court previously found, all elements of Rule 23 are satisfied in this case. Eurton's Motion should be denied.

## II.     PROCEDURAL BACKGROUND

As the Court is aware, this case was filed on December 6, 2016. (Dkt. 1.) Plaintiff moved for class certification on November 6, 2017, and Defendant filed its response in opposition on November 27, 2017. (Dkts. 36, 39.) On May 29, 2018, the Court certified the Class. (Dkt. 47.)

On March 4, 2019, Plaintiff filed its motion to approve a notice plan. (Dkt. 65.) This motion was granted in part and denied in part on September 13, 2019 (Dkt. 72). On December 12, 2019, the Court granted the Parties' Joint Motion for Extension of Time to Disseminate Class Notice (Dkt. 76) and ordered that Notice be disseminated by January 30, 2020.

In accordance with the Court's December 12, 2019 Order, Class Counsel worked with a class action administrator to disseminate notice to the Class in accordance to the Court's September 13, 2019 Order. The website went live and the short form notices were mailed by the January 30, 2020 deadline established by the Court. As explained in detail in Plaintiff's motion for leave to disseminate a second round of notice, a (very) late production of additional class members by Eurton on February 28, 2020 necessitated a second round of notice. (*See* Dkt. 86.) The request for a second round of notice was granted on April 28, 2020 (dkt. 87) and notice was sent to the newly-disclosed Class members by the Court's deadline.

Since that time, Eurton has attempted to re-litigate the case. On June 10, 2020, Eurton served a "Second Set of Supplemental Disclosures," (Dkt. 88, Ex. C) which really are changes to

2

its answers to the interrogatories served by Plaintiff in April 2017. Similarly, on July 8, 2020, Eurton served a "Third Set of Supplemental Disclosures" which amended its 26(a)(1) disclosures served years earlier. (*See* Dkt. 88, Ex. D.) Eurton served a similar amendment on July 30, 2020. (Dkt. 88, Ex. E.) All of this appears to have been done to gear up for this instant Motion.

As explained below, the Court should deny Eurton's Motion.

### III.   ARGUMENT

#### A.   Eurton Does Not Meet The Standard For Reconsideration Or Decertification—It Does Not Present Newly-Discovered Evidence, But Rather Evidence It Chose Not To Raise The First Time

In a motion for reconsideration, "it is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing." *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Instead, reconsideration is appropriate only where there is "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice". *Id*.

Eurton does not meet this standard. Although Eurton cites to evidence it did not use in its opposition to class certification, none of it is new. Eurton has (obviously) been in possession of its own records since before this case was filed. It chose not to raise these arguments or cite to these exhibits when class certification was briefed in 2017. Reconsideration is thus unwarranted for this reason alone. *See Bell v. Brockett*, 922 F.3d. 502, 513 (4th Cir. 2019) ("Defendants have had multiple opportunities to raise the issues they now have advocated to this court. To see decertification more than four years after the class certification order with arguments that either were presented, or could have been presented, is unwarranted and inappropriate").

Though Eurton styles its motion for reconsideration as a motion to decertify, contending that it is on Plaintiff to show (again) that the requirements of Rule 23 are satisfied, courts

construe a motion to decertify as a motion for reconsideration. *See In re Motor Fuel Temperature Sales Practice Litig.*, 279 F.R.D. 598 (D. Kan. 2012) (construing a motion to decertify as "a motion for reconsideration of the class certification order"). In any event, whether the appropriate standard is reconsideration or a rehashing of Rule 23, decertification is inappropriate unless there has been a "material change in the law or facts since [the court] certified the class." *Schell v. OXY USA, Inc.*, 213 U.S. Dist. LEXIS 129569, *11 (D. Kan. 2013) (denying motion to decertify).

Here, there have been no material factual changes since the Court certified the Class. Rather, Eurton has decided to advance arguments based on documents in its possession at the time class certification was briefed. If it wished to argue that this "new" evidence defeats certification, it should have argued it then.[1] Eurton should not permitted to re-litigate certification simply because it did not like the result the first time.

