# Exhibit 1

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| PHYSICIANS HEALTHSOURCE, INC., an Ohio corporation, individually and on behalf of similarly situated persons,<br><br>           Plaintiff,<br><br>v.<br><br>A-S MEDICATION SOLUTIONS, LLC, WALTER HOFF and JOHN DOES 1-10,<br><br>           Defendants. | Case No. 12-cv-05105<br><br>Hon. Matthew F. Kennelly |

## DEFENDANTS' LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**NOW COME** Defendants, A-S Medication Solutions, LLC ("A-S Medication") and Walter Hoff (collectively, "Defendants"), by and through their attorneys, and pursuant to Local Rule 56.1(b)(3)(C), respectfully submit the following Statement of Additional Material Facts in Opposition to Plaintiff's Motion for Summary Judgment. (Dkt. ## 269, 270, 275).

    1.    Allscripts, LLC ("Allscripts") is a company that "offer[s] an open, integrated portfolio of healthcare information technology solutions for hospitals, physician practices, and extended care organizations." (*See* Allscripts' "About Us," *available at* http://www.allscripts.com/company-current/about-us (last visited Jan. 29, 2018). One such healthcare solution was Allscripts' "pre-packaged medication fulfillment solutions business" (the "Medication Business"). (Asset Purchase Agreement, p. 5). The Medication Business provided "both medications and software for dispensing and inventory control." (*Id.*).

2. Since 2006, Allscripts has used a customer relationship management database called Salesforce. (Moffett *Allscripts* Dep., pp. 9-10; Moffett Dep., p. 10). Allscripts uses Salesforce to keep track of data pertaining to its customers and prospective customers, such as their contact information and order history. (Moffett Dep., pp. 9-10). If Salesforce had a fax number for a particular entity, it was only because that entity had voluntarily provided its fax number to Allscripts, along with permission to receive a fax advertisement:

> Q: Does the fact that Allscripts have a fax number for a particular entity mean that they have permission to send them advertisements by fax?
>
> A: The client would have given us that fax number. That wouldn't have come from any place. The client would have given us permission.

(Moffett *Allscripts* Dep., p. 78; Moffett Dep., pp. 41-42)(attorney objection omitted).

3. One of the ways in which Allscripts communicated with its customers and prospective customers was via fax; in fact, until the more recent advent of email, faxing was the most common method of communication:

> Q: And prior to February of 2010, how common was fax communication between Allscripts and its customers and prospects?
>
> A: Prospects? I'll say for customers, it was very – it was very common. Again, a lot of these clients [customers] did not have e-mail addresses at that time….
>
> Prospects, if the prospects wanted information, we would always ask for permission, and we would send it to them if they wanted it faxed. Again, e-mail was – you know, for a lot of these doctors, they were not technologically savvy. That's why they were trying to move to us to help them with that, and early on, fax was a big communicator.

(Moffett Dep., pp. 42-43)(attorney objections omitted).

Allscripts sent fax advertisements based off of information contained in its Salesforce database. (Moffett *Allscripts* Dep., p. 60).

4.      Allscripts sent information about its various products and services to its customers and prospective customers via fax. If a customer was already using a particular Allscripts product or service, Allscripts would fax it information about other Allscripts products and services; and, Allscripts would also fax information about its products and services to entities that had not previously purchased or used any Allscripts products or services. (Moffett Dep., pp. 123-125). The goal was to market a whole suite of Allscripts products and services—and product and service upgrades—to customers and prospects. (Moffett *Allscripts* Dep., pp. 121, 123). When the Medication Business was part of Allscripts, Allscripts' centralized marketing and sales staff marketed and promoted the Medication Business' products and services. (*See* Affidavit of John Gregory Cull ("Cull Aff."), attached hereto as **Exhibit A**, ¶ 3). This included occasionally sending faxes advertising the Medication Business' products and services to Allscripts' current and potential customers. (*Id.* ¶¶ 3-4).

5.      Allscripts' fax advertisements were always sent with the recipient's permission, and often at the recipient's request:

Q:      Did Allscripts' clients [customers] and prospects frequently request information regarding Allscripts' products and services via fax?

A:      Yes.

Q:      And I'll just ask this one more time. Allscripts, am I correct, had a policy and practice of obtaining consent before sending faxes of promotion or informational nature to clients and prospects?

A:      Yes.

(Moffett Dep., pp. 45-46; 125)(attorney objection omitted).

