**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Senior Judge Marcia S. Krieger**

Civil Action No. 16-cv-02981-MSK-KMT

**TECH INSTRUMENTATION INC., individually and on behalf of all others similarly situated,**

      **Plaintiff,**

**v.**

**EURTON ELECTRIC CO. INC.,**

      **Defendant.**

---

**OPINION AND ORDER DENYING MOTION TO DECERTIFY CLASS**

---

**THIS MATTER** comes before the Court pursuant to the Defendant's ("Eurton") Motion to Decertify Class **(# 90)**, the Plaintiff's ("Tech") response **(# 95)**, and Eurton's reply **(# 98)**. Also pending is Eurton's Motion Requesting Judicial Notice **(# 99)** of certain filings that were made in another case in the Northern District of Illinois. Tech did not file any opposition to that motion.

## BACKGROUND AND FACTS

The Court begins with a review of the pertinent law. The Junk Fax Protection Act[1] ("JFPA" or sometimes simply "the Act"), 47 U.S.C. § 277, provides generally that it is unlawful for any person to send "an unsolicited advertisement" to "a telephone facsimile machine" ("a fax"). 47 U.S.C. § 277(b)(1)(C). That prohibition is subject to an exception: if the sender: (i)

---

[1]     The Act was an amendment to the Telephone Consumer Protection Act of 1991, and is sometimes discussed under that name as well.

1

has an established business relationship with the recipient; (ii) the recipient voluntarily communicated its fax number to the sender in conjunction with that relationship; and (iii) the advertisement contains a conspicuous provision advising the recipient of the ability to request that the sender cease sending advertisements by fax.  47 U.S.C. § 277(b)(1)(C)(i)-(iii).

If the sender cannot establish all of the requirements of the "established business relationship" exception, it may instead attempt to demonstrate that the recipient gave prior express permission to receive the ad – *i.e.* that the ad was not "unsolicited."  *Physicians Healthsource, Inc. v. A-S Medication Solutions, LLC*, 950 F.3d 959, 964 (7th Cir. 2020).  Express permission to receive a faxed ad "requires that the consumer understand that by providing a fax number, he or she is agreeing to receive fax advertisements."  Such consent must be affirmative in nature, as "negative options, in which a sender presumes consent unless advised otherwise, are insufficient to prove express permission." And, importantly, the permission granted by the recipient must specifically be permission to the sender to <u>advertise</u> via fax, as "evidence of permission to generally send faxes does not establish prior express permission to fax ads." Thus, in *Physicians Healthsource*, the Seventh Circuit held that "the consumer must affirmatively and explicitly give the advertiser permission to send it fax advertisements on an ongoing basis. The invitation or permission cannot simply authorize a single, specific fax, or state that the consumer consented to receive faxed ads from the defendant in the past. Instead, it must explicitly convey that the consumer gives the advertiser ongoing permission to send ads via fax until such time as the consumer withdraws its consent."  *Id.* at 966.

Eurton is a company that sells and services electric motors, primarily for commercial and industrial clients.  Beginning in or about 2013, Eurton embarked on an advertising campaign using fax machines.  It retained a company called WestFax to send ads on its behalf via fax and

provided WestFax with a list of recipients it sought to reach.  It appears that Eurton derived the

list of recipients' fax numbers through several methods.

> • According to Eurton's President, John Buchanan, its "primary practice to
> obtain fax numbers" was a method described as the "three-step process."  A
> Eurton representative would cold-call potential customers, explain its services,
> and "ask whether the business would be interested in receiving more
> information."  If the potential customer orally agreed to receive information and
> provided a fax number, Eurton would then log the number in one or more of its
> databases or lists.  Eurton admits that relying on oral expressions of consent was
> an "imperfect system," and stated that if a "mistake" occurred and a recipient
> complained about receiving an advertisement, Eurton would remove that
> recipient's fax number from its records.  It is undisputed that Eurton did not retain
> any records memorializing the phone calls or oral consents it obtained in this
> manner.

> • Eurton would also ask some potential customers to complete an
> "Application For Credit."  This one-page form would be sent to and completed by
> the potential customer.  The customer was asked to provide the company's name
> and address, phone number, fax number, the number of years the customer had
> been in business, number of locations, and so on.  The customer was then asked to
> list "references" – that is "vendors with which you have a current open account."
> The Application For Credit form contained the following statement from Eurton:

>> IT IS FAST BECOMING THE INDUSTRY STANDARD TO
>> ONLY GIVE OUT CREDIT INFORMATION BY FAX OR
>> MAIL.

>> ALSO, MANY LARGE CORPORATIONS WILL GIVE CREDIT
>> INFORMATION FROM THE CORPORATE HEADQUARTERS
>> ONLY.  WHEN LISTING A LARGE CORP., BE SURE TO
>> INCLUDE THE ADDRESS OF THE MAIN OFFICE AND
>> YOUR ACCOUNT NUMBER.

