**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:16-cv-02981-MSK-KMT

TECH INSTRUMENTATION, INC., a Colorado corporation, individually and on behalf of all others similarly situated,

              Plaintiff

v.

EURTON ELECTRIC COMPANY, INC., a California corporation

              Defendant

---

**DEFENDANT'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

---

1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Plaintiff seeks summary judgment for its TCPA class, but it fails to establish Article III standing for any class member.  Regardless, Eurton has both oral and documentary evidence of prior express permission or invitation.  Because Plaintiff lacks standing for an opt-out notice claim, Eurton's established business relationship ("EBR") presents triable issues for Plaintiff's class. Plaintiff's Motion for Summary Judgment should be denied in its entirety.

### II. FACTS

Eurton supplies and repairs electric motors. (Declaration of John Buchanan, ¶ 4.) It is a small business with 30 employees.  (Buchanan Decl. ¶ 4.)  Eurton engaged a company called WestFax to mount an advertising campaign via fax to a list of recipients that Eurton supplied. (Buchanan Decl. ¶ 8.)  This list included Plaintiff Tech Instrumentation Inc.  (TII) and over 1,000 other people/businesses.  (Buchanan Decl. ¶ 9.)  Eurton developed the list by locating potential customers online and cold calling them to ask whether they would be interested in receiving more information.  (Buchanan Decl. ¶¶ 12-16.)  Eurton does not have records of who it faxed. (Buchanan Decl. ¶ 10-11.)   A subpoena to WestFax only produced invoices.  (Declaration of Stephen A. Watkins, ¶ 2 & Ex. 15.)

#### A. Eurton's Three-Step Process

Eurton's three step process for obtaining fax consent is described as follows:

First Step:  Eurton's practice was to first locate businesses online that might use motors in their operations.  (Buchanan Decl. ¶ 13.)

Second Step:  Cold-call those businesses and ask whether the business would be interested in receiving more information.  (Buchanan Decl. ¶ 14.)

Third Step:  The company policy was to then ask the businesses if they agreed to receive more information, including by fax.  (Buchanan Decl. ¶ 15.)

The deposition testimony of Eurton established the broad parameters of Eurton's three-step process, but more specifically, Eurton's representative would first identify his or herself, and

{00161749;1}

state what Eurton does, namely that Eurton rewinds small electric motors and supplies motor repairing parts. (Buchanan Decl. ¶ 16)  Then the representative would state "Can I speak with repair department or someone who handles with that?" or a variation thereof.  (Buchanan Decl. ¶ 17)

Once Eurton reached that person, it would ask them "Do you have need for such a service? We can offer a unique, special rewinding service for people in your industry, and supply electric motor repair items for those who repair them in house." (Buchanan Decl. ¶ 18)  Eurton's representative would then state, "I can send you a flyer periodically explaining our products and services."  (Buchanan Decl. ¶ 19)  For example, the flyers alleged to be sent to Plaintiff are the types of flyers explaining its products and services contemplated by Eurton's dialogue with potential customers.  (Buchanan Decl. ¶ 20)  At that point, if the target agreed, Eurton would state, "can I have your fax number."  (Buchanan Decl. ¶ 21)

Eurton asserts this three-step process by itself establishes consent to fax advertisements.

**B.    Eurton's Forms**

Eurton has also produced various credit applications, customer update forms and data quote forms whereby individuals provided their fax number prior to being faxed product information. The three-step process and the credit applications were not an "either or" proposition.  It is possible a cold call led to an individual being interested in a credit application in order to do business on an ongoing basis.  (Buchanan Decl. ¶ 58)  In other words, fax numbers were provided during the life span of the consumer relationship.  Given that the persons provided class notice were from Eurton's customer records, it is likely the majority of those individuals are Eurton customers.  (Buchanan Decl. ¶ 45).

**C.    Eurton's Prior Permission Forms**

In 2019, Eurton directly contacted its customers to verify their company information and their prior consent to receive faxes during the class period.  (Buchanan Decl. ¶ 92)  Many of these individuals specifically mentioned the "three step" process.  (Buchanan Decl. ¶ 92)

These signed prior permission forms state:

> Eurton Electric has had permission to contact us via: phone calls, faxes, emails, and mailings.  Sending flyers, catalogs, postcard, etc. to keep us informed on the latest rewinds, repair parts, products, sales and specials offered from time to time.  Eurton Electric has had this permission more than 5 years, and we are looking forward to continue the possibility of working together with Eurton Electric for many years to come.

Ex. 14 to Buchanan Decl. at EE001291.

### D.     Persons Given Notice

The Court directed that class notice be sent to the following persons or entities:

(i)        those listed on Eurton's 2017 fax logs;

(ii)       those listed on any existing iteration of Eurton's "fax list"; and

(iii)      those who do not meet either of the first two criteria, but who are noted as having a fax number in either Eurton's accounting database or on its potential customer/actual customer spreadsheet.

