**EXHIBIT 17**



1

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF COLORADO

3

4   Tech Instrumentation, Inc., a        )
    Colorado Corporation, individually )
5   and on behalf of all others         )
    similarly situated,                 )
6                                        )
                Plaintiff,               )
7                                        )
        vs.                             ) Case No.
8                                        ) CV 16-02981-KMT
                                         )
9   Eurton Electric Company, Inc., a    )
    California Corporation,             )
10                                       )
                Defendant.               )
11   _____ )

12

13

14

15   DEPOSITION OF JOHN BUCHANAN

16   Tuesday, September 12, 2017

17

18   9:54 A.M.

19   633 W. 5th Street, Suite 900

20   Los Angeles, California 90071

21

22

23   Reported by:
     Maria Beesley
24   CSR 9132, RMR, FCRR
     Job No. 139402
25

**CERTIFIED COPY**

2

```
 1    APPEARANCES OF COUNSEL:

 2


 3    For Plaintiff:

 4           WOODROW & PELUSO
             BY:  STEVEN L. WOODROW, ESQ.
 5           3900 E. Mexico Avenue, Suite 300
             Denver, Colorado 80210
 6           720.213.0676

 7


 8
      For Defendant:
 9
             ALVARADO SMITH
10           BY:  THEODORE BACON, ESQ.
             633 W. 5th Street, Suite 900
11           Los Angeles, California 90071
             213.229.2400
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                          I N D E X

2     WITNESS:   JOHN BUCHANAN

3     EXAMINATION BY                              PAGE

4     By Mr. Woodrow....................................4

5                          EXHIBITS

6

7     EXHIBIT  DESCRIPTION                        PAGE

8

9        1     Notice of Deposition........................12

10       2     Westfax Response to Subpoena................41

11       3     Sample faxes................................61

12       4     Fax Opt-out.................................79

13       5     Preliminary Statement.......................84

14       6     Invoice dated 5/14/16.......................124

15

16

17

18

19

20

21

22

23

24

25

4

```
1                    LOS ANGELES, CALIFORNIA

2              TUESDAY, SEPTEMBER 12, 2017, 9:54 A.M.

3

4                        JOHN BUCHANAN,

5         having been first duly sworn, was examined and

6                     testified as follows:

7                          EXAMINATION

8    BY MR. WOODROW:

9         Q.    Good morning.

10              My name is Steven Woodrow.   I'm an attorney in

11   the lawsuit.

12              Can you say and spell your full name for the

13   record?

14        A.    John Buchanan, J-o-h-n, B-u-c-h-a-n-a-n.

15        Q.    What is your date of birth?

16        A.    7/13/62.

17        Q.    Have you ever been deposed before?

18        A.    No.

19        Q.    Okay.  So just a few ground rules that I'm

20   sure your attorney went over, but I'm going to do it

21   again, so bear with me.