Indeed, Eurton made no mention of these documents when it opposed certification in 2017. Instead, it hung its hat on its three-step process. (*See* Dkt. 39 at 17 "Buchanan, the President of Defendant, provided testimony on the procedure utilized in order to obtain consent from the recipients"). Now in 2020, Eurton's Motion to reconsider the certification Order does not refute its use of the three-step process—in fact, Eurton reiterates its claim that it used its "three-step process" to supposedly obtain consent orally. (Dkt. 90 at 2.) Thus, the Court's statement that "Eurton has no records of who it contacted and who consented" remains true today.

---

[1] Eurton's contention that it could not "develop[] evidence of consent" until class members were identified (dkt. 90 at 5) is specious. The class list was produced by Eurton itself and it had records of who was in the Class throughout the duration of the case. This is not a situation where Plaintiff uncovered the identity of class members from a third party. The class list came from Eurton's own records.

Understanding that its argument regarding its three-step process is a losing argument, Eurton now pivots to changing its own deposition testimony[2] and arguing alternative methods of consent apart from the three-step process it raised throughout the case. As explained below, even if the Court reviews these new theories of consent, the documents relied upon by Eurton are insufficient under the JFPA.

### B.      All of Eurton's Theories of Consent (Both New and Old) Fail

Eurton bears the burden of proving that it had "prior express invitation or permission" to send the faxes at issue to Plaintiff and the Class. *See True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018) ("We therefore hold that 'prior express invitation or permission' is an affirmative defense on which [the defendant] bears the burden of proof.").

Until recently, Eurton's only theory of consent was its supposed three-step process. As explained in Plaintiff's Motion for Class Certification, Eurton employed a common, three-step method for obtaining supposed consent, under which Eurton's practice was to first locate businesses online that might use motors in their operations and then, second, cold-call those businesses and ask whether the business would be interested in receiving more information. (Eurton Depo. Tr., attached hereto as Exhibit A, 67:1-25 - 69:1-19.) The company policy was to then ask the businesses if they agreed to receive more information, including by fax. (Eurton Depo. Tr. 67:5-10.) This was an admittedly imperfect system, so it was also a matter of company policy that Eurton would remove anyone when "mistakes" occurred. (Eurton Depo. Tr. 56:4-25 - 57:1-5; 77:9-10.)

---

[2] This is the subject of Plaintiff's Motion to Strike Errata (Dkt. 88).

Critically, however, Eurton did not record any conversations where consent was supposedly obtained. (Eurton Depo. Tr. 57:17-20.) Hence, Eurton has no evidence that Plaintiff (or anyone else for that matter) actually gave prior express permission or invitation to be faxed via its three-step process. (Eurton Depo. Tr. 65:20-25 - 66:1-10.) As Eurton's corporate designee testified:

> Q. But we have already established that you have no evidence that any fax sent to my client was solicited; correct?
>
> A. No.
>
> Q. You do have evidence?
>
> A. I'm sorry. Evidence, no. No evidence. You're right.

(Eurton Depo. Tr. 65:18-25; 56:4-17.) Indeed, Eurton lacks any other written evidence of consent for anyone:

> Q. [D]o you now make sure you have a record of someone giving consent before they go on the fax list or do you still sort of put them on and take them off?
>
> ...
>
> THE WITNESS: Yes. I wasn't aware that I had to until this, and now we are doing it, yeah.

(Eurton Depo. Tr. 139:5-15; *see also* 65:20-25 - 66:1-10.) Indeed, rather than keep any records of consent, Eurton simply presumes it obtained consent because of its supposed policy to call ahead and ask for such permission. (Eurton Depo. Tr. 66:12-25 - 67:1-25; 76:6-10.) This is why the Court's Order certifying the Class in this case stated "Eurton has no records of who it contacted and who consented".

Realizing that having no evidence of consent is a big problem, Eurton now pivots away from its three-step process and claims that its "credit applications, update forms, and data quote forms" demonstrate prior express permission to be faxed. As explained above, these arguments

6

should be considered waived—Eurton could have presented these documents during class certification briefing but chose not to. But even if the Court considers the arguments, Eurton's documents fail to demonstrate prior express permission to be faxed.