Declarations from Allscripts' customers show that they provided general prior express permission to receive fax advertisements from Allscripts (and other companies) about various products and services. (*See* Allscripts Declarations, attached hereto as **Group Exhibit B**). For example:

> We have used Allscripts' (or one of its predecessor's) products (among others) within at least the past six years. I do not specifically remember receiving any particular faxes from Allscripts (or a predecessor) promoting its (or others') products or services, but in general, I have consented to receiving such communications from Allscripts and others, in the past and currently as well.

(*Id.* at 2-3).

> We have used Allscripts' products within at least the past ten years. I do not specifically remember receiving any particular faxes from Allscripts promoting its products or services, but in general, I have consented to receiving such communications from Allscripts and others, in the past and currently as well.

(*Id.* at 4-5).

6.      Brian Moffett has been an Allscripts employee for over 21 years and is familiar with Allscripts' business practices and how Allscripts keeps track of information pertaining to its customers and prospective customers in Salesforce. (Moffett Dep., pp. 6, 9-10). He testified that Allscripts had a custom and practice of faxing advertisements only with the consent of the recipient:

> Q:    You had said that Allscripts always got permission to send advertisement by fax, is that correct?
>
> A:    That is correct.

(Moffett *Allscripts* Dep., p. 51; *see also id.* at 39-40, 43, 62, 65-66, 125; Moffett Dep., pp. 45-46).

Moffett explained that Allscripts' employees were trained to always ask permission before sending fax advertisements, and that part of asking for permission to send a fax would be to verify the fax number that Allscripts had for that entity in its Salesforce database:

> Q: Did Allscripts train its employees to request permission prior to sending faxes promoting Allscripts' goods and services?
>
> A: We always had that. We always ask permission.
>
> Q: Okay. And –
>
> A: Part of that was to validate the fax number [that the entity had previously provided to Allscripts].

(Moffett Dep., p. 45; Moffett *Allscripts* Dep., p. 78).

7. Allscripts allowed Salesforce contacts, including Plaintiff, to log in and manage their own accounts, add and delete fax number(s), and manage other contact information. Each account also contained a check box that contacts could select, or ask Allscripts to select, if they did not want to receive fax communications. (Moffett *Allscripts* Dep., pp. 45, 77-78). Plaintiff never checked, or asked Allscripts to check, the box saying it did not wish to receive fax communications. (Transcript (excerpts) of Dr. John Ruch Deposition ("Ruch Dep."), attached hereto as **Exhibit C**, p. 221).

8. In March 2009, A-S Medication purchased Allscripts' Medication Business, which "include[d] the offering of a formulary of pre-packaged medications and related dispensing software licensed to customers using FirstFill$^{TM}$ and TouchScript$^{TM}$, as currently conducted." (Asset Purchase Agreement, p. 6). After A-S Medication's purchase of Allscripts' Medication Business and its acquisition of all the assets and liabilities related thereto (Hoff Dep. II, pp. 13-15, 17), A-S Medication functioned—and

was presented to the healthcare field—as a continuation of that Medication Business. As Walter Hoff, A-S Medication's Chief Executive Officer and part owner, explained:

> [W]e were a continuation of Allscripts' [Medication] business. We had a joint marketing arrangement with Allscripts. We were generally known on the street as Allscripts, even after the business because we were a continuation. We purchased the assets from Allscripts, the equipment, the contract. We assumed the employees. We're actually still in the same building as Allscripts, and we had a continuing relationship with our customers between us and Allscripts, so we were simply a continuation of the Allscripts business. Same business, different owners.

(Hoff Dep. II, pp. 17-18; *see also* Cull Aff., ¶ 5).

9. Pursuant to the Marketing Agreement between A-S Medication and Allscripts, which was executed in conjunction with the sale of the Medication Business, A-S Medication was granted a five-year license to use certain "Allscripts Trademarks" for the "marketing and sale of [A-S] products in furtherance of the joint marketing relationship" and for "advertising and promotional material for the products that are covered by the marketing arrangement." (*See* Marketing Agreement, attached hereto as **Exhibit D**, pp. 25-26, 38). A-S Medication's advertisements after its purchase of the Medication Business often described A-S Medication as "Formerly Allscripts Medication Services Group" and included an approved Allscripts logo. (*See* Exemplar Advertisements, attached hereto as **Group Exhibit E**).