>> THIS INFORMATION PROVIDES US WITH THE BEST WAY
>> OF CONTACTING YOU FOR ALL NORMAL BUSINESS
>> PURPOSES, INCLUDING: INVOICES, SALES ORDERS,
>> CATALOGS, PROMOTIONAL FLYERS, PRICING UPDATES,
>> ETC.

>> THANK YOU

> Customers who completed the Application For Credit and who were approved
> would be listed in Eurton's customers database as having a credit account.

Conversely, Eurton assumes that any customer listed as having a credit account would necessarily have completed an Application For Credit form.[2]

• Every few years, Eurton would send its customers a one-page document entitled "Customer Contact Information Updated Form."  The form invites the customer to list its name, address, phone and fax numbers, and e-mail addresses. The pre-printed form states:

> The above information is current and is the best way of contacting us through normal business communications including: invoices, sales orders, pricing, sales promotions, references, phone, facsimile, e-mails, specials and catalog and brochure mailers, etc.
>
> We have always enjoyed our business relationship with Eurton Electric, and we are looking forward to continue working together with Eurton Electric for many years to come.

Eurton states that it would retain a copy of the most recent Customer Contact Information form in the customer's file, discarding any prior versions.

• Customers (and prospective customers) might also ask Eurton for an estimate of the cost of a particular job.  It appears that Eurton would fax the customer a Data Quotation Sheet, asking the customer to identify certain information about the customer (including fax number) and the characteristics of the job.  The customer would fax the completed form back to Eurton.  Eurton would then fax the form back with a estimate of the job's cost.  The Data Quotation Sheets did not contain any language disclosing an intention to send subsequent advertisements to the customer, requesting or confirming the customer's consent to receive such advertisements, or advising the customer of the ability to opt-out of such advertisements.

Most of the details of the actual fax advertising campaign are unknown.  It appears to be undisputed that neither Eurton nor WestFax retained any records or correspondence that would establish how many faxes were sent over the course of Eurton's advertising campaign, when they

---

[2]    Eurton's President's affidavit concedes that "not every credit application would have specifically had the language referencing faxes for 'sales and specials,' for various reasons: (i) the customer's application "date[s] back before faxing"; (ii) the customer submitted "their own pre-filled out credit forms with their contact information which includes their fax number"; (iii) Eurton "changed credit application forms over the years" and "the specific verbiage [quoted above] was not always included," although "the forms provided for normal business communications which included faxing for promotions."

were sent, or to which fax numbers.[3]  Plaintiff Tech contends that it received two fax advertisements from Eurton on two different dates in June 2016.  It asserts that it had never given express permission to Eurton to send that ad to its fax number.[4]  Tech commenced this action, asserting a single claim that Eurton was violating the JFPA, 47 U.S.C. § 277(b)(1)(C).

Tech sought to pursue its claim as a class action on behalf of all persons who, over a given period "were sent [ ] a [fax] message substantially similar" to that received by Tech, "from whom [Eurton] claims it obtained prior express permission or invitation to send the faxes in  the same manner as [Eurton] claims it obtained prior express consent to fax [Tech]."  In response **(#39)** to Tech's request for class certification**,** Eurton's only argument (albeit extensively presented) is that "the predominant issue in this lawsuit is whether [Eurton] obtained the express permission of each member of the purported class prior to any transmissions," and that "this issue is sufficiently individualized to require the denial of [ ] certification of the class."  Eurton made no particular arguments regarding the Fed. R. Civ. P. 23(a) factors of numerosity, commonality, or typicality, nor the Rule 23(b)(3) factor of superiority, presenting only an argument on the Rule 23(b)(3) factor of predominance.

On May 29, 2018, the Court granted **(# 47)** Tech's request to certify a class, finding that Tech had adequately demonstrated each of the Rule 23 factors.  Addressing Eurton's

---

[3]      The Court understands that the only surviving evidence on this point are invoices from WestFax for faxes sent in July 2016.  Those invoices list only a total number of pages sent by WestFax, reflecting approximately 2,000 pages in that month.  The advertisements in the record are single pages, suggesting that the July 2016 distribution reached as many as 2,000 recipients.