(ECF 72-4 )

On January 30, 2020, notice was sent to the individuals presumably associated with the 1,498 numbers forth in EE001-33 (See Dkt. 86 at 3.)  Notice was sent to the second class list on June 12, 2020.  (Watkins Decl.¶ 25.)  That Second List totaled, 2,378 fax numbers.  Eurton has evidence of consent for at least 409 of the 1498 numbers in the First List and 505 of 2,378 numbers on the Second List.  Plaintiff's request for classwide summary judgment should be denied.

## III.    ARGUMENT

### A.     Plaintiff's Burden on Summary Judgment

A motion for summary judgment is to be granted if the movant shows that (1) there is no genuine dispute as to any material fact of the claims on which judgment is sought, and (2) the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  When, as is the case here, the plaintiff moves for summary judgment, the plaintiff bears the initial burden of demonstrating "that there is an absence of evidence to support the [defendant's] case."  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  Once this burden is satisfied, to avoid summary judgment, defendant must designate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Ultimately, "summary

{00161749;1}

judgment will not lie if [there is a] dispute about a material fact [that] is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the party opposing the motion, and resolve all doubts in favor of the existence of triable issues of fact. *World of Sleep, Inc. v. La–Z–Boy Chair Co*., 756 F.2d 1467, 1474 (10th Cir. 1985),

### B.    Eurton Should Be Permitted to Present Its Documentary Evidence

Plaintiff's Motion argues that Eurton "waived" its right to assert documentary evidence in support of its defenses.  (Dkt 105 at 4-5.)  Plaintiff is essentially arguing that Eurton's supplemental disclosures with this evidence were untimely and should be excluded pursuant to Rule 37(c)(1). Rule 26(e)(1)(A) requires a party to supplement its initial disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A).   Rule 37(c) instructs that if "a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).   Eurton produced the documents relating to its defenses in supplemental disclosures on February 27, 2020, June 10, 2020, July 8, 2020 and July 30, 2020.  (See Declaration of Stephen A. Watkins, Ex. 18 ) However, the Court's Order held that merits discovery was closed as of January 4, 2019.  (Dkt 100 at 4)

There is no bright line rule that supplementation of disclosures is improper if made after the close of discovery.  *American Gen. Life Ins. Co. v. Vistana Condo. Owners Assoc*., 2016 WL 1611585, at *2 (D. Nev. Apr. 21, 2016).   The Rule 37(c)(1) inquiry as to whether the belated disclosure was harmless "depends upon several factors that a district court should consider in exercising its discretion." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J*., 663 F.3d 1124, 1129 (10th Cir. 2011). These factors include: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or

{00161749;1}

willfulness." *Woodworker's Supply, Inc., v. Principal Mut. Life Ins. Co*., 170 F.3d 985, 993 (10th Cir. 1999).

In the context of considering whether a district court properly excluded evidence because a party failed to comply with rule 26(a) or (e), the Tenth Circuit has explained: "The parties to a litigation are not merely players in a game, trying to catch each other out. Rather, litigation should promote the finding of the truth, and, wherever possible, the resolution of cases on their merits." *Gillum v. United States*, 309 Fed.Appx. 267, 270 (10th Cir. 2009).

In *Gillum*, the Tenth Circuit determined that a party's failure to produce a written expert report in compliance with rule 26(a)(2)(B) did not warrant the extreme sanction of excluding the expert's testimony. *See* 309 Fed.Appx. at 269–70. The district court had found that the inadequate expert report prejudiced the United States, but the Tenth Circuit held that the district court "abused its discretion in analyzing the 'cure factor,' " because the district court "focused on the fact that the inadequate report permanently deprived the United States of the opportunity to confront [the expert] ... 'flat-footed.' " 309 Fed.Appx. at 270.

The Tenth Circuit held that this analysis was faulty, because the plaintiff had arranged for the United States to depose the expert a second time before the end of the discovery period, and the plaintiff could cover the United States' costs for a second deposition.  See 309 Fed.Appx. at 270. While stating that "[b]y no means do we condone the provision of inadequate expert report and begrudging snippets of information, and we caution that parties who behave in this manner act to their peril," the Tenth Circuit held that the total exclusion of the expert's testimony was unnecessary.  309 Fed.Appx. at 370.

There was no bad faith in producing these documents after the merits discovery cutoff. They were produced once Eurton was made aware of their utility after a change in counsel.  (John Buchanan Decl. ¶ 48)  The trial is not disrupted as there is no trial date set.

Although Plaintiff did not have these documents in order to take discovery, Plaintiff had these documents within sufficient time to request reopening discovery as to these documents, as they were served over a year ago.  Regardless, the Court itself has analyzed these documents in

the context of Eurton's motion for decertification.  That same motion put Plaintiff on notice of the arguments Eurton would make with respect to these documents.  Therefore, even if these documents surprised Plaintiff, the prejudice was cured and the Court should not exclude this evidence.  *See Gillum, supra*.   Moreover, as Plaintiff did not meet and confer as to its implicit Rule 37(c)(1) motion, that is grounds alone to deny it.  *See, e.g., Allen v. Wal-Mart Stores, Inc*., No. 19-CV-03594-KLM, 2021 WL 4133914, at *3 (D. Colo. Sept. 10, 2021).