22              One thing is I'm going to be asking you

23   questions and it's very important for the sake of the

24   court reporter's fingers that you wait until I'm done

25   talking until you answer.
```

13

1          MR. BACON:  No, you are not.  Just so we're

2     clear.

3          THE WITNESS:  Not under any drugs or alcohol,

4     yes.

5          MR. WOODROW:  I appreciate the clarity of the

6     record.  The witness has testified he is not under the

7     influence of any drugs or alcohol.

8          MR. BACON:  It's all good.  Thank you.

9     BY MR. WOODROW:

10         Q.   Mr. Buchanan, have you had a chance to look at

11    it?

12         A.   I have.

13         Q.   Do you see on page 4 where it says Schedule A

14    Deposition Topics?

15         A.   Yes.

16         Q.   And do you see 11 topics there?

17         A.   I do.

18         Q.   And have you seen this document before?

19         A.   I have.

20         Q.   Before today?

21         A.   Yes.

22         Q.   And had you had a chance to review it before

23    today?

24         A.   Briefly, yes.

25         Q.   With respect to topic number one, "Your

14

1    causing faxes to be sent to plaintiff and others," what

2    did you do to prepare yourself today to answer questions

3    about topic number one?

4         A.   I'm not following.  What did I do?

5         Q.   Did you review any documents to prepare

6    yourself to answer questions about topic number one?

7         A.   No, I did not.

8         Q.   Other than your attorney, did you have any

9    conversations with anyone about topic number one to

10   prepare for today?

11        A.   No.

12        Q.   Did you do anything else other than talking

13   with your attorney to prepare for topic number one?

14        A.   No.  Topic number one confused me a little bit

15   by what the meaning of the question was.

16        Q.   Okay.  Topic number one isn't a question

17   though, is it?

18        A.   It doesn't have a question mark, no.

19        Q.   It says "Your causing of faxes to be sent to

20   plaintiff and others."  Correct?

21        A.   Yes.

22        Q.   And that confuses you?

23        A.   Yeah, exactly what your meaning of this was.

24   I mean, what did you mean?

25        Q.   So you were confused.  Did you do anything to

1    get clarification on deposition topic number one?

2         A.    Reading your definitions below.

3         Q.    Anything else?

4         A.    It didn't help me, but no, nothing after that.

5              MR. BACON:  Other than talking to counsel, you

6    can answer that.  You did talk to me.  What we said is

7    privileged, but the fact that you talked to me is

8    something you can mention.

9              THE WITNESS:  Okay.  Other than that.

10   BY MR. WOODROW:

11        Q.    Other than speaking with counsel?

12        A.    Yeah.

13        Q.    And your counsel is Mr. Bacon?

14        A.    Yes.

15        Q.    Was that conversation in person or over the

16   phone?

17        A.    Phone.

18        Q.    How long did it last?

19        A.    Few minutes.

20        Q.    How much time would you say that you spent

21   talking with your counsel about topic number one?

22             And again, I don't want to know the substance

23   of the conversation.  I merely want to know the length

24   of the conversation about topic number one.

25        A.    Yesterday or in total?

16

1      Q.    In total to prepare for today's deposition.

2      A.    Minutes; less than 10.

3      Q.    And that's just on topic number one?

4      A.    Perhaps 1 through 11, but...

5      Q.    Is it possible that you spent a total of 11 --

6    10 to 11 minutes talking with your counsel about all 11

7    topics?

8      A.    It is possible.

9      Q.    Do you think you spoke with your counsel

10   longer than that?

11     A.    No.

12     Q.    So with respect to topic number two, "Your

13   relationship and communications with WestFax," did you

14   review any documents to prepare yourself to testify

15   about topic number two?

16     A.    No.

17     Q.    Did you speak with your attorney about topic

18   number two to prepare for today?

19     A.    I don't recall if number two was covered.

20     Q.    Did you do anything else to prepare to answer

21   questions about topic number two?

22     A.    No.

23     Q.    Number three, "Your practices related to

24   complying with the TCPA or JFPA."

25            Did you review any documents to prepare

1   yourself to answer questions about topic three?

2        A.    No.

3        Q.    Did you talk about number three with your

4   lawyer?

5        A.    I don't believe we did.

6        Q.    Did you do anything else to prepare yourself

7   to answer questions about topic number three today?

8        A.    No.

9        Q.    Same question with number four, "The drafting

10  and production of your faxes."

11             Did you review any documents to prepare

12  yourself to answer questions about topic number four?

13       A.    I'm trying to calculate.  I did look up and

14  briefly look up a congressional ruling on faxes,

15  unsolicited faxes.

16       Q.    Are we going back to number three?

17       A.    No, we're on four.

18       Q.    Okay.

19       A.    And I did that.  That's about the only

20  preparation I did on that.

21       Q.    Do you remember what the ruling was?

22       A.    Yes.  I mean --

23       Q.    What is it?

24       A.    It's in my favor.  But I don't have the

25  verbiage in front of me.

18

1       Q.    What do you believe is in your favor about the

2   ruling?

3       A.    It was about solicited and unsolicited fax,

4   how Congress ruled what is a solicited fax and the

5   opt-out clause not being necessary for solicited faxes,

6   and was.

7       Q.    So you looked up that ruling?

8       A.    The only one I saw, yes.

9       Q.    You didn't look up any others?

10      A.    No.

11      Q.    Had you looked up that -- did you look up that

12  ruling in preparation for the deposition today?

13      A.    Yes, just a review.

14      Q.    Did you do anything with respect to topic

15  four, though, with regard to the drafting and production

16  of your faxes?  Did you do anything to prepare to answer

17  questions about that other than look up this ruling?

18      A.    No.

19      Q.    Did you have any conversations about topic

20  number four?

21      A.    No.

22      Q.    Number five, "Your three-step process for

23  obtaining express permission to send faxes as set forth

24  in your amended answers to Request to Produce No. 2 and