The Seventh Circuit recently analyzed the question of what a defendant must put forward to demonstrate "prior express invitation or permission" in *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 965–67 (7th Cir. 2020). The Seventh Circuit reviewed three different methods of supposed consent. "The first category includes statements suggesting that the individual or entity generally gave permission to receive faxes from [the defendant]. [E]vidence of permission to generally send faxes does not establish prior express permission to fax ads." *Id.* at 966.  The second supposed method of consent set forth in *Physicians Healthcare* was "post hoc statements that an individual *would have* given consent," which failed "because they do not show AMS had *prior* express permission to send the faxes in question." *Id.* (emphasis in original.)

The third method the defendant argued in *Physicians Healthcare* was "statements that the affiants and their employers consented to receive '[defendant's] product information' at the beginning of their business relationship with [defendant]". *Id.* The Seventh Circuit rejected this theory as well, explaining:

> The district court found these [statements] uniformly "too thin to permit a reasonable jury to conclude that "consented," as used in the declarations, meets the legal definition of 'prior express permission.' " Specifically, the court explained that the affidavits and other testimony (1) did not permit an inference that the recipient understood he or she was expressly giving, *in advance*, permission to send faxed advertisements, and (2) did not describe the content of the faxes that the declarant purportedly consented to receive. We agree.
>
> First, at a general level, we must ask whether a consumer must renew its permission for every fax advertisement, or whether a consumer's consent at one point in time gives ongoing consent. Both *CE Design* and *Travel 100 Grp*., as well as the FCC's regulations, imply that a party may consent on an ongoing basis to faxed

7

> advertisements. *See* 637 F.3d at 726; 321 Ill.Dec. 516, 889 N.E.2d at 789; 18 F.C.C. Rcd. at 14128–29. Given the impracticality of any other rule, we make our ruling explicit: Provided a customer gives consent in the manner described below, we will presume that the customer has given permission on an ongoing basis to fax advertisements.
>
> The second and more challenging question is how that permission should be phrased. In light of the FCC's explanation that, for prior express permission to be valid, "a consumer [must] understand that by providing a fax number, he or she is agreeing to receive fax advertisements," 18 F.C.C. Rcd. at 14129, we conclude that the consumer must affirmatively and explicitly give the advertiser permission to send it fax advertisements on an ongoing basis. The invitation or permission cannot simply authorize a single, specific fax, or state that the consumer consented to receive faxed ads from the defendant in the past. Instead, it must explicitly convey that the consumer gives the advertiser ongoing permission to send ads via fax until such time as the consumer withdraws its consent. This framework is both consistent with the FCC's statements on the matter and conforms to the TCPA's text. *See, e.g.*, 18 F.C.C. Rcd. at 14129 ("For example, a company that requests a fax number on an application form could include a clear statement indicating that, by providing such fax number, the individual or business agrees to receive facsimile advertisements from that company. Such statement, if accompanied by the recipient's signature, will constitute the necessary prior express permission to send facsimile advertisements to that individual or business.").
>
> With that rule in mind, the third category of affidavits does not demonstrate that the affiants gave prior express permission for faxed advertisements. A statement explaining that a consumer agreed to receive "product information" via fax after purchasing some products or services from a company is not the same as agreeing to accept faxed advertisements. As the FCC and now we have explained, a recipient must specifically acknowledge that faxed advertisements will follow its consent to constitute prior express permission. A consumer's statement that it gave permission to send "product information" via fax, even on an ongoing basis, after purchasing products or services from a company cannot as a matter of law constitute prior express permission. (It would be a different matter if the affidavits explicitly suggested that that consent included promotional materials or product information regarding products or services not yet purchased.) Similarly, that one had consented to receive a fax advertisement in the past and would have consented to fax advertisements if asked again does not establish ongoing permission to send fax advertisements.
>
> Thus, AMS has not shown that Allscripts had prior express permission to send faxes.

*Physicians Healthsource, Inc.*, 950 F.3d at 966–67. With this standard in mind, Eurton's new

theories of consent fail.