10. The fax at issue in this case describes A-S Medication as "formerly Allscripts Medication Services Group." (Dkt. # 270-1, p. 4). The fax advertises a new A-S Medication product, PedigreeRx, that A-S Medication started marketing in early 2010. (Hoff Dep. I, p. 41). PedigreeRx was a web-based software that was a newer version of an existing Medication Business product—TouchScript™—that A-S Medication acquired from Allscripts:

> Q: Okay. And if I understand your testimony just a moment ago, A-S was trying to convert former TouchScripts customers to use PedigreeRx?
>
> A: Correct.
>
> Q: And why – why did A-S want to convert them from TouchScripts to PedigreeRx?
>
> \*\*\*
>
> A: I think it was just a better – a newer system.

(McElroy Dep., pp. 145-46; Asset Purchase Agreement, p. 6).

The fax advertisement was intended to inform A-S Medication's and Allscripts' customers and prospective customers about PedigreeRx and get them to upgrade to this new product. (*Id.*).

11. The fax at issue was targeted to be sent to a list of existing A-S Medication and Allscripts customers that was generated from Allscripts' Salesforce database. (Hoff Dep. I, p. 26). As Walter Hoff testified:

> Q: Okay. Looking at Exhibit 2 [fax attached as Exhibit A to the Complaint], from reading this document, can you tell who this exhibit was directed to?
>
> A: Our clients.
>
> Q: And what is the basis of that?
>
> A: It talks about a product update [PedigreeRx] that we are now rolling out a new web based software solution and that we're standing behind and guaranteeing our services, so this is clearly directed to our current clients. The other thing is it says no upfront costs for software implementation or training, and the only people who got that were current clients and Allscripts' clients. Everybody else we charged for it.
>
> Q: Okay. Does the first sentence of the second paragraph, our new service not only continues to provide your practice, does that –

>   what does that suggest to you?
>
>   A:   That's our current clients.

(Hoff Dep. I, pp. 65-66; *see also* Dkt. # 270-1, p. 4 ("[o]ur new service ***continues*** to provide your practice with the highest quality, state-of-the-art dispensing solution, but we now also provide you with the most comprehensive web-based dispensing and 3rd party payer management system in the industry, PedigreeRx.")(emphasis added)).

A digital forensic analysis shows that fax numbers from the A-S Medication fax log for the February 2010 fax transmission at issue in this matter matched fax numbers and other corresponding data in Allscripts' Salesforce database. (Transcript of Yaniv Schiff Deposition, attached hereto as **Exhibit F**, pp. 34-38; Hoff Dep. I, p. 37). Entities on that fax list had provided Allscripts permission to send them faxes about various Allscripts products and services, including those in the Medication Business. (Hoff Dep. I, pp. 17, 21-22).

12.   A number of class members are A-S Medication customers who were also Allscripts' customers. (*See, e.g.,* Declaration of Victoria Smith ("Smith Dec."), attached hereto as **Exhibit G**, ¶¶ 2-3; Affidavit of Cathy Bolt Jones ("Jones Aff."), attached hereto as **Exhibit H**, ¶¶ 2, 4; Williams Aff., ¶¶ 2-5; Oliver Aff., ¶¶ 2, 5; Declaration of Debra Lucas, ("Lucas Dec."), attached hereto as **Exhibit I**, ¶ 3). Affidavits from class members in this matter show that they provided prior express permission to Allscripts to receive fax advertisements about Allscripts' various products and services, including products marketed and sold by Allscripts' Medication Business. (*See* Affidavit of Lindsey Williams ("Williams Aff."), attached hereto as **Exhibit J**, ¶¶ 2-3; Affidavit of Jeannine Oliver ("Oliver Aff."), attached hereto as **Exhibit K**, ¶¶ 2-3; Jones Aff., ¶ 3; Smith Dec., ¶¶ 6-8; Lucas Dec., ¶ 5).

13. After A-S Medication purchased Allscripts' Medication Business, Allscripts' customers just started ordering medication from A-S Medication, because they considered A-S Medication to be a continuation of Allscripts Medication Business. (*See, e.g.,* Oliver Aff., ¶¶ 4-7; Williams Aff., ¶¶ 3-5; Jones Aff., ¶¶ 2-5). For example, Victoria Smith, a medical technician for one of the class members, explained:

> Prior to purchasing medication from A-S [Medication], Riverview purchased medication from Allscripts, LLC….After A-S [Medication] purchased Allscripts's pre-packaged medication fulfillment solutions business (the "Medication Business"), Riverview began purchasing medication from A-S [Medication]….I was aware that Allscripts sold its Medication Business to A-S [Medication], and considered A-S [Medication] to be a continuation of Allscripts's Medication Business because it was the same business, just with a different owner.