[4]      It is not clear whether Tech had a pre-existing business relationship with Eurton at the time.  But Tech's complaint makes clear that Eurton's faxed advertisements did not contain a complete notice of the recipient's ability to opt-out, as is required in order for Eurton to invoke the "existing business relationship" exception.  47 U.S.C. § 277(b)(1)(C)(iii).  Thus, it appears that Eurton's liability to Tech turns solely on whether it can be shown that Tech gave prior express consent to receive faxed ads – *i.e.* that the faxed ads were not "unsolicited" under the Act.

predominance argument (albeit under the rubric of commonality), the Court agreed that, if proof of each individual recipient's unique granting of consent was necessary, class certification would not be appropriate.  But the Court noted that Eurton was not purporting to suggest that it might (or even could) demonstrate individualized instances of consent.  Instead, the Court observed that Eurton was relying entirely on the fact that its "three-step process" of acquiring fax numbers included a step in which recipients were asked to give consent to receive advertisements by fax. Thus, the Court explained, "the question to be adjudicated is not whether each class member consented to Eurton's faxes, but whether Eurton's standardized practice is sufficient to obtain consent."  Because that inquiry "is an issue common to all potential claimants," the Court found that certification of a class was appropriate.  But consistent with the finding that the sufficiency of the "three-step process" was the central issue in the case, the Court modified the class definition to comprise "Any person/entity who: (i) received a cold call from Eurton <u>pursuant to its three-step procedure</u>; (ii) is listed on a list prepared by Eurton and supplied to WestFax; and (iii) received one or more faxes sent by Eurton or WestFax between December 16, 2013 through the date notice is sent to the class." (Emphasis added.)

Almost two and a half years after that class certification decision, Eurton filed the instant motion **(# 90)** seeking to decertify the class.  Eurton argues that it "has now developed its factual record of documents showing consent to fax" from members of the class.   That evidence consists of: (i) Applications For Credit forms submitted by some recipients; (ii) Customer Contact Information Update forms; (iii) Quotation Data Sheets that some customers sent <u>to</u> Eurton via fax; and (iv) Eurton's post-lawsuit efforts to (re-)verify consents to send faxed advertisements.  As to this last category, Eurton explains that, during this litigation, it "contacted [ ] customers to orally confirm/verify the fax numbers" it had, and that "during this verification

process, Eurton would then send these persons . . . a flyer to confirm their prior consent and number to receive faxes."[5]  Eurton argued that because it could now demonstrate various instances of individualized instances of consent via the types of evidence listed above, the Court's prior finding on the issue of predominance was "eviscerated."

Eurton also offered: (i) brief arguments that the Rule 23 elements of commonality and superiority were not present, although those arguments simply circled back to Eurton's argument that individual issues of consent predominated over any class issues; (ii) an argument that the class should be decertified because the membership of the class was not reasonably ascertainable, given both the evidence that some class members may have consented (based on the tendered evidence) and the fact that no documents exist to identify the particular recipients of the faxes; (iii) a perfunctory argument as to numerosity, contending that Tech "has not identified any class member faxed without consent other than itself"; and (iv) an abbreviated argument that the class definition should exclude faxes sent to "online fax services" on the grounds that such services are not "facsimile machines" as defined by the Act.

---

[5]     The flier that Eurton sent as part of this process consists of a prominent pictorial ad for Eurton's products and services, with a text paragraph at the bottom that reads:

> Permission for Faxing was given by the contact at the top of this flyer.  If you wish to discontinue receiving future faxed advertisements from this sender, send your opt out request to us by email at [email address], by fax at [fax number], or by telephone at [telephone #].  Specify the telephone numbers of the fax machine(s) covered by your request.  As required by law we will comply with your request within the shortest reasonably time not to exceed 30 days.

Notably, the bracketed text in the quote is present in the flier itself – that is, it appears that the flier was sent before the placeholder text was replaced with Eurton's actual contact information. However, Eurton's actual contact information appears prominently, immediately below the text paragraph.

## ANALYSIS

### A. Whether reconsideration of the class certification question is warranted

Fed. R. Civ. P. 23(c)(1)(C) allows a court to alter or amend an order that previously granted class certification. This Court " retains the ability to monitor the appropriateness of class certification throughout the proceedings and to modify or decertify a class at any time before final judgment." *In re Integra Realty Resources, Inc.*, 354 F.3d 1246, 1261 (10th Cir. 2004). It is appropriate to hold motions seeking to alter a class certification to the same standards that apply to motions for reconsideration generally, as the interests of maintaining judicial efficiency and avoiding successive motion practice apply with equal force in both contexts. *See e.g. Braver v. North Star Alarm Services, LLC*, 2019 WL 572207 (W.D.Ok. Nov.5, 2019) (slip op.) Thus, it is appropriate to require Eurton establish an intervening change in the controlling law, new evidence that was not previously available, or the need to correct clear error or prevent manifest injustice, not simply a desire to revisit issues previously consider or raise arguments that it could have raised in prior briefing. *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). *Anderson Living Trust v. WPX Energy Production, LLC*, 308 F.R.D. 410, 439 (D.N.M. 2015), on which Eurton relies, is not to the contrary. After extensively considering the issue of whether motions to decertify a class should be treated like ordinary motions for reconsideration, the court found that "common-law law-of-the-case grounds, which, incidentally, are the same as those [in *Paraclete*], constitute the majority —perhaps even the consensus-standard among courts for reconsidering class certification denials." *Id.* at 440.