## C.    Plaintiff's TCPA Claim

To prevail on a claim under the TCPA and its implementing regulations, plaintiff must show that defendant: "(1) used a telephone facsimile machine, computer or other device to send a facsimile; (2) the facsimile was unsolicited; and (3) the facsimile constituted an advertisement." *Hinman v. M and M Rental Cente*r, 545 F. Supp. 2d 802, 805 (N.D.Ill.2008).  *See also* 47 U.S.C. § 227(b)(1)(C); 47 C.F.R. § 64.1200(a)(4).

## D.    Eurton's Defenses

TCPA only prohibits faxed advertisements that are "unsolicited."  *Physicians Healthsource, Inc. v. Cephalon, Inc*., 954 F.3d 615, 618–19 (3d Cir. 2020) [hereinafter *Cephalon*].  An "unsolicited advertisement," is that which is sent "to any person without that person's prior express invitation or permission, in writing or otherwise." *Id.* § 227(a)(5). Thus, fax advertisements sent with the recipient's prior express invitation or permission (i.e., solicited faxes) are not violative of the TCPA.  *Id.*  Plaintiff asserts that it is Eurton's burden to demonstrate this defense.

The TCPA also has a defense based on its "established business relationship" with its customers.  The TCPA prohibits a party from sending unsolicited fax advertisements unless the sender and the recipient have an established business relationship ("EBR"), the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, and the advertisement contains an adequate opt-out notice. 47 U.S.C. §§ 227(b)(1)(C), (b)(2)(D)-(E). Federal regulations define "established business relationship" as:

> a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a business or residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the

business or residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party.

47 C.F.R. § 64.1200(f)(6).

Therefore, if a sufficient opt-out notice is provided and the number was voluntarily provided, EBR is a complete defense to a TCPA unsolicited fax claim.

### E.     Plaintiff fails to show who received a fax

Plaintiff's motion asserts that "the only remaining issue to resolve is whether TII and the Class gave prior express permission or invitation to receive the fax advertisements" (Dkt 105 at 2), but Plaintiff has not met its burden on summary judgment to demonstrate who was sent a fax. The Court already has held that Tech has not identified who actually received faxes:

> The time is ripe for Tech to explain how it will corelate the information it has obtained in order to identify the members of the class who actually received unsolicited faxed advertisements. Tech will make that showing in a notice filed with the Court, supported by such evidence as may be necessary to evaluate the accuracy and efficiency of that method, within 30 days of this Order.

(Dkt 102 at 21.)

When a TCPA plaintiff cannot show every class member received the offending communication, class-wide summary judgment should be denied. *Hossfeld v. Lifewatch, Inc.*, No. 1:13-CV-9305, 2021 WL 1422785, at *5 (N.D. Ill. Feb. 5, 2021). In *Hossfeld*, the plaintiff asserted the following TCPA class: "all individuals in the United States who received one or more phone calls directed to a telephone number assigned to a cellular service using an automated telephone dialing system or an artificial or prerecorded message made by, on behalf of, or for the benefit of Lifewatch, Inc. from October 16, 2013 through the present." *Id.* at *1.

The plaintiff moved for summary judgment on the issue of that "third-party marketers used an artificial or prerecorded message in every call to Class members." *Id.* The plaintiffs in *Hossfeld* presented evidence, including statements from multiple individuals, that prerecorded messages were used by at least some telemarketers working with a telemarketer. *Id.* at *5.

In opposition to the plaintiff's claims, the defendant in *Hossfeld* presented declaratory evidence that telemarketers neither engaged in robocalling nor did anything illegal in connection with their marketing activities related to defendant. *Id.* The Court held that "Based on this counter

{00161749;1}

evidence, the Court cannot conclude as a matter of law that every call made by telemarketers working with Lifewatch included a prerecorded message." *Id.*  It therefore denied summary judgment on that issue. *Id.*

Eurton asserts it was unlikely the 2,378 persons in Eurton's database that do not overlap with the Initial List that was given class notice were faxed. (Buchanan Decl. ¶ 42) The Initial List was primarily based on the Tool List for Mailer 5-2009, and the Tool List was generally Eurton's running record of persons actually faxed.   Buchanan Decl. ¶ 43)  Just because Eurton possessed names, address, telephone numbers, fax numbers in the database did not mean they were faxed. (Buchanan Decl. ¶ 44)

For the same reason, not everyone in the database was mailed or called on the phone.  It was simply a database.  (Buchanan Decl. ¶ 44)  The fact that the Initial List does not wholly overlap with the database bears this out.  (Buchanan Decl. ¶ 44)

Plaintiff has not shown that Eurton used a telephone facsimile machine, computer or other device to send a facsimile to every class member.  Therefore, per *Hossfeld*, summary judgment should be denied on this ground alone and this issue remains for trial, despite Plaintiff's claim that only remaining issue in this case is Eurton's consent defense.