25  Interrogatory No. 1 served June 7, 2017."

19

1          Did you do anything to prepare yourself to

2     answer questions today about topic five?

3          A.   Prepare myself for this, only the answers I

4     gave and the interrogatories.  I mean, other than that,

5     I didn't prepare further than that.

6          Q.   So you're saying that you reviewed your

7     answers to Request to Produce No. 2 in the

8     interrogatories?

9          A.   No.  I knew my answers so I didn't review

10    them.

11         Q.   So did you actually do anything to prepare to

12    answer questions about topic number five?

13         A.   When?

14         Q.   Prior to today, in preparation for today's

15    deposition --

16         A.   Right.

17         Q.   -- did you do anything to prepare yourself to

18    answer questions about topic number five?

19         A.   Wouldn't answering the questions in the

20    interrogatory be preparation?

21         Q.   Sure.  Apart from answering discovery earlier

22    in the case, I'm talking about specifically to get

23    yourself ready for today to come and answer questions.

24         Did you review your discovery responses that

25    you had served earlier in the case as part of your

1   preparation for today?

2        A.   I did not need to review them.  So I mean,

3   when I answered would be the preparation for answering

4   the questions.

5             MR. BACON:  Just so we're clear, he is

6   entitled to know if you did anything further to prepare.

7   If you already knew the answer and didn't prepare, you

8   can just -- because you already knew the answer, you can

9   tell him that.  He is entitled to find out if there is

10  anything else you looked at or persons you talked to.

11            THE WITNESS:  Anything other than that, no.

12            MR. BACON:  If you already knew the answer,

13  you didn't have to look at stuff, you can tell him that.

14  That's where we're going.

15            THE WITNESS:  I was hoping that was implied.

16  BY MR. WOODROW:

17       Q.   Nothing is implied.  I want to know express,

18  everything.  Pretend -- and this is going to be easy for

19  you -- pretend like I'm an idiot.

20            Did you talk to anyone, other than your

21  lawyer, about topic number five to prepare yourself to

22  answer questions about topic number five?

23       A.   No.

24       Q.   And when you say you spoke with your lawyer

25  about topic number five, is that part of the 10 or

21

1    11-minute discussion that you referenced earlier?

2        A.   Yes, when we covered all the overview of this

3    whole thing.

4        Q.   Topic number six.  "The training of your

5    personnel in your three-step process for obtaining

6    express permission to send faxes as set forth in your

7    amended answers to Request to Produce No. 2 and

8    Interrogatory No. 1 served June 7, 2017."

9            Same question:  Did you do anything to prepare

10   yourself to testify today about topic number six?

11       A.   No.

12       Q.   You never reviewed any documentation?

13       A.   No.

14       Q.   And you didn't talk with anyone other than

15   your lawyer?

16       A.   Correct.

17       Q.   And your conversation with your lawyer was

18   part of the 10 or 11-minute discussion you have already

19   referenced?

20       A.   Exactly, yes.

21       Q.   Moving on to number seven, "Your list of fax

22   numbers and procedures for updating your list."

23           Did you review any documents to prepare

24   yourself to answer questions about topic seven?

25       A.   No.

22

1      Q.   Did you talk with anyone other than your

2  lawyer?

3      A.   No.

4      Q.   And with respect to your attorney, did you

5  speak with him about topic seven just for the 10 or 11

6  minutes that we have already talked about?

7      A.   No.  This subject, this question wasn't

8  brought up.

9      Q.   At all?

10     A.   Yesterday?  No, correct.

11     Q.   It wasn't brought up at all?

12     A.   Correct.

13     Q.   Number eight, "All opt-outs from your faxes."

14         Did you review any documents to prepare

15  yourself to testify today about topic number eight?

16     A.   No.

17     Q.   Did you talk with anyone other than your

18  lawyer about topic number eight?

19     A.   No.

20     Q.   And did you talk with your lawyer about topic

21  eight?

22     A.   Perhaps in general terms, nothing specific.

23  But it may have been covered.

24     Q.   And number nine, "And all transactions or

25  sales between you and plaintiff."

23

1          Did you review any documents to prepare

2   yourself to testify about topic nine?

3          A.    No.

4          Q.    Did you have any conversation with anyone to

5   prepare yourself to testify about topic nine?

6          A.    No.

7          Q.    Topic 10, "Your access to data, reports, or

8   other information regarding the number of persons you

9   caused to be faxed and the number of faxes sent to each

10  such person."

11         Did you review any documents to prepare

12  yourself to answer questions about topic 10?

13         A.    No.

14         Q.    Did you have any discussions with anyone about

15  topic 10 to prepare yourself?

16         A.    No.

17         Q.    Including your lawyer?

18         A.    In yesterday's conversation, no, we didn't

19  cover topic 10.

20         Q.    Have you ever talked about topic 10 with

21  anyone, not just in preparation for this deposition, but

22  ever?

23         A.    With my attorney.

24         Q.    Okay.  Number 11, "Your efforts to preserve

25  information in this lawsuit."

24

1          Did you do anything to prepare yourself to

2   answer questions about topic 11?

3          A.    No.

4          Q.    Did you review any documents --

5          A.    No.

6          Q.    -- to prepare yourself to testify about topic

7   11?

8          A.    No.

9          Q.    Did you have any conversations with anyone

10   about topic 11?

11          A.    It could have been covered in our conversation

12   yesterday.

13          Q.    The 10 --

14          A.    With my attorney.

15          Q.    The 10 or 11-minute discussion?

16          A.    Yes.

17          Q.    Aside from that 10 or 11-minute discussion and

18   reviewing no documents other than the, I think it's an

19   FCC ruling you referenced, other than doing that, did

20   you do anything else to prepare for today's deposition?

21          A.    No.

22          Q.    You hired WestFax to send faxes; is that

23   correct?

24          A.    By hiring them, you mean did I enter into a