First, Eurton claims its "credit application forms" constitute prior express invitation or permission. (Dkt. 90 at 2; Dkt. 90-7.) These forms are ostensibly completed by customers of Eurton for the purpose of receiving credit from Eurton. The forms contain fields to list the name of the company applying, the address, phone number, and fax number for the company, and a list of references to provide. (*See* Dkt. 90-7.) The forms are not signed, nor do they appear to be dated. *Id.* On the right side of the form, there is a text box which reads:

> IT IS FAST BECOMING THE INDUSTRY STANDARD TO ONLY GIVE OUT CREDIT INFORMATION BY FAX OR MAIL.
>
> ALSO, MANY LARGE CORPORATIONS WILL GIVE CREDIT INFORMATION FROM THE CORPORATE HEADQUARTERS ONLY. WHEN LISTING A LARGE CORP., BE SURE TO INCLUDE THE ADDRESS OF THE MAIN OFFICE AND YOUR ACCOUNT NUMBER.
>
> THIS INFORMATION PROVIDES US WITH THE BEST WAY OF CONTACTING YOU FOR ALL NORMAL BUSINESS COMMUNICATIONS, INCLUDING: INVOICES, SALES ORDERS, CATALOGS, PROMOTIONAL FLYERS, PRICING UPDATES, ETC.
>
> THANK YOU.

(Dkt. 90-7.) Eurton claims these forms "clearly demonstrate prior express permission to be faxed" (dkt. 90 at 12), but that is simply not the standard. A customer of Eurton who may have filled out these forms did so in the context of applying for credit. There is nothing on the form that approaches the standard explained in *Physicians Healthcare*. For example, as the FCC has stated, "a company that requests a fax number on an application form could include a clear statement indicating that, by providing such fax number, the individual or business agrees to receive facsimile advertisements from that company. Such statement, if accompanied by the recipient's signature, will constitute the necessary prior express permission to send facsimile advertisements to that individual or business."). 18 F.C.C. Rcd. at 14129. Eurton's "credit

application" forms do not do that. The forms simply do not satisfy the prior express invitation or permission standard.

Next, Eurton claims its "Customer Contact Information Update" forms also demonstrate prior express invitation or permission. (Dkt. 90 at 12.). These forms (which are unsigned) have fields for contact information and contain a statement at the bottom that "The above information is current and is the best way of contacting us through normal business communications including: invoices, sales orders, pricing, sales promotions, references, phone, facsimile, e-mails, specials and catalog and brochure mailers, etc." (Dkt. 90-9.) Once again, there is nothing on these forms that satisfies the standard explained in *Physicians Healthcare*.

Next, Eurton claims that its "Data Quote" forms somehow demonstrate prior express invitation or permission. (Dkt. 90 at 3.) These forms contain no language regarding permission for Eurton to send fax advertisements. (*See* Dkt. 90-11.) Eurton seems to be contending that because customers fax these forms to Eurton that the customers have provided some sort of implied consent to receive fax advertisements in return. (Dkt. 90 at 3.) This theory falls woefully short of constituting proper prior express invitation or permission.

Finally, Eurton contends that at some point after the case was filed it modified its three-step process to now include a fourth step, whereby Eurton faxes someone who it claims orally consented a form stating "Permission for Faxing was given by the contact at the top of this flyer". (Dkt. 90 at 3, Dkt. 90-12.) As explained above, this sort of "post-hoc", retroactive statement was rejected by the Seventh Circuit in *Physicians Healthcare*. It is also self-serving—the forms are not sent to Eurton by the customer and instead are sent from Eurton to the customer. In other words, it is Eurton (and not the fax recipient) who is confirming that the fax

recipient provided permission. This is not proof that permission was given, only that Eurton claims permission was given.

Thus, each one of Eurton's new theories of consent that supposedly warrants decertification fails to satisfy the prior express invitation or permission standard. And as explained below, not only do the new theories fail to support decertification, they actually bolster the certification decision. Eurton's Motion should be denied.

### C.   Rule 23 Continues To Be Satisfied In This Case

As Plaintiff previously explained, and as the Court previously held, all elements of Rule 23 are satisfied here. That remains true.

#### 1.   The Class is ascertainable.

First, the existence of an ascertainable class is an implied prerequisite to class certification under Rule 23. *Edwards v. Zenimax Media Inc.*, No. 12-CV-00411-WYD-KLM, 2012 WL 4378219, at *4 (D. Colo. Sept. 25, 2012). A class is ascertainable if it is "administratively feasible for the court to determine whether a particular individual is a class member." *Id.* (citation omitted.) As such, "it is not fatal for class definition purposes if a court must inquire into individual records, so long as 'the inquiry is not so daunting as to make the class definition insufficient.'" *Agne v. Papa John's Int'l*, 286 F.R.D. 559, 566 (W.D. Wash. 2012) (quoting *Herkert v. MRC Receivables Corp.*, 254 F.R.D. 344, 348 (N.D. Ill. 2008)).