(Smith Dec., ¶¶ 1, 3-5).

14. Affidavits from class members show that they considered the permission they gave Allscripts to send them fax advertisements about various products and services to extend as consent given to A-S Medication to receive fax advertisements, as they considered A-S Medication simply to be a continuation of Allscripts' Medication Business. For example, Cathy Jones, an administrator for one of the class members, explained:

> I consented to receive Allscripts' product information via fax at the beginning of our business relationship….I considered the consent previously provided to Allscripts [to send fax advertisements] extended to A-S Medications. I again consented to receive information about A-S Medications products and services via fax….

(Jones Aff., ¶¶ 3, 5).

15. Similarly, Jeannine Oliver, the office manager for another putative class member, attested:

Case No. 1:16-cv-02981-MSK-MDB   Document 99-2   filed 11/24/20   USDC Colorado   pg 11
of 15
Case: 1:12-cv-05105 Document #: 277 Filed: 01/29/18 Page 10 of 14 PageID #:6421

> I consented to receive Allscripts' product information via fax at the beginning of our business relationship….When OFH [putative class member] provided its fax number to Allscripts, it agreed to and consented to receive faxes from Allscripts regarding Allscripts' products and services. I considered the consent that I previously provided to Allscripts extended to A-S Medications as it appeared to me to be a continuation of the same business.

(Oliver Aff., ¶¶ 3, 7).

16. And, Lindsey Williams, a director for another putative class member, stated: "Stern [putative class member] agreed to and consented to receive faxes from Allscripts regarding Allscripts' products and services. I considered the consent that I previously provided to Allscripts extended to A-S Medications." (Williams Aff., ¶ 5).

17. Other putative class members attested that they would have provided prior express permission to Allscripts and A-S Medication to receive fax advertisements about various products and services. As Smith explained:

> I do not specifically recall Riverview [putative class member] ever receiving fax advertisements from Allscripts or A-S. However, if Riverview did receive any fax advertisements from Allscripts or A-S, I would have given Allscripts and A-S permission to send Riverview those fax advertisements.

(Smith Dec., ¶ 7).

Similarly, Debra Lucas, the purchasing manager for a putative class member, stated:

> While I do not specifically recall giving Allscripts or A-S permission to send DAK fax advertisements, given my custom, practice and experience in dealing with Allscripts and A-S, I can attest that I would have given Allscripts and A-S permission to send DAK faxes advertising their products and/or services.

(Lucas Dec., ¶ 5).

18. Walter Hoff explained that A-S Medication would have had permission to send faxes about its products and services to Allscripts' customers whose fax numbers

Case No. 1:16-cv-02981-MSK-MDB   Document 99-2   filed 11/24/20   USDC Colorado   pg 12
  of 15
Case: 1:12-cv-05105 Document #: 277 Filed: 01/29/18 Page 11 of 14 PageID #:6422

were in Allscripts' Salesforce database, because Allscripts' customers provided prior express permission to receive fax advertisements about Allscripts' products and services, generally:

> Q: [D]id Allscripts ever tell the customer or ask for permission to the customer for A-S to be able to send fax advertisements to them?
>
> A: They didn't do it on a product-by-product basis, so we [Medication Business] would be one of the many products that they represent – had in their portfolio and represented on their website as available for sale. They wouldn't get permission for this product or that product. They get permission for the overall customer relationship.

(Hoff Dep. II, pp. 17, 21-22).

19. Class members also specifically gave A-S Medication permission to send them fax advertisements because they wanted to stay apprised of A-S Medication's products. (*See, e.g.,* Oliver Aff., ¶¶ 6-7; Williams Aff., ¶¶ 4-5; Jones Aff., ¶¶ 5-6; Smith Dec., ¶¶ 7-8). And, class members did not ever ask Allscripts or A-S Medication to stop sending them fax advertisements. (*See, e.g.,* Oliver Aff., ¶ 8; Williams Aff., ¶ 6; Jones Aff., ¶ 7; Smith Dec., ¶ 9; Lucas Dec., ¶ 7).