This reasoning is sound. Eurton had an opportunity to present all of its arguments against certification, based on all of the information that was known to it at the time in 2018. The judicial system depends on parties to identify and raise their strongest arguments at the time an

issue is first being considered.  To allow parties to constantly revise and refine their arguments over time, presenting and re-presenting them to the court successively until they succeed, is wasteful of the parties' and the court's limited resources and a fundamental violation of Fed. R. Civ. P. 1.  Thus, requiring a request for reconsideration to be based on a change in meaningful circumstances, not just a request to re-argue a matter already considered by the court, is a sound practice.

The Court finds that Eurton's motion raises no facts or arguments that are both relevant and newly-occurring since 2018.  Eurton is not alleging that it did not previously have access to the Application For Credit or Customer Information Update forms it now presents at the time this Court was considering the class certification question in 2018.  By all appearances, those forms have been in Eurton's possession since before this litigation began.  Indeed, it is essential that the forms existed prior to Eurton's commencement of the fax advertising campaign.  For Eurton's defense that the faxes were "solicited" to succeed, it is necessary that the recipients gave their consent to receive fax ads before Eurton began sending them.  Thus, it is undisputed that Eurton could have raised the existence of the Application For Credit or Customer Information Update forms at the time the Court was initially considering class certification in 2018.  Eurton offers no explanation for why it did not do so at that time.  Moreover, as discussed more fully below, the existence of those forms is irrelevant to the Court's class certification analysis in any event.

Nor does the one purported piece of "new" evidence change the analysis.  As mentioned above, Eurton asserts that "in 2017, without prompting or involvement of defense counsel," it directly contacted its customers "to verify their company information and consent to fax."  It "orally confirm[ed]/verif[ied] the fax numbers" and "would then send these persons . . . a flyer to

confirm their prior consent."  Arguably, this process might have been complete by November 2017, when Eurton filed its opposition to Tech's class certification motion, and should have been included therein.  But even if it wasn't, the omission is immaterial.

For several reasons, the probative value of Eurton's "verification" process on the issues bearing on class certification is negligible.  First, and perhaps most fundamentally, a recipient's statement in 2017 about its willingness to receive faxed advertisements does not establish that the recipient gave prior permission before receiving faxes that were sent earlier.  *Physicians Healthcare* addresses this issue specifically, finding that "post hoc statements that an individual would have given consent" to receive faxes that had already been sent were not probative because "they do not show [that the sender] had prior express permission to send the faxes in question."  950 F.3d at 966 (emphasis in original).  That same logic applies here.

Second, Eurton has not provided any meaningful explanation of what the result of its 2017 verification process was, much less that its methodology was one that could render results that might be significant.  If, for example, Eurton called each customer[6] and said "do you recall whether, in 2013 or earlier, you gave us oral consent to send you advertisements by fax?," and every single customer responded "yes, I remember doing that," Eurton's process might have some value in the class certification consideration.[7]  On the other hand, a call that consisted of

---

[6]      Eurton seems to equate the concepts of "recipient of a faxed ad" and "customer of Eurton" interchangeably.  Given that Eurton admittedly generated some portion of its fax list through cold calling, it seems highly likely that not every fax recipient was one that was, or even eventually became, an actual customer of Eurton's products or services.  The Court need not grapple with that distinction at this time, although it may behoove the parties to consider that issue as the case proceeds.

[7]      This assumes, of course, that Eurton could render those results in an admissible form.  It would seem that Eurton's officers could not testify about the answers they received from each customer without running afoul of the hearsay rule.  Thus, arguably, a series of affidavits from the customer confirming the customer's oral response might be necessary.  Ultimately, however, the question of how Eurton might prove such a fact is merely an abstract exercise, because there

Eurton asking "is this still your fax number and may we send you a fax today?" would be meaningless in attempting to determine the state of the recipient's consent to receive faxed ads as of 2013.[8]

Third, the "confirmation" reflected in the form is not a confirmation at all. It is simply another advertisement that includes text advising the recipient that <u>Eurton</u> asserts that the recipient has consented to receipt of the ad by fax. In that sense, the "confirmation" flier is much like the "negative option" faxes described in *Physicians Healthcare* – an unsolicited ad sent to a recipient with an instruction that the recipient call if it no longer wishes to receive such faxes. Such faxes are clearly prohibited under the Act. 950 F.3d at 965. Arguably, the <u>phone call</u> that Eurton allegedly made as part of its verification process might, depending on its content, be sufficient to establish a recipient's consent to receive <u>future</u> fax advertisements. But Mr. Buchanan's description of the verification process seems to state that Eurton's phone calls merely verified "the fax number," not the recipient's willingness to receive faxed advertisements. Thus, the "verification" process Eurton allegedly engaged in in 2017 is irrelevant to the question of whether Eurton's faxing of ads in 2016 and earlier was solicited by any of the recipients.