C.    **Eurton is entitled to trial on its defense of prior express invitation or permission**

Eurton's evidence of consent argues against classwide summary judgment.  *Booth v. Appstack, Inc*., No. C13-1533JLR, 2016 WL 3030256, at *13 (W.D. Wash. May 25, 2016), *order clarified*, No. C13-1533JLR, 2016 WL 3620798 (W.D. Wash. June 28, 2016).  In that case, the plaintiffs sued the defendant for "robocalls" made without prior express consent under the TCPA. *Id.* at *1  The defendant obtained phone numbers and other phone number voluntarily provided by prior customers, which the defendant dialed as part of its "win-back campaign." *Id.* at *2.

The plaintiffs in *Booth* argued that the defendants' evidence did not clearly indicate consent for any given phone call.  The Court rejected this argument stating in pertinent part:

> Viewing the evidence is the light most favorable to Defendants, the court concludes
> that there is sufficient circumstantial evidence before the court to reasonably

conclude that some members of the TCPA Class consented. Plaintiffs are correct that Defendants' evidence does not clearly indicate consent for any given phone call. However, Appstack's "win-back campaign" and other marketing efforts make it likely that some portion of the TCPA Class consented. (See 11/14/14 Reiten Decl. Exs. 7, 15 at 10.) Although the consenting portion of the TCPA Class appears to be small, the record demonstrates that the issue is unsuited for summary judgment on a classwide basis.

*Id.*

The Court held that the TCPA Class was entitled to summary judgment on its prima facie claim against the defendant, but the defendant's affirmative defense of consent remained for trial. *Id.* at 13. Eurton's evidence of prior express invitation or permission similarly precludes summary judgment.

### 1. Plaintiff Does not Prevail on Summary Judgment Simply because Eurton Received Oral Evidence of Consent

In our case, every class member was subject to the Eurton's three-step oral process for obtaining consent by definition. Eurton's three-step process establishes consent for every class member and therefore Plaintiff's motion should be denied in its entirety. Plaintiff sole argument is that because Eurton's process was oral, and there are no recordings of the three-step process, Plaintiff is entitled to summary judgment on the issue that the three-step process does not establish prior express permission or invitation. This argument fails for two reasons, as set forth below.

#### a. Testimony Can Establish Oral Evidence of Consent

Contrary to Plaintiff's assertion, an oral agreement can be established via testimony. *Creaghe v. Iowa Home Mut. Cas. Co.,* 323 F.2d 981, 985 (10th Cir. 1963) (citing *Kansas City Southern Ry. Co. v. Keffer*, 96 Okl. 63, 220 P. 361). Moreover, TCPA consent can be established via oral testimony. *See Physicians Healthsource, Inc. v. Cephalon, Inc*., 340 F. Supp. 3d 445, 452 (E.D. Pa. 2018), aff'd, 954 F.3d 615 (3d Cir. 2020) (granting summary judgment whereby defendant "rel[ied] on Dr. Martinez's deposition testimony regarding his contacts with representatives of Cephalon to establish that he gave prior permission to Cephalon to send him information by fax.")

Eurton's oral three-step process specifically sought to obtain consent to faxed

advertisements, prior to doing so.  (Buchanan Decl. ¶¶ 16-21)

That Eurton's oral process sought to obtain permission prior to faxing is reflected by its opt out language which mentions "permission" prior to the fax.

> **PLEASE REMOVE:**  We at Eurton Electric try our best to contact all customers on our list, but understand mistakes occur, or un-authorized permission may have been given.  If you have no need for our repair or parts service, and wish to be removed from future contacts, please fax, e-mail, or phone (below) and let us know the number you wish removed.

(Buchanan Decl. ¶ 22 & Ex. A to Plaintiff's Complaint )

The reason Eurton specifically asked leads whether they consented to receive these faxes was in part sometimes the person Eurton spoke to was not the person that ultimately received the initial fax.  (Buchanan Decl. ¶ 24)   Therefore, if there was confusion when the fax was received, Eurton could inform the recipient at the company who had authorized the fax.  (Buchanan Decl. ¶ 24)

Eurton's three-step process therefore establishes prior express consent, despite Plaintiff's repeated citation to *Physicians Healthsource, Inc. v. A-S Medication Sols.*, *LLC*, 950 F.3d 959, 965–67 (7th Cir. 2020).  In *Physicians Healthsource,* the Seventh Circuit reviewed three different methods of supposed consent. "The first category includes statements suggesting that the individual or entity generally gave permission to receive faxes from [the defendant]. [E]vidence of permission to generally send faxes does not establish prior express permission to fax ads." *Id.* at 966.  The second supposed method of consent set forth in Physicians Healthcare was "post hoc statements that an individual would have given consent," which failed "because they do not show AMS had prior express permission to send the faxes in question." *Id.* (emphasis in original.) Neither of these categories apply in our case.