25   contract?  They did the faxes for me and I paid them to

32

1      A.    Exactly.

2      Q.    Describe the reports to me.  You talked

3   briefly about them saying it would show you which faxes

4   were marked received and which ones failed to send; is

5   that correct?

6      A.    Correct.

7      Q.    Do you remember anything else about the

8   reports?

9      A.    Have you seen the list, the fax list?

10         MR. BACON:  You don't get to ask questions,

11   sorry.  But just to the extent you know.

12         THE WITNESS:  Okay.  I'll tell you about --

13   the fax list is just a list of numbers.

14   BY MR. WOODROW:

15      Q.    I'm talking about the reports.

16      A.    Well, no --

17      Q.    I want to --

18      A.    -- the list of numbers would be on the report.

19      Q.    How so?  In what?  You saw the reports, I

20   didn't.  So I want to know what's on.

21      A.    I would submit the fax numbers.

22         MR. BACON:  All he wants to know is what the

23   report looks like; what information is on the report

24   itself.

25         THE WITNESS:  It has the fax numbers listed.

33

1   It has the date it went through and whether or not they

2   were good, busy, bad numbers.  And you know, no contact

3   of any kind, and remove these, and these are the good

4   numbers, these are the bad ones.

5   BY MR. WOODROW:

6        Q.   So the reports would indicate the numbers that

7   faxes were sent to; correct?

8        A.   Yes.

9        Q.   It would also indicate which of those numbers

10   received faxes; correct?

11        A.   Yeah.

12        Q.   It would also indicate which of those numbers

13   returned a busy signal; isn't that correct?

14        A.   Correct.

15        Q.   It would also let you know which ones had some

16   sort of data transmission error; isn't that correct?

17        A.   Yeah.  For whatever reason would not be

18   deliverable.

19        Q.   The ones that you would remove, did you only

20   use the reports to remove the numbers that were

21   unworking or undeliverable or did you remove even the

22   ones with the busy signal?

23        A.   Generally, I would just keep the ones that

24   were good numbers and the busy numbers.

25        Q.   Because the busy numbers could still be a good

34

1    number, they just could have been busy at the time of

2    transmission; correct?

3        A.    Correct.

4        Q.    But what about a number where there was a

5    transmission data error, would you remove that number or

6    keep it?

7        A.    I would remove generally remove them all.

8        Q.    What else would cause you to remove a number

9    from the list?

10       A.    If I got a request.

11       Q.    And how many requests have you received in the

12   last 10 years?

13       A.    I have no idea.  Very few.

14       Q.    Do you remember how many you produced in this

15   case?

16       A.    How many?

17       Q.    Requests.

18       A.    For removal?

19       Q.    Yes.

20       A.    No, I don't know.

21       Q.    Does two sound about right?

22       A.    There would be some time I could fax that and

23   I would get zero.  Other times I may get more than two.

24       Q.    I'm talking about people who reached out and

25   contacted you directly by e-mail or phone call to say I

35

1    would like to be removed from faxes.

2         A.    Right.

3         Q.    You actually produced evidence in discovery in

4    this case of a couple opt-out requests.

5              Do you remember that?

6         A.    I do because those are the only ones I had,

7    yeah.

8         Q.    Is it your testimony that there were more and

9    you just don't have the e-mails anymore?

10        A.    Correct.  Yeah.

11        Q.    About how many more?

12        A.    If we would get asked, I would take the

13   number, remove them from the list, update the list, and

14   it would be gone.

15        Q.    And then you would probably delete the e-mail?

16        A.    I'd delete the e-mail or usually, the funny

17   thing is, more people would fax it back to me.

18        Q.    And what would you do with those faxes?

19        A.    I would tell them please don't fax me.

20        Q.    Would you remove them from the list?

21        A.    Yes, of course.

22        Q.    Would you save the fax or throw it out?

23        A.    I would throw it out after I removed them.

24        Q.    Okay.  So there is no pile of faxes sitting

25   somewhere from people asking you not to fax them

36

1   anymore?

2       A.   Correct.

3       Q.   And aside from the two e-mails that you have

4   produced, there are no other e-mails of people

5   requesting that you remove them from the list?

6       A.   To the best of my knowledge, yes.

7       Q.   What did you do to search your e-mails?

8       A.   Well, they would come to me.   Our e-mail is

9   listed on the flier.

10      Q.   I mean in terms of producing information in

11  this case, I assume that the e-mails that were produced

12  were found in your e-mail system; correct?

13      A.   Yes.

14      Q.   Do you use Outlook?

15      A.   No.

16      Q.   Do you use gmail?

17      A.   Yes.

18      Q.   So did you have to search your gmail for those

19  requests?

20      A.   No.   Generally, they would come in my in box.

21      Q.   I mean the two that you produced in the case.

22      A.   Yes.   I searched for those.

23      Q.   Do you remember what search terms you used?

24      A.   No.

25      Q.   Do you remember how long you searched for?

1    "solicited faxes."

2          Q.   That's interesting, because when I was reading

3    this saying that your opt-out language was faulty, you

4    said, oh, but it says unsolicited.

5          So now you are telling me I have to define

6    "unsolicited."  It's a word you just used.

7                MR. BACON:  Do you know what he means by

8    "solicited"?

9                THE WITNESS:  No.

10               MR. BACON:  Please explain.

11   BY MR. WOODROW:

12         Q.   With permission.

13         A.   That's not the definition.

14         Q.   What is the definition of "solicited"?

15         A.   You have to look it up, but I have read it.

16   And if we don't have it here in front of us, I don't

17   think I should -- we should review it in answer because

18   solicited is people that have given permission, do

19   business with, and potentially can do business with,

20   amongst other things.

21               And by that definition, all these are

22   solicited faxes.

23         Q.   So by your definition you think you sent a

24   solicited fax to my client?