The Class is not only ascertainable here, it has been ascertained. Eurton produced the Class list and notice has been sent. This element has plainly been satisfied.

#### 2.   Numerosity is satisfied.

The Class is sufficiently numerous as well so as to satisfy Federal Rule 23(a)(1). Numerosity is satisfied where "the class is so numerous that joinder of all members is

11

impracticable." Fed. R. Civ. P. 23(a)(1); *Celano v. Marriott Int'l, Inc*., 242 F.R.D. 544, 549 (N.D. Cal. 2007) (explaining that, in general, numerosity is satisfied when the class comprises forty or more members). Here, notice was sent to thousands of Class members, and numerosity is satisfied.

### 3. Class members share common issues that drive the resolution of the claims.

Next, common issues abound in satisfaction of Rule 23(a)(2). As the Court held in its Order certifying the Class, "the question to be adjudicated is not whether each class member consented to Eurton's faxes, but whether Eurton's standardized practice is sufficient to obtain consent under the JFPA. That is an issue common to all potential clients. Thus, the Court finds that TII's claims are sufficiently common to certify the class". (Dkt. 47 at 3.)

Eurton's new theories regarding consent actually bolster certification. As with its three-step process, the forms Eurton now argues evidence consent are part of a "standardized practice". They are form documents supposedly sent to class members uniformly. So the question of whether these forms are sufficient to obtain consent under the JFPA (as explained above, they plainly are not) is common to each Class member, just as the three-step process is. Commonality remains satisfied.

### 4. Typicality is met as well

TII also satisfies Rule 23(a)(3)'s requirement of typicality. "Typicality insures that the class representative's claims resemble the class's claims to an extent that adequate representation can be expected." *Colo. Cross-Disability Coal.*, 2012 WL 1378531, at *11-12. Typicality "does not mean that the claims of the class representative[s] must be identical or substantially identical to those of the absent class members." 5 NEWBERG ON CLASS ACTIONS, § 24.25 (3d ed. 1992); *Milonas v. Williams*, 691 F.2d 931, 938 (10th Cir. 1982) (citing *Rich v. Martin Marietta Corp*.,

12

522 F.2d 333, 340 (10th Cir. 1975) ("courts have consistently ruled that even though it appears that the named plaintiffs have not suffered discrimination, this fact does not prevent them from representing the class") (citations omitted)).

In its prior Order, the Court held that it "concludes that the claims are sufficiently typical of the class for the reasons discussed as to commonality". (Dkt. 47 at 4.) That conclusion holds.

### 5. Both TII and its counsel remain adequate

The Court previously held that "[t]here is no apparent conflict of interest with other class members and Eurton points to no reason why TII and its counsel could not prosecute the class claims vigorously." (Dkt. 47 at 4.) TII and its counsel remain adequate and have prosecuted the claims vigorously. Adequacy is satisfied.

### 6. Common questions predominate and a class action remains superior

The Court previously held that "having concluded that Eurton's common course of conduct obviates the need for individualized determinations of consent, the Court finds that the issue of whether this course of conduct was sufficient under the TCPA predominates among the entire class." *Id.* As explained above, Eurton's arguments for decertification set forth newly-argued common courses of conduct, but they are still common courses of conduct. Just as the issue of whether Eurton's three-step process was sufficient consent satisfied the predominance requirement, so too does the issue of whether Eurton's credit application forms are sufficient consent. The analysis has not changed, and predominance is satisfied.

The same is true of superiority. The Court previously rejected Eurton's argument that individual inquiries defeat superiority, and it should do so again. A class action remains the superior method of adjudication.

### D. E-Faxes Should Not Be Excluded

13

Finally, Eurton makes a brief argument that so called "e-faxes" should be excluded from the Class due to the FCC's 2019 *Amerifactors* Ruling. (Dkt. 90 at 17.) It is true that the FCC issued an interpretive declaratory ruling stating than an "online fax service" is not a "telephone facsimile machine" as defined by the statute. However, the *Amerifactors* order is currently on appeal to the full FCC and is therefore not a "final order" of the FCC subject to the Hobbs Act. It is therefore due no deference for two main reasons.