20. Plaintiff is a former customer of Allscripts. (Transcript of Gearline Monhollen Deposition ("Monhollen Dep."), attached hereto as **Exhibit L**, pp. 66-67). Allscripts and Plaintiff communicated on multiple occasions, including via fax. (*Id.* pp. 67-69). Plaintiff's former office manager, Gearline Monhollen, is the individual who generally communicated with Allscripts. (Ruch Dep., p. 132). Monhollen had provided Allscripts with permission to send Plaintiff information via fax: "[Allscripts] would call me and say, you know, 'Can I fax this over to you?' I would say, 'Yes.'" (Monhollen Dep., pp. 68-69, 71-72). She testified:

> Q:   Right. But I just want to [go] back and clarify what you said earlier. That you would ask them for information. And you would ask them to send you information. And they would send it to you by fax?
>
> A:   Well, they would say, 'Can we send this over to you by fax?' And I would say, 'Yes.'

(*Id.*).

Monhollen had also asked Allscripts to send Plaintiff information about various products and services. (*Id.* at 87-90). Plaintiff's owners, Dr. Ruch and Dr. Elwert, have testified that Plaintiff has given Allscripts permission to send it fax advertisements. (Transcript of Dr. Jeffrey Elwert Deposition ("Elwert Dep."), attached hereto as **Exhibit M**, p. 228; Ruch Dep., p. 130).

21.   Monhollen testified that she would provide companies permission to fax information about any products or services that might benefit Plaintiff:

> Q:   So for example, if someone called in to Physicians Healthsource and said, hey, I have this product or this service that I think Physicians Healthsource might be interested in, can I fax you over some information about it? Are there circumstances where you would have said yes?
>
> A:   Well, that would generally go to Dr. Ruch or I. And I would, if I was intrigued by it and felt that it would benefit us, I would say yes.

(Monhollen Dep., p. 100; *see also id.* at 47-48, 116).

22.   The fax log at issue purports to show successful transmission to 11,422 unique fax numbers. (Biggerstaff Report, ¶ 22). However, a comparative analysis between the 11,422 fax numbers from the fax log and the National Provider Identifier ("NPI") Registry indicates that 62,144 different medical providers—each with their own unique NPI number—are associated with the 11,422 fax numbers on the fax log at issue. (*See* Declaration of Yaniv Schiff, attached hereto as **Exhibit N**, ¶ 4). The NPI Registry is

a government database required and maintained under the Health Insurance Portability and Accountability Act, and is a directory of all active NPI records. (*See* NPI Registry *available at* https://npiregistry.cms.hhs.gov/ (last visited Jan. 29, 2018). Healthcare providers acquire unique 10-digit NPIs to identify themselves throughout their industry. (*Id*.). Individuals and organizations apply for NPIs through the U.S. Centers for Medicare and Medicaid Services ("CMS") National Plan and Provider Enumeration System (NPPES). (*Id*.). After CMS supplies an NPI, it publishes the parts of the NPI record that have public relevance, including provider's name, specialty, practice address and other contact information. (*Id*.). CMS provides this service based on federal law. (*Id.*). (citing 45 C.F.R. Part 162). CMS is a part of the United States Department of Health and Human Services. (*See* "About CMS" *available at* https://www.cms.gov/About-CMS/About-CMS.html, last visited Jan. 29, 2018).

23. There are on average more than five other provider organizations or persons associated with each of the 11,422 unique numbers identified in the fax log at issue here. (*Id.* ¶¶ 4-5; *see also* Spreadsheet, attached hereto as **Exhibit O**).

                                              Respectfully submitted,

                                              /s/ Yesha Hoeppner
                                              One of Defendants' Attorneys

Eric L. Samore
Albert Bower
Yesha Hoeppner
SMITHAMUNDSEN LLC
150 N. Michigan Avenue #3300
Chicago, IL 60601
(312) 894-3251

Case No. 1:16-cv-02981-MSK-MDB   Document 99-2   filed 11/24/20   USDC Colorado   pg 15
of 15
Case: 1:12-cv-05105 Document #: 277 Filed: 01/29/18 Page 14 of 14 PageID #:6425

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 29, 2018, she served a copy of Defendants' Statement of Additional Material Facts in Opposition to Plaintiff's Motion for Summary Judgment upon all counsel of record via the Court's ECF filing system:

[x]  Pursuant to 28 USC Section 1746(2), I certify under penalty of perjury that the foregoing is true and correct. Executed on: January 29, 2018.

/s/ Yesha Hoeppner