For these and other reasons, the Court finds that Eurton has not shown the existence of a change in facts or law that warrant the Court revisiting the class certification question under Rule 23(c)(1)(C) at this time.

---

is no evidence in the record that Eurton even asked such a question during its 2017 "verification" process.

[8]     The Court need not decide whether the 2017 faxes, reproduced in part above, are sufficient to comply with the Act's requirement that any faxed ad sent pursuant to the "established business relationship" exception of 47 U.S.C. § 277(b)(1)(C)(i) contain specific opt-out language as set forth in 47 U.S.C. § 277(b)(2)(D) and (E). As discussed herein, the existence of contents of faxes sent in 2017 is irrelevant to the question of whether Eurton had <u>prior</u> permission of the recipients when it sent faxed ads between 2013 and 2016.

### B. Review of the class certification question

Although *Anderson* endorsed applying the principles limiting motions for reconsideration to the context of a motion seeking decertification of a class as well, it added a caveat. Noting that courts have "an ongoing responsibility to modify or decertify the class as the need arises," *Anderson* suggested that a motion seeking decertification that did not otherwise rise to the standard justifying reconsideration should nevertheless not be denied "out of hand." Rather, it suggested that the court consider other factors in deciding whether to reach the substantive issues in the motion, most notably "the thoroughness with which [the court] decided the issue or issues that the motion to reconsider challenges." 308 F.R.D. at 439-40. With that advice in mind, the Court takes this opportunity to review and clarify some aspects of the class certification ruling, as that ruling carries difficulties for both sides in this case going forward.

#### 1. Predominance

As it did in the initial class certification briefing, Eurton's instant motion leans heavily on the issue of "predominance" among putative class members. More specifically, it argues that the question of whether each class member gave prior consent to receive fax advertisements in 2013 raises so many individual issues of fact that those individual issues will overshadow the issues that are common to the class. The predominance inquiry "asks whether the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating issues." *Menocal v. GEO Group, Inc.*, 882 F.3d 905, 915 (10th Cir. 2018).

As it did in 2018, Eurton's current motion relies heavily on *Gene and Gene, LLC v. BioPay, LLC*, 541 F.3d 318, 326 (5th Cir. 2008), a case in which the appeals court reversed a trial court's finding that a JFPA case like this one could be maintained as a class action. The 5th Circuit found that individual issues of whether each individual recipient might have given

consent to receive faxed ads predominated, rending class treatment inappropriate.  *Id.* at 327

("the predominant issue of fact is undoubtedly one of individual consent").  In certifying the

class here, this Court found *Gene and Gene* distinguishable because Eurton proffered only its

"three-step process" as evidence that, categorically, each recipient gave their individual consent.

*Gene and Gene* recognized that class certification might be appropriate in situations where the

question of the recipients' consent could be determined categorically based on the sender's

overarching practice for allegedly obtaining that consent, rather than based on the individualized

questions of when and how each recipient may have given their individual consent.  541 F.3d at

327-28, *citing Kavu v. Omnipak Corp.*, 246 F.R.D. 642, 645 (W.D.Wa. 2007).  This Court

agreed that "the question to be adjudicated is not whether each class member consented to

Eurton's faxes, but whether Eurton's standardized practices [are] sufficient to obtain consent

under the JFPA."  *Docket* # 47 at 3.  As is clear from the Court's modification of the class

description in its 2018 certification, the "standardized practice" in question is Eurton's stated

"three-step process" for obtaining customer fax numbers.  Thus, the issue that will be tried is

whether that "three-step process" is one that is a sufficiently reliable way of obtaining advance

consent to receive faxed advertisements to permit Eurton to thereafter send faxed ads to

recipients identified via that process.

    That analysis remains sound, at least based on the record that has been made to date.

This case appears to be burdened by the absence of business records that might demonstrate

critical facts relating to whether a recipient consented to receive a fax.  For example, there are no

records demonstrating affirmative consent, the date of consent, the manner it was given, or the

identity of the person giving it.  In the absence of evidence of individualized evidence, Eurton

has fallen back on what is essentially a categorical argument: that everyone who was sent a fax

consented to receive it because the primary process by which Eurton obtained fax numbers – the "three-step process" – included a step by which consent to send ads by fax was (allegedly) secured.  Eurton's argument can be analogized to that of an amusement park: the operator of the roller coaster does not check whether each rider has a valid ticket to the park, because the operator relies on the sufficiency of the ticket-checking process at the entry gate to the park. Such assumption might be warranted if the entry gate procedures are soundly-designed, competently-administered, and if the physical security of the remainder of the park is adequate. But if, for example, the entry gates are indifferently staffed or alternate park entrances are left open, the roller coaster operator's assumption that each rider has a valid park ticket would be misplaced.