The third method the defendant argued in *Physicians Healthcare* consisted of "statements that the affiants and their employers consented to receive '[defendant's] product information' at the beginning of their business relationship with [defendant]". *Id.*

The Seventh Circuit made two critical points with respect to evidence of prior express permission or invitation:

(a)     consent that referred to promotional materials or product information regarding products or services not yet purchased, was consent to faxed advertisements, whereas consent to receive product information about a product <u>already purchased</u> was not);

(b)     That one had consented to receive a fax advertisement in the past and would have consented to fax advertisements if asked again does not establish ongoing permission to send fax advertisements. *Id.* at 966.

With respect to this third method, by definition the "cold call" made by Eurton means that they were not yet customers and therefore asking if they agreed to faxes regarding product information satisfies *Physicians Healthcare* that consent was being provided for product information prior to a purchase, not consent to a receive product information about a product already purchased

Moreover, the request of the Eurton representative would have requested "Do we have permission to send faxes periodically" because Eurton is engaged, on a regular basis, in the repair business and the person called would frequently be in need of Eurton's rewinding service and repair products. (Buchanan Decl. ¶ 19)

At a minimum, the testimony of Eurton presents a triable issue as to whether prior express permission or invitation was established with respect to the entire class. *See Cephalon, Booth, supra*. *See also Physicians Healthsource, Inc. v. Masimo Corp*., No. SACV1400001JVSADSX, 2020 WL 5260650, at *7 (C.D. Cal. July 13, 2020) ("Having considered the evidence, the Court finds that there is sufficient evidence for a reasonable jury to conclude that Masimo had an "express invitation or permission" to send advertisements via fax to Plaintiffs as established through SK&A's business practices.")

## 2.      Documents support inference of oral consent

Eurton also has documents that support its assertion that it had oral consent to call class members. *See, e.g., Ung v. Universal Acceptance Corp*., 319 F.R.D. 537, 540 (D. Minn. 2017). In that case, the plaintiff sought to certify a class of "All persons in the United States to whose cellular telephone number [Universal] placed a non-emergency telephone call using the same

software and/or equipment it used to call Plaintiff between July 1, 2012, and February 9, 2015, where the person was identified as a landlord or other reference in UAC's system." *Id.* at 538.

The Court held that "While Ung correctly notes that the declarants do not expressly state the references provided consent, here too it is reasonable to infer from the Declarations that some portion of the in-person references either orally expressed their consent to be contacted or voluntarily provided their cell phone numbers, which would suffice to show prior express consent." *Id.* (citing *In re Rules & Regulations Implementing Tel. Consumer Prot. Act of 1991*, 7 FCC Rcd. 8752, 8769 (Oct. 16, 1992) ("[A]ny [cellular] telephone subscriber who releases his or her telephone number has, in effect, given prior express consent to be called by the entity to which the number was released.... [P]ersons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given.").

In the same manner, for at least 122 class members, Eurton obtained signed statements asserting that Eurton possessed permission to call for more than five years:

> Eurton Electric has had permission to contact us via: phone calls, faxes, emails, and mailings. Sending flyers, catalogs, postcards, etc. to keep us informed on the latest rewinds, repair parts, products, sales and specials offered from time to time.
>
> Eurton Electric has had this permission for more than 5 years, and we are looking forward to continue the possibility of working together with Eurton Electric for many years to come.

(Buchanan Decl. ¶¶ 92-95   & Ex. 14 at 1291; Ex. 16 to Watkins Decl.)

Just as in *Ung*, these documents established an inference that oral consent was provided via Eurton's three step process.  Per *Physicians Healthsource, supra*, at 996, these statements refer sales, specials and products "offered", meaning not yet purchased.  These statements therefore refer to faxed advertisements.  To the extent Plaintiff claims this does not establish ongoing permission (per *Physicians Healthsource, supra* at 996), these statements state "from time to time".  Finally, to the extent Plaintiff asserts this is "after the fact" consent, given that class members would have been subject to the three-step process  and many remembered the process (Buchanan Decl. ¶ 92), it can be inferred that these documents refer to the three-step process that is prior

consent. *World of Sleep*, 756 F.2d at 1474 (inferences favor nonmoving party on summary judgment).

This is the very type of circumstantial evidence of consent that defeated classwide summary judgment in *Booth*. "Although the consenting portion of the TCPA Class appears to be small, the record demonstrates that the issue is unsuited for summary judgment on a classwide basis." *Booth,* 2016 WL 3030256, at *13. Unlike the naked statements in *Physicians Healthcare*, these documents merely confirm the oral consent that was already obtained.

Moreover, Eurton's other forms establish a consent defense. Plaintiff's Motion omits the key sentence in *Physicians Healthsource*. The Seventh Circuit acknowledged the FCC's example of prior express permission, but went on to state:

> "It would be a different matter if the affidavits explicitly suggested that that consent included **promotional materials or product information** regarding products or services not yet purchased."