25         A.   By the definition I believe I sent solicited

56

1    faxes to everyone on that list.

2         Q.   Including my client?

3         A.   Yes.  Because of our policy as well.

4         Q.   Do you have any evidence that my client agreed

5    to receive faxes from you?

6         A.   I have no evidence from your client.

7         Q.   So sitting here today you are guessing you

8    sent solicited faxes to my client?

9         A.   As our policy states on the flier, that we do

10   try our best to contact everyone on that list, get

11   permission, and then do it.

12        If we make a mistake, and mistakes can be

13   made, just let us know and we'll remove you.

14        So yes, I'm assuming by our policy Tech

15   Instrumentation was contacted.

16        Q.   Before you sent the fax?

17        A.   Yes.

18        Q.   But you don't have any proof.  You are just

19   saying it based on your --

20        A.   It would be --

21        Q.   Stop.  Let me finish the question before you

22   interrupt, sir.

23        So you are just guessing based on your company

24   policy that the fax to my client must have been

25   solicited because it's your company policy to send only

57

1    solicited faxes; correct?

2        A.   It's an educated assumption, yes.

3        Q.   You don't actually have proof do you?

4        A.   I have no written proof from Tech

5    Instrumentation.

6        Q.   Do you have any oral proof?

7        A.   From Tech Instrumentation?

8        Q.   Yes.

9        A.   What would be oral proof?

10       Q.   Do you have a recording of a conversation?

11       A.   No.

12       Q.   Do you have any e-mails?

13       A.   I did have a conversation with Tech

14    Instrumentation.

15       Q.   After the lawsuit was filed; correct?

16       A.   It was.  I did.

17       Q.   I'm talking about before you sent faxes to

18    Tech Instrumentation, do you have any recordings of

19    conversations?

20       A.   Sorry, we don't do that.

21       Q.   Do you have any e-mails from Tech

22    Instrumentation?

23       A.   If I had, they would have been deleted and I

24    don't think so.

25       Q.   Do you have any recorded conversations with

58

1   any person you have sent faxes to indicating their

2   consent to receive faxes?

3        A.   We do not record conversations.

4        Q.   So is that a no?

5        A.   Correct.

6        Q.   Do you have any e-mails from any person

7   indicating their consent to receive faxes from Eurton

8   Electric?

9        A.   I don't know.  I have never checked for that.

10        Q.   You have done no search in this case for types

11   of e-mails?

12        A.   For that particular question I don't think I

13   have ever searched.

14        Q.   So you have done no search for e-mails in this

15   case of proofs of consent from your customers or people

16   on your faxes?

17        A.   Can you say that again, rephrase that?

18        Q.   Sitting here today, you have done no search

19   prior to today for any e-mails evidencing proof of

20   consent from any person you sent a fax to indicating

21   their consent to receive the fax?

22        A.   Yes.

23        Q.   Yes, you have done no search?

24        A.   Yes, I have done no search.

25        Q.   So sitting here today, are you aware of any

59

 1    e-mails in your possession that evidence someone

 2    agreeing or consenting to receive a fax from you?

 3         A.   Well, that's confusing.  I may have some.

 4         Q.   Where might they be?

 5         A.   I would imagine they would be in my e-mails.

 6         Q.   You are unsure because you haven't searched

 7    yet?

 8         A.   Well, I haven't searched for e-mails.  You are

 9    asking a different question.

10         Q.   Okay.  So you haven't searched for e-mails.

11    And sitting here today you think you might have some;

12    correct?

13         A.   Might have some --

14         Q.   E-mails.

15         A.   -- e-mails.  Concerning?

16         Q.   People indicating that they would like to

17    receive faxes from you.

18         A.   I have no -- I have done no search for that

19    type of thing.

20         Q.   Right.

21              And sitting here today you don't actually know

22    whether you have any such e-mails in your possession;

23    correct?

24         A.   I don't know.

25         Q.   What don't you know?

60

1          MR. BACON:  He doesn't know the answer to the

2  question.

3          Can we take a break?

4          MR. WOODROW:  Can we wait five minutes?  I

5  want an answer to the question.

6          MR. BACON:  I'd like to take a break.  I

7  thought you said we could take a break when we wanted to

8  take a break.  He answered the question.

9          MR. WOODROW:  I don't think he did, Ted.

10          MR. BACON:  You said does he know, and he said

11  "I don't know."

12  BY MR. WOODROW:

13      Q.   Do you not know whether or not you have

14  e-mails?

15      A.   I know I have e-mails.

16      Q.   E-mails where someone is agreeing -- don't be

17  cute -- e-mails where someone is agreeing or consenting

18  to receive faxes from you, do you know if you have those

19  e-mails or are you unsure?

20      A.   I'm unsure if I have e-mails from -- just so I

21  know, you are asking do I have e-mails from people on

22  that list?

23      Q.   E-mails from anyone asking to get faxes from

24  you.  How's that?

25      A.   Giving permission to get faxes?

61

1    Q.   Yeah.

2    A.   I imagine if I did, that would be -- we'd have

3  no case, or you'd have no case.

4         MR. BACON:  Are you aware of any?

5         MR. WOODROW:  Ted, can we get him to answer

6  the question?

7         MR. BACON:  He's answered like five times.  He

8  doesn't know, unsure, "I don't know."  I'm not going to

9  come out --

10        MR. WOODROW:  Ted, but then he goes off on a

11 little explanation about having no case.  What does that

12 mean?  You know that's not responsive.

13        What we need to know is the answer to the

14 question, does he have any e-mails, okay, where someone

15 asked to get faxes or consented and said yes, send me

16 faxes.

17        He either can say:  Yes, I have those e-mails;

18 no, I don't have those e-mails; or, I'm unsure if I have

19 those e-mails.

20        THE WITNESS:  I'm unsure if I have those

21 e-mails.

22        MR. BACON:  Done.  Let's take a break.

23                      (Recess.)

24 BY MR. WOODROW:

25    Q.   I'm going to show you what we're marking as

65

1   number removed, you would remove them; correct?

2      A.   Yes.

3      Q.   And are you aware of the TCPA, sitting here