First, the term "telephone facsimile machine" is unambiguously defined in the statute. *See* 47 U.S.C. 227(a)(3). When a statute is unambiguous, Courts do not typically defer to an administrative ruling interpreting the clear provision. *See Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.*, 788 F.3d 218, 223 (6th Cir. 2015).

Second, even if the Court wishes to consider FCC rulings, the *Amerifactors* ruling (as a non-final order) does not control. Rather, the FCC's prior final rulings do. In 2003, the FCC (in a final order) found that a fax that is forwarded to a consumer by email falls under the statute. In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 FCC Rcd. 14014, 14133 ¶ 199. The FCC stated that the statute "broadly applies to any equipment that has the capacity to send or receive text or images," and that the statute is designed to "ensure that the prohibition on unsolicited faxing not be circumvented." *Id.* ¶ 201. The FCC ruled that "unsolicited faxes impose costs on consumers, result in substantial inconvenience and disruption", and that "Congress could not have intended to allow easy circumvention of its prohibition when faxes are (intentionally or not) transmitted to personal computers and fax servers, rather than to traditional stand-alone facsimile machines and also may have serious implications for public safety." *Id.* ¶ 199.

Later, in 2015 the FCC issued its "WestFax Order". In re WestFax, Inc. Petition for Consideration & Clarification, 30 FCC Rcd. 8620, 8623, ¶ 9 (rel. Aug. 28, 2015).[3] There, the FCC rejected "the contention that e-faxes do not implicate the TCPA's consumer protection concerns" because they "may shift the advertising costs of paper and toner to the recipient if they are printed" and they cause "interference, interruptions, and expense" the same way a traditional fax does. *Id.* ¶ 11. The FCC ruled that e-faxes "just like paper faxes, can increase labor costs for businesses, whose employees must monitor faxes to separate unwanted from desired faxes." *Id.*

Courts have also consistently rejected efforts by defendants to dodge liability by contending that e-faxes are outside the scope of the statute. *See, e.g., Am. Cooper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 2013 WL 3654550 (W.D. Mich. July 12, 2013); *Whiteamire Clinic, P.A., Inc. v. Cartridge World N. Am., LLC*, 2017 WL 561832 (N.D. Ohio Feb. 13, 2017); *J2 Glob. Commc'ns, Inc. v. Protus IP Sols.*, 2010 WL 9446806 (C.D. Cal. Oct. 1, 2010); *Holtzman v. Turza*, 728 F.3d 682 (7th Cir. 2013); *Imhoff Inv., LLC v. Alfoccino, Inc.*, 792 F.3d 627 (6th Cir. 2015).

In sum, there is no need for the Court to defer to the FCC since the statute is not ambiguous. If it does defer to the FCC, the governing rulings are the 2003 Order and the WestFax Order, not the more recent *Amerifactors* Ruling which is not final and contradicts the FCC's prior Orders. Eurton's arguments to the contrary should be rejected.

## IV. CONCLUSION

The Class certified by the Court in May 2018 should remain certified. Eurton could have made these arguments back then and chose not to—this is not grounds for reconsidering the certification decision over two years later and after two rounds of notice have been sent to Class

---

[3] The Court will recall that WestFax is the exact same vendor used by Eurton in this case.

members. Even if the Court considers Eurton's new arguments, they fail to warrant decertification (and in fact strengthen the case for certification). Eurton's Motion should be denied in its entirety, and the Court should award such additional relief as the it deems necessary, reasonable, and just.

               *        *        *        *        *        *

Dated: October 30, 2020  Respectfully submitted,

**TECH INSTRUMENTATION INC.**, individually and on behalf of all others similarly situated,


By: /s/ Patrick H. Peluso
One of Plaintiff's Attorneys

Steven L. Woodrow
swoodrow@woodrowpeluso.com
Patrick H. Peluso
ppeluso@woodrowpeluso.com
Woodrow & Peluso, LLC
3900 East Mexico Ave., Suite 300
Denver, Colorado 80210
Telephone: (720) 213-0675
Facsimile: (303) 927-0809

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served upon its filing via this Court's CM/ECF system on this 30th day of October, 2020 to all counsel of record.

<u>/s/ Patrick H. Peluso</u>