Likewise, Eurton's assumption that every fax number it possesses belongs to someone who has consented to receive advertisements by fax is premised on a similar series of predicates: that the "three-step process" was effectively-designed to obtain consent, that the employees responsible for carrying out that process performed it properly, and that no significant amount of fax numbers ended up on Eurton's lists without compliance with the designated consent process. Eurton's categorical assumption is suitable for testing on a classwide basis.  For example, imagine that Tech can show that Eurton's three-step process involves Eurton representatives cold-calling fax machine-owning prospects and following a pre-determined script:

> Hello, I'm calling from Eurton Electric.  We service and repair electric motors.  Is that a service that you might occasionally use? [If yes,]  Great!  If you give me your fax number, I'll send you some contact information for our company so you can reach out to us when you might need our services.

In those circumstances, the Court might conclude that because the script did not specifically request the recipient's willingness to receive faxed advertisements – as opposed to just "contact

information" – the "three-step process" is not one that can operate to secure a recipient's specific consent to receive faxed advertisements.  *See e.g. Physicians Healthcare*, 950 F.3d at 966 ("evidence of permission to generally send faxes does not establish prior express permission to fax ads").

If the three-step process is one that could <u>never</u> produce an effective consent, one could conclude that Eurton lacked consent to send the faxed ads and relief on a classwide basis might be appropriate.  On the other hand, if the evidence established that Eurton's cold call script was scrupulous in disclosing Eurton's intent to fax advertisements and securing the recipient's consent to such, but that Eurton's representatives did not regularly follow that script and instead engaged in bespoke conversations with each recipient – conversations whose content might be incapable to now establish – the question of which calls yielded effective consents and which did not becomes more individualized and less amenable to resolution on a classwide basis.

All of which is to say that the question of whether class certification in this case remains appropriate is a heavily fact-dependent one.  The precise manner in which the "three-step process" operated is critical, and to date, the record does not meaningfully describe that process. At most, the record reflects that Mr. Buchanan has testified that Eurton's representatives carrying out that process:

> call, introduce the company.  Explain what we do and ask permission to contact them via fax, e-mail, or mail.  Get their attention, their e-mail address.  And then mail, e-mail, or fax some information on us. . . . We introduce ourselves, explain what we do and how we can be of value to them.  And if they agree, then they allow us to send them something or e-mail or fax.

But this level of generality does not allow the Court to conclude whether the process itself is adequate or not.  If those are verbatim quotes, references to faxing "some information" or "something" might not be sufficiently descriptive of an intent to send "advertisements" so as to

obtain a valid consent from the recipient.  But if Mr. Buchanan was just paraphrasing and representatives specifically asked recipients to consent to receiving faxed advertising, the result could be different.  Because there remains the possibility that the issue of consent can be resolved categorically on a classwide basis, the Court's finding of predominance and certification of a class remains a correct one at this time.

### 2. Class definition

As recited above, the class definition certified by the Court provides that, to be a member of the class, a recipient must have "received a cold call from Eurton pursuant to its three-step procedure."  That limiting characteristic renders much of Eurton's evidentiary showing in its motion irrelevant.  Eurton's point in tendering the Application For Credit or Customer Information Update forms is to show that some customers provided their fax numbers to Eurton (and, arguably, consented to receive faxes[9]) through channels other than the three-step procedure.  But if that is the case, that customer may no longer one whose fax number and consent to fax was obtained "pursuant to [the] three-step procedure," and thus, that customer may no longer a member of the class.  The various forms tendered by Eurton might be useful as between the parties for the purpose of narrowing down the membership of the class (although,

---

[9]     The Court does not necessarily share Eurton's confidence that, for example, the language in the Application For Credit form clearly discloses Eurton's intention to fax advertisements, nor reflects the recipient's consent to receive advertisements by fax.  A reasonable reading of that form by a recipient might be that, by providing a fax number, the recipient was simply consenting to receive "CREDIT INFORMATION BY FAX" – namely, Eurton's decision as to whether or not credit would be extended.  Or it may be that the recipient was willing to receive faxes for "NORMAL BUSINESS PURPOSES, INCLUDING INVOICES [and] SALES ORDERS," but not necessarily advertising.  Eurton's assumption that providing a fax number constituted express consent from the recipient to use that fax number for any conceivable business purpose may be too aggressive a reading of the form's language, particularly in light of the explicitness with which *Physicians Healthcare* requires disclosures and consents to contain. 950 F.3d at 966.  But that issue is not presently before the Court and thus, the Court expresses no opinion as to the matter.

again, the Court has not been called upon and thus makes no findings at this time as to whether any particular recipient or group of recipients may or may not fall within the class definition). But those items of evidence are irrelevant to the question posed by Eurton's instant motion: whether the class as a whole should be decertified.