*Id.* (emphasis added). *See also Cephalon, Inc.*, 954 F.3d at 619 ("The voluntary provision of a number—phone or fax—by a message-recipient to a message-sender, constitutes express consent such that a received message is solicited and thus not prohibited by the TCPA, if the message relates to the reason the number was provided."); *Gorss Motels Inc. v. A.V.M. Enterprises, Inc.*, No. 3:17-CV-01078 (KAD), 2021 WL 1163022, at *7 (D. Conn. Mar. 26, 2021) (same).

The fax numbers provided in Eurton's form relate to the reason the number was provided, as shown below.

| Type of Form | Does form refer to faxed advertisements? Physicians Healthsource, supra, at 996 | Does form contemplate faxes? |
|---|---|---|
| Credit Applications (Ex. 4,5 to Buchanan Decl.) | Yes. "THIS INFORMATION PROVIDES US WITH THE BEST WAY OF CONTACTING YOU FOR ALL NORMAL BUSINESS COMMUNICATIONS INCLUDING NOVICES, SALES ORDERS, **CATALOGS, PROMOTIONAL FLYERS…**" | Yes. |
| Customer Update Form (Exh. 6,7 to | Yes ("Sales Promotions", "Specials", "Catalogs") | Yes |

| Type of Form | Does form refer to faxed advertisements? Physicians Healthsource, supra, at 996 | Does form contemplate faxes? |
|---|---|---|
| Buchanan Decl.) | | |
| Data Quote Form (Ex. 8 to Buchanan Decl.) | The form is faxed to Eurton seeking a "quote". Either a faxed quote is not an advertisement and therefore those types of faxes do not trigger the TCPA or faxing a quote is an advertisement and covered by the form. | Many times the fax number is the only number provided by the person seeking the quote. Buchanan Decl. ¶¶ 82-83. |

Plaintiff makes two arguments that the credit application does not constitute prior express permission or invitation. First, that the forms are not signed, but this is not required by the FCC. Plaintiff treats this FCC language regarding a signature as the exclusive method of establishing prior express permission, but the FCC states it is merely providing an example. The Court in *Gorss Motels Inc. v. A.V.M. Enterprises, Inc*., No. 3:17-CV-01078 (KAD), 2021 WL 1163022, at *4 (D. Conn. Mar. 26, 2021) made this clear, noting Congress also negated the portion of the 2003 FCC Order stating that prior express invitation or permission had to be "obtained in writing, include the recipient's signature, contain a clear indication that he or she consents to receiving such faxed advertisements, and provide the fax number to which faxes are permitted to be sent." *Id.* (citing S. Rep. No. 109-76, at 3 (2005) (citing the 2003 FCC Order).

Congress did so by modifying the definition of "unsolicited advertisement" and adding "in writing or otherwise" to the end of the definition of unsolicited advertisement. *Id.* (citing JFPA, Pub. L. 109-21, § 2, 119 Stat. 359, 362 (emphasis added). Moreover, the Court in *Gorss* stated in pertinent part:

> This change was designed to statutorily prohibit the FCC from promulgating a rule that would require prior express permission to be obtained only in writing. S. Rep. No. 109-76, at 11–12 (2005). The definition has not been amended since, see 47 U.S.C. § 227(a)(5), and the FCC subsequently amended its own regulations to align with the language adopted by Congress. 2006 FCC Order, 21 F.C.C. Rcd. at 3810–11; 47 C.F.R. § 64.1200(f)(15).

*Id.*

Plaintiff's second argument is to parrot the Court's Order denying certification (Dkt 105 at 9), which noted Eurton's forms refer to a list of items to possibly be faxed, only some of which

{00161749;1}

constituted indicated the faxing of an advertisement.  Therefore, the Court contemplated that the consumer may have only intended to agree to certain items on the list, not necessarily the "catalogs and promotional flyers" described.

> The Court does not necessarily share Eurton's confidence that, for example, the language in the Application For Credit form clearly discloses Eurton's intention to fax advertisements, nor reflects the recipient's consent to receive advertisements by fax. A reasonable reading of that form by a recipient might be that, by providing a fax number, the recipient was simply consenting to receive "CREDIT INFORMATION BY FAX" – namely, Eurton's decision as to whether or not credit would be extended. **Or it may be that the recipient was willing to receive faxes for "NORMAL BUSINESS PURPOSES, INCLUDING INVOICES [and] SALES ORDERS," but not necessarily advertising**.

(Dkt 102 at 16, n.9) (emphasis added).

The Court also held this "issue is not presently before the Court and thus, the Court expresses no opinion as to the matter." *Id*.  However, now this issue is now before the Court.