4   today?

5      A.   Yes.  I haven't read the whole -- everything

6   they have, but major parts.

7      Q.   You have some familiarity with it today?

8      A.   Now, yes.

9      Q.   And some familiarity with this section of the

10   TCPA that's referred to as the Junk Fax Prevention Act?

11      A.   I would have to read that again just to say

12   I'm familiar with it.

13      Q.   I'll represent to you that it's the part of

14   the TCPA that deals with faxes and it's why we're here.

15      A.   But that's to unsolicited faxes.

16      MR. BACON:  Just answer the question.

17   BY MR. WOODROW:

18      Q.   But we have already established that you have

19   no evidence that any fax sent to my client was

20   solicited; correct?

21      A.   No.

22      Q.   You do have evidence?

23      A.   I'm sorry.  Evidence, no.  No evidence.

24   You're right.

25      Q.   In fact, you don't have evidence, sitting here

66

1 today, that any of the faxes you sent were solicited;

2 correct?

3      A.   I need to clarify what we said earlier.  Yes.

4 To answer the earlier question prior to this lawsuit, I

5 had no evidence or e-mails.

6           MR. BACON:  Today, as of this lawsuit, do you

7 have any evidence that prior to this lawsuit you had any

8 permission; is that correct?

9           THE WITNESS:  I had no tangible or physical

10 evidence.

11 BY MR. WOODROW:

12      Q.   When you say "no tangible or physical

13 evidence," are you saying that you just have memories of

14 conversations?

15      A.   Well, our policy is to contact everybody and

16 that's what I gave instructions for them to follow

17 what's on this flier.

18      Q.   Okay.  Who did you give instructions to?

19      A.   People -- employees.

20      Q.   Of Eurton Electric?

21      A.   Yes.

22      Q.   How many employees were part of this process?

23      A.   Well, over the years we have had telemarketers

24 in and out to call and contact, and usually I would have

25 no more than two.

67

1      Q.   So two people at any give time?

2      A.   At any given time.  And we went years without

3 having any.  So that would be -- but the most at any

4 given time was two.

5      Q.   What would you instruct these individuals?

6      A.   Well, they call, introduce the company.

7 Explain what we do and ask permission to contact them

8 via fax, e-mail, or mail.  Get their attention, their

9 e-mail address.  And then mail, e-mail, or fax some

10 information on us.

11      Q.   And that's been your policy from the get-go?

12      A.   Mm-hmm.  It says -- that's why it's on there.

13      Q.   But I want know, this "please remove" language

14 is slightly different from what you're instructing the

15 marketers; right?  You give them more than just three

16 sentences; correct?

17      A.   Well, that's part of the introduction of

18 Eurton Electric.  We introduce ourselves, explain what

19 we do and how we can be of value to them.  And if they

20 agree, then they allow us to send them something or

21 e-mail or fax.

22      Q.   Are the marketers put in a room to do this?

23      A.   I have a room currently to do this specific

24 thing.  Otherwise, some of them were in various

25 locations in the company.

68

1      Q.    Where would they get the phone numbers to call

2  people and ask them if they wanted to receive faxes?

3      A.    The computer.

4      Q.    Like they would go on the computer and get

5  the number?

6      A.    Well, the number I would give them is via

7  computer.

8      Q.    So you would locate numbers of potential

9  customers of Eurton?

10     A.    Yes.

11     Q.    How would you do that?  You would go online?

12     A.    Any number of ways.  I mean, people -- online

13 is certainly one of them.  People would contact us.

14 They're current customers or potential customers.  And

15 online would be probably the primary source of

16 collecting data.

17     Q.    We're not talking about your current

18 customers.  We're just going to talk about the potential

19 ones.

20           You would go onto, what, Google and look up

21 companies and get their phone numbers?

22     A.    That's one way, yes.

23     Q.    Were there other ways?

24     A.    Sure.  Say we do business with a Dewalt

25 service center.  They have a hundred Dewalt service

69

1   centers so I would solicit Dewalt to give me all their

2   service centers that way.  It would be other than just a

3   Google search, something like that.  A rental yard has

4   400 stores.  They would say, here's all our stores.

5   That's type of thing.

6         So it wouldn't necessarily involve Google, but

7   that's only one avenue.  So there are other avenues.

8      Q.   But you would get a list of numbers and

9   provide it with the -- provide that list to the

10   marketers for them to call and solicit permission?

11      A.   Yes.

12      Q.   How many numbers would you provide them at a

13   time?

14      A.   I don't know.  Whatever is on the list,

15   however many I compile.  If I had 10 on a list at one

16   point, I would give them 10.  If somebody gave me a

17   hundred, like if Dewalt said here's all our service

18   centers, here's 150, that kind of stuff.

19         So it could vary all the time.

20      Q.   Do they make these calls just with their cell

21   phones or do they work computer phones?

22      A.   I think originally they were landline phones.

23   At some point some used cell phones, and now we're using

24   a -- like a Google phone, whatever.  It plugs in a wifi

25   phone.

1   there is that group of people who never made it into the

2   main system but had sales?

3       A.   Right.

4       Q.   But they would still be on your spreadsheet

5   from which you made the fax list; correct?

6       A.   The potential customer spreadsheet, yeah.

7       Q.   We call it a potential customer spreadsheet,

8   but it has some actual customers?

9       A.   It has many, many actual customers.

10       Q.   But they're not your all-stars, correct, that

11   you would enter into your system?

12       A.   No, they could be all-stars on the list.

13       Q.   And you haven't put them in your system yet?

14       A.   No.  Some of them are on the system, some of

15   them wouldn't be in the system yet, and some of them are

16   not.

17       Q.   So the list is a work in progress?

18       A.   Yeah.

19       Q.   So some of those customers on the potential

20   customer -- actual customer list do actually make it

21   into the system?

22       A.   Yes.

23       Q.   So let's, for the sake of the record, be clear