### 3. Ascertainability

Eurton's motion argues that the class should be decertified because the lack of records showing who received faxed ads during the campaign makes it impossible to ascertain which members of the class actually received any unlawfully-sent advertisements.  Eurton cites to *Sandusky Wellness Center, LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 470-71 (6th Cir. 2017).  There, the facts indicated that a pharmaceutical distributor attempted to send fax ads to a list of some 53,000 recipients, but for various reasons, only about 40,000 – 75% of the total – were transmitted successfully.  In addition, as here, the logs showing each individual recipient no longer existed.  Thus, the court explained, "total number of actual [ ] fax recipients is known, [but] the identity of each is not."  863 F.3d at 465.   The trial court found that (among other things), the inability to identify the actual recipients (and thus, the actual class members) without resorting to a cumbersome process of tendering affidavits affirming receipt of a fax warranted denial of class certification.  On appeal, the court affirmed.  After ruminating at some length as to how to fit the concept of ascertainability into the Rule 23 framework, the Court of Appeals noted that "no circuit court has ever mandated certification of a [JFPA] where fax logs did not exist, and we decline to be the first."  It acknowledged that there could be circumstances where a trial court cold conclude, "given the specific facts presented, that classwide treatment was manageable," but it found that the trial court's decision that such treatment would be too cumbersome in that case was not an abuse of discretion.  863 F.3d at 472-73.

The question of exactly what the doctrine of "ascertainability" is, and where it fits within the Rule 23 factors, is one that has generated a fair amount of judicial contemplation, but few firm rules. As *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015), explains, "courts have long recognized an implicit requirement under Rule 23 that a class must be defined clearly and that membership be defined by objective criteria." But "more recently, however, some courts have raised the bar for class actions under Rule 23(b)(3)" by "impos[ing] a new requirement that plaintiffs prove at the certification stage that there is a 'reliable and administratively feasible' way to identify all who fall within the class definition." *Id., citing Byrd v. Aaron's, Inc.*, 784 F.3d 154, 164-65 (3d Cir. 2015). The *Mullins* court resisted that trend, finding that "nothing in Rule 23 mentions or implies this heightened requirement" and found that it "has the effect of barring class actions where class treatment is most often needed" – that is, cases involving low-value claims where parties "are unlikely to have documentary proof" needed to support class membership. The court suggested that the policy concerns underlying the trend towards an exacting ascertainability inquiry could instead be addressed by trial courts carefully considering the Rule 23(b)(3) question of "the likely difficulties in managing a class action" balanced against "whether a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* at 657-58.

The 10th Circuit has not meaningfully weighed in on this issue. It has spoken in *dicta* of a lack of "identifiability" of the members of the class as being "a factor that may defeat Rule 23(b)(3) class certification." *Shook v. El Paso County*, 386 F.3d 963, 972 (10th Cir. 2004). But it has not clearly staked out a path that leads either towards or away from an exacting ascertainability analysis as part of the certification of a Rule 23(b)(3) class.

This Court begins its consideration of the issue by noting that this is precisely the sort of argument that Eurton could have raised in its initial opposition to class certification in 2018, but did not. All of the facts necessary to present the issue – essentially, the undisputed fact that no logs exist of the recipients of Eurton's faxes – were known to Eurton at that time. Nevertheless, because the Court did not expressly consider the issue of ascertainability in its prior order granting class certification, it is appropriate to address the matter now.

In the absence of controlling authority from the 10th Circuit adopting a rule similar to the Third Circuit's requirement in *Byrd* that there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition," this Court finds that the *Mullins*' thorough and carefully-reasoned approach reflects the more appropriate reading of Rule 23's requirements. A strict ascertainability requirement would erect powerful obstacles to effectively carrying out Congress' intent in passing consumer-protection statutes like the JFPA. As *Mullins* suggests, cases involving relatively low statutory damages (like the JFPA's $500 maximum) already provide an economic disincentive for vigorous enforcement via private litigation. Enforcement via class action is often the only feasible way in which Congress' goal in eliminating unsolicited fax advertising can be accomplished. Moreover, an exacting ascertainability standard would actually encourage parties engaging in such unlawful faxing to destroy records to frustrate identification of putative class members. In this case, the ability to identify every recipient of a Eurton fax advertisement would only be found via reviewing fax logs generated by WestFax. WestFax could, of course, share those logs liberally with customers like Eurton and retain them for an extended period of time. But given that WestFax's business model profits from sending out large numbers of faxes, the best way for WestFax to insulate itself and its clients from liability under the JFPA is to delete those logs

relatively quickly, before recipients of the faxes can investigate the source of the faxes, bring suit, and subpoena WestFax's records.  In short, an exacting ascertainability requirement hands gives the JFPA violator the opportunity to quickly destroy the only evidence that could be used to establish that requirement.

As in *Mullins*, this Court believes that the appropriate ascertainability requirement is a limited one: Rule 23 merely requires that "a class must be defined clearly and that membership be defined by objective criteria."  795 F.3d at 657.  The class definition previously certified by the Court meets these requirements.  Thus, the Court finds that decertification is not appropriate at this time.