Eurton asserts simply because reference to faxing items such as "CATALOGS, PROMOTIONAL FLYERS" are referred to as part of a larger document does not mean prior express invitation or permission is not established.  In *Travel 100 Grp., Inc. v. Mediterranean Shipping Co. (USA) Inc.*, the Appellate Court of Illinois held that the plaintiff had granted express permission for the challenged faxes where the cover letter to the questionnaire the plaintiff's representative completed stated that providing its contact information would "assure[ ] that suppliers will direct relevant promotions and FAM [familiarization] trip information to our participants." 383 Ill.App.3d 149, 321 Ill.Dec. 516, 889 N.E.2d 781, 785 (2008) (second alteration in original) (quoting questionnaire cover letter).

As Eurton's forms establish consent to be faxed, there is substantial evidence of consent.The chart below sets forth the totals of Eurton's evidence of consent relating to the initial Class List relating to 1,498 fax numbers.

| Credit Applications found in EE1411-1501 "Credit app list…") (Buchanan Decl. ¶ 50 & Ex. 4) | 19 |
|---|---|

| | |
|---|---|
| Data Quote Sheet found in EE2365-3060 "fax flyers…" (Buchanan Decl. ¶¶ 82-85 & Ex. 4) | 32 |
| Update Found in  EE2023-2361 ("List recipient")  (Buchanan Decl. ¶¶ 59-63 & Ex.7) | 152 |
| Update Found in EE03061-3946 "Customer Masters…" (Buchanan Decl. ¶¶ 59-63 & Ex.7) | 290 |
| Prior Permission forms EE01290-1410 ((Buchanan Decl. ¶¶ 92-95 & Ex.15) | 112 |
| Excluding duplicates | **409**[1] |

Pursuant the foregoing, at there is evidence of consent for at least 409 of the 1,498 numbers on the Initial List.  With respect to the Supplemental List, Eurton has evidence for at least 505 (See Ex. 19 to Watkins Decl., Ex. 2 to Buchanan Decl.) of those 2,738 given class notice.

Given that inferences are to be made in favor of Eurton in opposing summary judgement, at a minimum, these documents present a triable issue of whether these documents establish consent to call the class.

Plaintiff cannot meet its burden to show faxes were sent to the entire class, and Eurton has shown its affirmative defense of consent remains at a minimum for trial.  Plaintiff's Motion should be denied in its entirety.

**C.      Plaintiff's class lacks standing**

**1.      No standing for faxes**

As shown above, as Plaintiff cannot establish who in the class received faxes.  Therefore summary judgment should be denied on the grounds its class lacks standing.  *See, e.g., Langer v. Colorado Pro. Bldg., LLC*, No. CV1802267SJOFFM, 2019 WL 4143307, at *3 (C.D. Cal. June 10, 2019) ("Although Defendants do not bring a separate motion for summary judgment that raises the standing issue, they argue in their opposition that Plaintiff lacks Article III standing).  Every class member must have Article III standing in order to recover individual damages. "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208, 210 L. Ed. 2d 568 (2021). *TransUnion* also

---

[1] See Ex. 16 to Watkins Decl.

{00161749;1}

confirms that "[a] plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.' " *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  *TransUnion* did not "address the distinct question whether every class member must demonstrate standing before a court certifies a class." 141 S. Ct. at 2208 n.4. However, given that Plaintiff's class is certified, its identification plan must identify class members with standing.

The alleged Article III injury from TCPA faxes is using paper and toner and time in response to the defendant's fax.  *See, e.g., Craftwood II, Inc. v. Generac Power Sys., Inc*., 920 F.3d 479 (7th Cir. 2019).  Without any showing that the class received faxes, they cannot show any Article III standing.  Summary judgment should be denied on this ground.

### 2.    No standing for opt-out notice

Summary judgment should also be denied because Plaintiff's class members lack Article III standing to assert their opt-out notice claims.  *See, e.g., St. Louis Heart Ctr., Inc. v. Nomax, Inc*., 899 F.3d 500, 504-05 (8th Cir. 2018) (concluding that "[a]ny technical violation in the opt-out notices thus did not cause actual harm or create a risk of real harm" such that the plaintiff "lacked Article III standing").

The Court in *TransUnion* clarified the statement in *Spokeo* where the Court said that "the risk of real harm" (or as the Court otherwise stated, a "material risk of harm") can sometimes "satisfy the requirement of concreteness."  *Spokeo*, 578 U. S., at 341–342, 136 S.Ct. 1540 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013)).  The Supreme Court in *TransUnion* held that this statement was confined to suits for injunctive relief, such as in *Clapper*.  141 S. Ct. at 2210.

In contrast, with respect to a suit for damages, the Court in *TransUnion* held that the mere risk of future harm, standing alone, could not qualify as a concrete harm.  *Id.* at 2210-2211. Instead, plaintiffs seeking damages must demonstrate that the "the risk of future harm materialized," or that the plaintiffs "were independently harmed by their exposure to the risk itself."  *Id.* at 2211.