24   on three things; right?  You have your company system;

25   correct?

102

 1     A.   Mm-hmm.

 2     Q.   We call that the network?

 3     A.   Yeah.  Our accounting database system,

 4  whatever that's in.

 5     Q.   That's better because I don't work for you.

 6  So whatever you want to call it.  The accounting

 7  database system.

 8          So that's what I have called the master list

 9  that has names, addresses, fax numbers, and sales;

10  correct?

11     A.   Of people that have done business with us.

12     Q.   Correct.  And it's not complete, is it?

13     A.   Correct.

14     Q.   Because you have a middle spreadsheet of,

15  we'll call it the potential customer spreadsheet that

16  actually has potential customers and some actual

17  customers on it; correct?

18     A.   Yes.  Our customers that have given us faxing

19  because you want to keep your current customers up to

20  speed on what you do, and potential customers, showing

21  them what you do, that's what's on the list.

22     Q.   Okay.  And then a third list is the fax list

23  which is the numbers that you have pulled from that

24  second spreadsheet; correct?

25     A.   Correct.

103

1    Q.    Have you done a search of these three data

2    sets to figure out if there has been any sales to Tech

3    Instrumentation?

4    A.    I did check on Tech Instrumentation, yes.

5    Q.    And you didn't find --

6    A.    I didn't find anything.

7    Q.    Did you find any indication of a date when

8    permission was obtained to send the faxes?

9    A.    No.  Of course, that was -- we never did that.

10   We didn't track that.

11   Q.    But if I wanted to find out if another person

12   who got faxes had sales with you, I could take a look at

13   the fax number from the fax list, you can run it through

14   your system, and if it's on the master list because

15   their company was entered into the system at some point,

16   we would be able to look at their sales; correct?

17   A.    Yes, if they're a regular customer with us.

18   Q.    You said that the process would be tedious.

19   Why is that?

20   A.    We would have to take each number and take it

21   back, research it, find out, and then do the next

22   number.  That's why.

23   Q.    How long do you think it takes to do per

24   number?

25   A.    Probably one to -- it depends on what you find

1      A.   Correct.

2           MR. WOODROW:  You want to break now?

3           MR. BACON:  That's fine.

4           MR. WOODROW:  Let's come back at 10 'til.

5           (Luncheon recess was taken)

6    BY MR. WOODROW:

7      Q.   Mr. Buchanan, we're going to try to plow

8    through the rest of my questions as efficiently as

9    possible.

10          So before we broke for lunch, you described

11   three basic buckets of information.  We have the Eurton

12   system database, that's number one.  Number two is the

13   potential/actual customer spreadsheet.  That's number

14   two.  And then number three is the fax list.

15          Do you recall testifying about those three

16   sets of information?

17     A.   Yes.

18     Q.   Does the potential/actual customer

19   spreadsheet, that Excel file that we have been talking

20   about as number two, does that have every customer who

21   would be in the system database, bucket number one?

22     A.   Does it have every one that's in the -- no.

23     Q.   It only includes some of those in the first

24   group?

25     A.   Right.  Exactly.

1    Q.   Why would someone be in the system database,

2    but not on the spreadsheet of potential and actual

3    customers?

4    A.   The one on the potential and actual would be

5    -- oh.  This particular list of this fax sheet, it's

6    just to specific potential customers in a specific area,

7    like the service industry.  I may have another list for

8    the medical industry.

9    Q.   Okay.  So this potential/actual customer

10   spreadsheet, the Excel file that we're talking about is

11   just for what type of customer?

12   A.   Electric motor repair, power tool repair,

13   service, and other repair, service industry people.

14   Q.   Okay.  So then there would be folks in the

15   system database who might be there as a customer for

16   health care or some other sector?

17   A.   Right, that wouldn't be on this list because

18   medical is a different -- would be a different list.

19   Q.   When an entry is made into the system

20   database, that's bucket number one, does the database or

21   the system make any notation as to when that record was

22   created?

23   A.   I don't know.

24   Q.   So, you've indicated in your responses to

25   discovery that when someone would respond to the

112

1    language, the opt-out language on your faxes -- and we

2    have two examples of people inquiring, asking to be

3    removed -- you indicate in your discovery responses that

4    you would remove them immediately; is that right?

5         A.   I would, yes.

6         Q.   Take me through that process.  How would you

7    remove them immediately?  Would you delete them from

8    just the fax list?  Would you delete them from the

9    patient -- potential customer spreadsheet?  Would you

10   delete their entry into the system database?  Tell me

11   how it's done.

12        A.   It would be I would get a notification, like

13   for example, if I got this one.

14        Q.   For the record, you are pointing to the one of

15   the two e-mails that we went over before?

16        A.   Yes.

17        Q.   Okay.  So you would get the first request?

18        A.   I would go to the fax list where his number

19   was and remove it from there.

20        Q.   But that --

21        A.   And then delete this e-mail.

22        Q.   Okay.  But that potential customer or actual

23   customer, their record would still appear on the

24   potential customer spreadsheet from which the fax list

25   was made originally; correct?

113

1    A.   Correct.  But that fax sheet is not used for

2  faxing.

3    Q.   I'm sorry, what?

4    A.   On that spreadsheet, those numbers would never

5  be faxed.  Only the fax list would be faxed.

6    Q.   Right.  And you get the fax list from the fax

7  numbers on the second group which we call the potential

8  customer, actual customer spreadsheet.

9    A.   Correct.

10    Q.   But my point is, you wouldn't then go to the

11  spreadsheet and delete them entirely.  You would just

12  delete their fax number off the fax list?

13    A.   Oh, correct.  Correct.  I have customers that

14  have said -- current customers that didn't want to be

15  faxed anymore.  They prefer e-mails.  And so I would