But the Court also agrees, to some extent, with Eurton on the more general question of ultimate proof: without fax logs, the obligation on Tech to identify the particular members of the class who meet the third prong of the class definition – that they "received one or more faxes sent by Eurton"[10] – is a formidable one.  Tech has never advised the Court of how it intends to make such a determination, much less demonstrated that its chosen method is one that is likely to be effective and fit within Rule 23(b)(3)'s "superiority" requirement.  In response to Eurton's current motion, Tech simply argues that "the class is not only ascertainable here, it has been ascertained.  Eurton produced the class list and notice has been sent."  But giving notice to persons who <u>may</u> be class members is not the same as identifying the persons who <u>are</u> class members.  The Court's September 2019 Order **(# 72)** approving notice to the class specifically recognized the possibility of "over-inclusiveness – the inclusion of persons who agreed to received Eurton's fax advertisements" within the scope of those receiving notice, yet the Court

---

[10]     The Court *sua sponte* modifies the class definition slightly to reflect the requirement that a class member have "received one or more <u>faxed advertisements</u> sent by Eurton," not simply "one or more faxes."

adopted a notice procedure that might nevertheless result in those persons receiving notice of the class.

As *Mullins* explains, courts "have the discretion to insist on details of the plaintiff's plan for notifying the class and managing the action." 795 F.3d at 664. Discovery in this matter is now closed **(# 100)**. Thus, Tech presumably has all of the information that it needs to now reduce the universe of <u>possible</u> class members to those that are <u>actual</u> class members – in other words, to identify those persons who were faxed advertisements by Eurton without prior consent and during the class period. *See Mullins*, *id.* (court may – "and normally should" – postpone an ascertainability inquiry until "more may be known about available records, response rates, and other relevant factors"). The time is ripe for Tech to explain how it will corelate the information it has obtained in order to identify the members of the class who actually received unsolicited faxed advertisements. Tech will make that showing in a notice filed with the Court, supported by such evidence as may be necessary to evaluate the accuracy and efficiency of that method, within 30 days of this Order. If the Court concludes that Tech's method is unreliable, seriously overbroad, or inefficient compared to other possible ways of adjudicating the controversy, the Court may choose to decertify the class or modify the class definition at that time. *Mullins*, 795 F.3d at 664.

### 4. Online fax services

Eurton appears to argue that the class definition should be modified to exclude those class members who received Eurton's fax advertisements through an "online fax service" – that is "a service that effectively receives faxes sent to a given telephone number and converts them into documents that are delivered to the recipient in the form of e-mail. Eurton argues that this result is warranted based on a declaratory ruling by the FCC that such online fax services are not

"telephone fax machines" covered by the Act.  *See In the Matter of AmeriFactors Fin,. Group, LLC*, 2019 WL 6712128 (OHMSV Dec. 9, 2019).

The Court declines the request.  Eurton has not attempted to show how such a ruling would affect any of the parties or putative class members in this case.  Absent a showing that such a clarification meaningfully alters the scope or outcome of this litigation, Eurton is simply seeking an advisory opinion on a matter that does not appear to be relevant.

Accordingly, Eurton's motion to decertify the class is denied.[11]

## CONCLUSION

For the foregoing reasons, Eurton's Motion to Decertify Class **(# 90)** and Motion for Judicial Notice **(# 99)** are **DENIED**.

The Court further notes that all discovery in this case has now closed.  *Docket* # 100 at 4. The Scheduling Order **(# 55)** did not set a deadline for dispositive motions, indicating that such a deadline would be "determined after ruling on notice issues."  Notice issues have been resolved since Sept. 2019, yet no party has requested that the Magistrate Judge set a new dispositive motion deadline.  Although the Court finds that it is time for this already-aged case to proceed to trial, it will grant the parties an opportunity to file dispositive motions within 30 days of the date of this Order.  The Court does not warrant that those motions will be resolved prior the scheduling of a trial date, and if they are not, the motions will be treated as trial briefs in anticipation of a motion made at trial pursuant to Fed. R. Civ. P. 50.  Simultaneously with the

---

[11]     Eurton's Motion for Judicial Notice asks that the Court consider certain factual statements that were submitted to the Northern District of Illinois by the parties in the *Physicians Healthsource* case.  The Court declines to do so.  The Circuit Court's decision in *Physicians Healthsource* speaks for itself and this Court finds that resort to the parties submissions underlying the court's opinion is unnecessary to understand the court's reasoning.  Accordingly, that motion is denied.

preparation of any dispositive motions, the parties shall begin preparation of a Proposed Pretrial Order and shall contact chambers to schedule a Pretrial Conference.

Dated this 9th day of September, 2021.

**BY THE COURT:**

Marcia S. Krieger
Senior United States District Judge