With respect to claims relating to a defective opt out notice, the Court in *Robert W. Mauthe, M.D., P.C. v. MCMC LLC*, 387 F. Supp. 3d 551, 564 (E.D. Pa. 2019) [hereinafter *Mauthe*] held that the TCPA requires a valid opt-out notice on faxes sent in connection with an EBR because Congress "determined it was necessary to provide recipients with the ability to stop future unwanted faxes sent pursuant to such relationships." S. Rep. No. 109-76 at 7. "That requirement reflects that a consumer very likely will be less annoyed—and have his privacy less intruded upon—by an unsolicited fax if he knows there is 'a cost-free mechanism' to ensure he will not receive additional faxes in the future."

Eurton asserts that harm described in *Mauthe* and similar decisions is the very "risk of harm" that is now rejected in *TransUnion* when seeking statutory damages. The harm would only materialize if the consumer believed that he could not opt out and acted accordingly. Otherwise, there would be a bare informational injury, which does not establish standing under *TransUnion*. An "asserted informational injury that causes no adverse effects cannot satisfy Article III." 141 S. Ct. 2190, at 2214. Given that Plaintiff is seeking monetary damages, its class lacks standing to assert claims based on a defective opt-out notice.

The Seventh Circuit's decision in *Casillas v. Madison Ave. Assocs., Inc*., 926 F.3d 329 (7th Cir. 2019) is instructive. In that case, the plaintiff in *Casillas* contended that the defendant violated 15 U.S.C. § 1692g(a) by failing to provide consumers with adequate notice about preserving their statutory rights to dispute their debt. *Id*. at 333–34. The plaintiff, however, did not assert any actual harm or risk of harm. She "complained only that her notice was missing some information" that the statute requires, without claiming that the defendant's mistake put her "in harm's way." *Id.* at 334.

In the same manner, unless class members who received these unidentified faxes can identify upon the "deficient" opt-out notice, there is no Article III standing. Plaintiff has not alleged that the class did not opt out or could not opt out as a result of the lack of opt-out notice. Therefore, there was no actual harm or risk of real harm to trigger Article III standing, and therefore Eurton's EBR defense is viable.

{00161749;1}

### G.      Eurton's EBR defense

Because Plaintiff lacks standing to assert its opt-out notice claims, all that remains is Plaintiff's unsolicited advertisement claims, which are therefore subject to Eurton's EBR defenses to the class.  Such defense would requiring showing that that there was an EBR and that the fax number was voluntarily communicated within the context of such established business relationship, from the recipient of the unsolicited advertisement, and the advertisement contains an adequate opt-out notice. 47 U.S.C. §§ 227(b)(1)(C).  The term EBR is defined as follows:

> The term established business relationship for purposes of paragraph (a)(4) of this section on the sending of facsimile advertisements means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a business or residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the business or residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party

47 C.F.R. § 64.1200(f)(6).

All of the forms whereby Eurton were provided fax numbers were pursuant to inquiry, transaction or application and thereby establish an EBR for those numbers.  The credit applications were provided when the customer would contact Eurton and request to be set up on account for future business and supply their company relevant information.  (Buchanan Decl. ¶ 34.)  The customer updates were by definition customers of Eurton who had purchased products.  The Data Quote sheets were inquiries or requests for quotes on Eurton products.  (Buchanan Decl. ¶ 82.)

Therefore, there is evidence of at least 409 EBRs out of the 1,498 first list of Class Members. See Ex. 16 to Watkins Decl.  With respect to the Supplemental List, credit applications for 90% of contacts beginning with A, B, or C were able to be located, reflecting 505 numbers of out the total Supplemental List of 2,378.  See Ex. 19 to Watkins Decl.  Review of credit applications and updates for letters D-Z was prohibitive given Eurton's lack of manpower and COVID-19.  (Buchanan Decl. ¶¶ 51-52.)

Given that there is EBR defense for a significant number of class members, classwide

summary judgment should be denied as to Plaintiff's unsolicited faxes claim.

IV.    **<u>CONCLUSION</u>**

Plaintiff's Motion for classwide summary judgment should be denied in its entirety.

November 1, 2021                                          /s/ David J. Kaminski

                                                  David J. Kaminski
                                                  Stephen A. Watkins
                                                  Carlson & Messer LLP
                                                  5901 W. Century Blvd., #1200
                                                  Los Angeles, CA 90045
                                                  kaminskid@cmtlaw.com
                                                  (310) 242-2200

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the 1st day of November 2021, a true and correct copy of the above and foregoing has been served by electronic notification by filing with the Clerk of Court using the CM/ECF system, which sent notification via e-mail to the following:

ppeluso@woodrowpeluso.com
tsmith@woodrowpeluso.com
woodrow@woodrowpeluso.com

   /s/ David J. Kaminski
David J. Kaminski
Stephen A. Watkins
Carlson & Messer LLP
5901 W. Century Blvd., #1200
Los Angeles, CA 90045
kaminskid@cmtlaw.com
(310) 242-2200