16  take them -- so they're still there for reference and

17  contacting, just not through faxing.

18    Q.   Do you have a computer background?

19    A.   Only using it for a long time, but no, no

20  technical repair.

21    Q.   You don't have a degree in computer science?

22    A.   No.

23    Q.   Would you know whether or not your new office

24  computer would have your logins to the WestFax website

25  for when you visited the website?

114

1      A.    No.

2      Q.    Do you know if your old computer would have

3   had that?

4      A.    No.

5      Q.    You didn't do any search for that type of

6   information, did you?

7      A.    No.

8      Q.    And you haven't produced any website logs or

9   browser, internet browser history in this case?

10     A.    No.

11     Q.    And you haven't searched for any?

12     A.    No.

13     Q.    With respect to the potential/actual customer

14   spreadsheet, the Excel file, do you maintain that as a

15   native file on your computer?

16     A.    As a what?

17     Q.    A native Excel file.

18           MR. BACON:  Do you know what that means?

19           THE WITNESS:  I don't know what native Excel

20   file means.

21   BY MR. WOODROW:

22     Q.    Just an Excel file.  So you haven't converted

23   into a PDF or a TIF.  It stays as an Excel file.

24     A.    Oh.  Well, this particular list is like an

25   Excel file on the cloud.

115

1      Q.    Okay.

2      A.    It's a Google Sheet.

3      Q.    This is number two, the potential/actual

4    customer spreadsheet?

5      A.    The potential/actual customer.

6      Q.    Is a Google Sheet?

7      A.    Yes.

8      Q.    Was it at one point an Excel file and now it's

9    a Google Sheet?

10      A.    Yes.

11      Q.    Do you still have the original Excel file?

12      A.    I believe I do.

13      Q.    Don't delete it.

14            Do you recall when you transferred the

15    information from the Excel file to the Google Sheet?

16      A.    Yes.  May or June.

17      Q.    Of this year?

18      A.    Yes.

19      Q.    After the lawsuit was filed?

20      A.    Yes.

21      Q.    Does the Google Sheet still provide you with

22    the same functionality?  You are still able to pull

23    numbers from a particular column and make the separate

24    fax list?

25      A.    I haven't made a separate fax list out of it,

135

1    case; correct?

2       A.   Correct.

3       Q.   And then on the 7/16/16, the first three I

4    rule out, but then it says armatures and parts, tools

5    CSV fax list, 1499 quantity.

6         Would you say that's our list?

7       A.   Yes.

8       Q.   The 7/23/16 invoice is not our list?

9       A.   Correct.

10       Q.   The 7/30/16 with those two entries, either of

11   those is our list; correct?

12      A.   Correct.

13      Q.   The 8/13 invoice with the Rigid 300 parts,

14   that's not our list?

15      A.   Correct.

16      Q.   The 8/20/16 welding equipment, welding CVS,

17   that is not our list; right?

18      A.   Correct.

19      Q.   And that brings us to the 8/27 invoice.  We're

20   down to 8/25/16, cords and protectors tools CSV fax

21   list, that's our list, but the four that come before

22   that are not?

23      A.   Are not, correct.

24      Q.   And it's your testimony that that's the last

25   entry in 2016 of our list?

136

1      A.   Yes.

2      Q.   So if I had the invoices from 2015, '14 and

3   '13, could I apply essentially the same logic and figure

4   out which entries on those invoices featured our list

5   versus a difference list?

6      A.   If you got this from WestFax you mean for

7   those years?  Yeah, it would show similar, I would

8   imagine.

9      Q.   So if there were entries for tools and being

10   sent to around 1500 people, I know from all the other

11   entries on the invoice that's the list in our case?

12      A.   That would be the one, yes.

13      Q.   So at any given time the people who got the

14   faxes that my clients got was only about 1500 people?

15      A.   Yeah.

16      Q.   Was the opt-out language the same on all your

17   faxes, though?

18      A.   Yes.

19      Q.   So it didn't matter what list you are on?

20      A.   Yeah.  If I'm autopsy saws, cast saws, RV, the

21   opt-out language is the same.

22      Q.   And do you generate those fax lists, those

23   separate ones in the same way as you did the tools fax

24   list?

25      A.   Yes.

137

1      Q.   And you do that by doing some sort of data
2    export from what was an Excel spreadsheet which is now a
3    Google Sheet?
4      A.   Yes.
5      Q.   Do you have to go through each entry and
6    decide which list every business is going to be on?
7      A.   Yes.
8      Q.   Do some businesses appear on multiple lists?
9      A.   It can, yes, some.  Usually they are
10   separated.  You can see autopsy saws wouldn't have much
11   to do with tools.  That kind of thing.
12          So it's easy.  Sometimes it's blurred,
13   sometimes it's easy.
14     Q.   I'm sure there is a joke somewhere in there
15   from someone much funnier than me.
16     A.   Yes, there are some good ones.
17     Q.   Do you believe that in the last four years you
18   have probably gotten fewer than 10 opt-out requests?
19   You showed us two.
20     A.   Fewer than 10 total?
21     Q.   Yes.
22     A.   No.  Are we talking off of this list?
23     Q.   Sure.
24     A.   In the last four years?
25     Q.   Yes.

138

1       A.    No, I believe there's probably been more.

2       Q.    How many would you say?

3       A.    Like I said, our opt-out rate is really,

4 really low when I get things back.

5       Q.    I know. That's why I said is it lower than

6 10.

7       A.    I can't really tell you. On this particular

8 list, it may be lower than 20.

9       Q.    How about total, all your lists?

10       A.    All the lists? Same type of -- we have the

11 same type percentage because we go through and get

12 approvals, depending on the list. You can see some of

13 the lists are very small. Like on page 1, for example,

14 there is only 193. I don't get any back on that. It's

15 zero.

16       But with the larger numbers -- in fact, it's

17 funny, on this particular one, Rental Yards, you can see

18 it's 1800. I specifically remember that, not getting

19 any back.

20       Q.    How does that -- what about that?

21       A.    It just means that everything is good.

22       Q.    What about that triggered your memory?

23       A.    Because it was big. And it was big and I

24 usually -- I could get one, something like that. Or

25 like I say, one or two off a list. But not to get